25 CV 02097

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

PLAINTIFFS SETH STERN, ANGELA
BINDNER, and MARIANNE SCHMITT,
on their own behalf, on behalf of all others
similarly situated, and on behalf of the
JPMorgan Chase Health Care and Insurance
Program for Active Employees and its
component Medical Plan,

        Plaintiffs,

    v.

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK N.A., JPMORGAN CHASE
U.S. BENEFITS EXECUTIVE,
JPMORGAN CHASE COMPENSATION &
MANAGEMENT DEVELOPMENT
COMMITTEE, BERNADETTE J.
BRANOSKY, STEPHEN B. BURKE,
LINDA B. BAMMANN, TODD A.
COMBS, AND VIRGINIA M. ROMETTY,

        Defendants.

Civil Action No. _____

**REDACTED**

## CLASS ACTION COMPLAINT

Plaintiffs Seth Stern, Angela Bindner, and Marianne Schmitt, individually, on behalf of all

others similarly situated, and on behalf of the JPMorgan Chase Health Care and Insurance Program

for Active Employees and its component Medical Plan (the "Plan" or "JPMorgan Plan"), bring

this action under 29 U.S.C. § 1132 against Defendants JPMorgan Chase & Co. and JPMorgan

Chase Bank N.A. (collectively, "JPMorgan"), the JPMorgan Chase U.S. Benefits Executive, the

JPMorgan Chase Compensation & Management Development Committee, Bernadette J.

Branosky, Stephen B. Burke, Linda B. Bammann, Todd A. Combs, and Virginia M. Rometty, for

breaches of fiduciary duties and prohibited transactions under the Employee Retirement Income

Security Act ("ERISA"), as amended, 29 U.S.C. §§ 1001-1461, and state and allege as follows:

1.      Congress enacted ERISA in the wake of several high-profile scandals involving employers that mismanaged their employee benefits programs.  This mismanagement inflicted millions of dollars of harm on employees and their dependents.  ERISA was designed to put an end to this mismanagement and protect employee benefit plan participants from their employers' waste and misconduct.  It does so by "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans," and by providing plan participants and beneficiaries with "appropriate remedies, sanctions, and ready access to the Federal courts" when plan fiduciaries mismanage ERISA plans.  29 U.S.C. § 1001(b).  Courts have referred to ERISA's fiduciary duties as "the highest known to the law."

2.      ERISA subjects anyone with discretionary authority over an employee benefits plan to fiduciary duties derived from the law of trusts.  Relevant here, ERISA's "duty of prudence" requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).  Among other things, ERISA's duty of prudence requires plan fiduciaries to make a diligent effort to compare alternative service providers in the marketplace, seek to minimize the expenses paid for the goods and services to be provided, and continuously monitor plan expenses to ensure they remain reasonable and appropriate under the circumstances. In addition, ERISA's "duty of loyalty" under 29 U.S.C. § 1104(a)(1)(A) requires fiduciaries to discharge their duties for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan.

3.      This case principally involves Defendants' systematic mismanagement of JPMorgan's prescription-drug benefits program under the Plan. Over the past several years,

Defendants breached their fiduciary duties by agreeing to grossly inflated prescription drug prices, costing the JPMorgan Plan and its participants/beneficiaries millions of dollars through higher payments for prescription drugs, higher premiums, higher out-of-pocket costs, higher deductibles, higher coinsurance, higher copays, and suppressed wages. Defendants' mismanagement is evident from, among other things, the prices the Plan agreed to pay one of its vendors—its Pharmacy Benefits Manager ("PBM")—for many generic drugs that are widely available at drastically lower prices.

4.     The stark disparity in prices that Defendants accepted is illustrated by teriflunomide (generic Aubagio, used to treat multiple sclerosis). Anyone with a 30-unit prescription for the teriflunomide could fill that prescription, *without even using their insurance*, at Rite Aid for $32.96, Wegmans for $34.71, ShopRite for $29.24, or from Cost Plus Drugs online pharmacy for $11.05. Defendants, however, agreed and/or allowed the Plan and its participants/beneficiaries to pay *$6,229* for each 30-unit teriflunomide prescription. The burden for that massive overpayment falls on JPMorgan's ERISA Plan, which pays most of the agreed amount from Plan assets, and on participants/beneficiaries of the Plan, who pay more in the form of increased premiums and increased out-of-pocket costs. No prudent fiduciary would agree or allow for its plan and participants/beneficiaries pay a price that is *more than two hundred times* higher than the price available to any individual who just walks into a pharmacy and pays out-of-pocket, and *five hundred sixty times* higher than the price available with just a few clicks online.



Cash Price Using No Insurance



Price Using JPMorgan Plan

5.     The roughly $6,200 (per-prescription) difference between a reasonable price for teriflunomide and what JPMorgan's ERISA Plan and participants/beneficiaries pay for the exact same drug goes largely into the pockets of the Plan's PBM vendor (Caremark), at the expense of the Plan and its participants/beneficiaries.

6.     This mismanagement extends across the entire prescription-drug plan. For all 366 generic drugs on the Plan's formulary with publicly available pharmacy acquisition cost data,

Defendants agreed and/or allowed for the Plan and its participants/beneficiaries pay an average markup of over *211%* above what it costs pharmacies to acquire those same drugs. In other words, Defendants agreed and/or allowed for the Plan and its participants/beneficiaries to pay the Plan's PBM, on average, about *three times* as much as the PBM paid for those very same drugs.

7. Defendants failed to satisfy their fiduciary obligations at multiple steps in the process of administering prescription-drug benefits. Defendants failed to exercise prudence and failed to act in the interest of participants and beneficiaries in selecting a PBM, in agreeing to allow the Plan and its beneficiaries to pay unreasonable prices for prescription drugs based on unreasonable methodologies, in agreeing to contract terms with the PBM that needlessly allow the PBM to enrich itself at the expense of the Plan and its participants/beneficiaries, in failing to monitor the PBM and the prices charged for prescription drugs, in failing to address conflicts of interest, in failing to actively manage and take reasonable measures oversee key aspects of the company's prescription-drug program, and failing to take available steps to rein in the PBM's profiteering, protect Plan assets, and avoid unnecessary costs to participants and beneficiaries and protect their interests.

8. The price discrepancies noted herein are illustrative of a pervasive and systematic problem of unreasonable prescription drug charges, despite well-known alternatives available to Defendants. Among other things, Defendants should have: used their bargaining power to obtain better rates from their own PBM or another traditional PBM; moved all or parts of their prescription-drug plan to a "pass-through" PBM that bases its prices on actual pharmacy acquisition costs rather than inflated and manipulable benchmarks; directed substantial portions of their prescription-drug program to a well-known online pharmacy that charges only a modest markup above acquisition cost; and/or taken other steps detailed below. Yet Defendants have

instead chosen to force the Plan and covered participants and beneficiaries to acquire drugs via some of the most expensive methods conceivable.

9. ERISA requires Defendants to make a diligent and thorough comparison of alternative service providers in the marketplace, to seek to minimize the costs for the goods and services to be provided, and to continuously monitor Plan expenses and ensure that they remain reasonable under the circumstances. Defendants did not do those things, and certainly not to the extent ERISA requires. Defendants breached their fiduciary duties by failing to engage in a prudent and reasoned decision-making process. If Defendants had engaged in a prudent and reasoned decision-making process, they would have known of, and adopted, many of the numerous options that would have drastically lowered the cost of prescription drugs, and would have resulted in other cost savings for the Plan and its participants and beneficiaries. Implementing those available options would have saved the Plan and its participants/beneficiaries millions of dollars over the proposed class period.

10. Defendants' failure to take these measures was not merely inattentive or negligent – it was willful. JPMorgan's own trade organizations recommended the very types of measures that Defendants failed to take here. Indeed, at one point, JPMorgan founded a venture, Haven Healthcare, with an eye toward reigning in abuses by PBMs and reducing costs for employer-sponsored health plans and their participants/beneficiaries. However, JPMorgan later backed away from Haven Healthcare and disregarded the teachings of its trade organizations with respect to PBM oversight and cost control because it did not want to jeopardize its lucrative investment banking and other business interests in the health care space. In short, JPMorgan placed its own business interests ahead of those of the Plan and its participants and beneficiaries in letting matters

slide with respect to the Plan's PBM and prescription drug program, and the costs of that program. This breached Defendants' duty of loyalty under ERISA, in addition to their duty of prudence.

11.    Defendants also violated ERISA's strict prohibitions on transactions with parties-in-interest.  To ensure that plan assets are not wasted through irresponsible outsourcing of fiduciary functions, Congress prohibited all exchanges of property between an ERISA plan and a third-party service provider, all furnishing of services between an ERISA plan and a third-party service provider, and all transfers of assets between an ERISA plan and a third-party service provider unless plan fiduciaries demonstrate that such transactions fall within specifically enumerated prohibited transaction exemptions.  Because Defendants will be unable to show that the compensation paid to Caremark was "reasonable," and because they will be unable to show that any other exemption applies, Defendants also violated ERISA's prohibited-transaction provisions.

12.    To remedy these fiduciary breaches and prohibited transactions, Plaintiffs, individually and on behalf of the Plan and all others similarly situated, bring this action under 29 U.S.C. § 1132 to enforce Defendants' liability under 29 U.S.C. § 1109, to enjoin Defendants from breaching their fiduciary duties and violating ERISA's prohibited transaction rules, to make good to the Plan and its participants and beneficiaries all losses resulting from each fiduciary breach and prohibited transaction, and for other equitable relief specified below.

I.    **PARTIES AND OTHER RELEVANT ENTITIES**

13.    Plaintiff Seth Stern is a "participant" in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Stern began employment with JPMorgan in October 2006 and remains employed by JPMorgan.  Stern paid premiums and purchased prescription drugs through the Plan and has been financially injured by the fiduciary breaches and prohibited transactions alleged herein.

14.     Plaintiff Angela Bindner was a "participant" in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Binder began employment with JPMorgan in November 2001 and ended her employment in November 2022.  Binder paid premiums and purchased prescription drugs through the Plan and has been financially injured by the fiduciary breaches and prohibited transactions alleged herein.

15.     Plaintiff Marianne Schmitt was a "participant" in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Schmitt began employment with JPMorgan in November 2022 and ended her employment in September 2024.  Schmitt paid premiums and purchased prescription drugs through the Plan and has been financially injured by the fiduciary breaches and prohibited transactions alleged herein.

16.     Plaintiffs bring this lawsuit on behalf of themselves, on behalf of all others similarly situated, and on behalf of the JPMorgan Plan, to remedy Defendants' mismanagement of the Plan and to obtain appropriate relief under ERISA.

17.     The Plan is an employee welfare benefit plan as defined at 29 U.S.C. § 1002(2)(A), and is subject to ERISA. The purpose of the Plan is to provide medical benefits, including prescription drug benefits, to employees of JPMorgan, as well as to their family members. According to the Plan's most recent Form 5500 filed with the Department of Labor, "The Plan is administered by a Plan administrator who is appointed by the Board of Directors of JPMorgan Chase or JPMorgan Chase Bank, N.A."  The Plan's prescription-drug benefits are managed by a third-party service provider called CVS Caremark ("Caremark").  The Plan pays Caremark about $3 million annually in administrative fees, plus many millions more in fees that Caremark collects from the Plan and its beneficiaries/participants through its spread pricing and retention of rebates, as described below.

18.     Defendant JPMorgan Chase & Co. ("JPMCo") is a multinational financial services company, which earned approximately $240 billion in revenue in the 2023 fiscal year, placing it 21st on the 2024 Fortune 500.  JPMCo is a Plan "employer" for purposes of ERISA, *see* 29 U.S.C. § 1002(5), and is also a Plan fiduciary that exercises discretionary responsibility, authority, and control with respect to the management and administration of the Plan and the disposition of Plan assets. Together with its subsidiary, JPMorgan Chase Bank N.A., JPMCo exercises overall supervisory authority with respect to the Plan, and on information and belief, was privy to the Plan's contract with Caremark and prescription drug prices under that contract. Accordingly, JPMCo bears direct fault for the overcharges alleged herein. JPMCo also has co-authority and responsibility to appoint the Plan Administrator, and exercises such authority. In addition, JPMCo has unilateral authority and responsibility to appoint the members of the Compensation Committee of its Board of Directors, which also plays an important fiduciary role with respect to the Plan as detailed below.  As an appointing fiduciary, JPMCo has a fiduciary duty to monitor its appointed fiduciaries and ensure their performance satisfies ERISA's fiduciary duties and other statutory requirements.  JPMCo is liable for the fiduciary breaches and other ERISA violations of Plan Administrator and Compensation Committee as an appointing and monitoring fiduciary, and also as a co-fiduciary under 29 U.S.C. § 1105.  Further, JPMCo is responsible for the breaches and other ERISA violations of the JPMorgan U.S. Benefits Executive and/or other persons identified herein because they were acting in the course and scope of their employment, and JPMCo did not make reasonable efforts under the circumstances to remedy the breaches and violations.

19.     Defendant JPMorgan Chase Bank N.A., ("JPMBank") is one of the nation's largest banks and a wholly-owned subsidiary of JPMCo.  JPMBank is the designated "sponsor" of the Plan, a Plan employer, and a fiduciary of the Plan that exercises discretionary responsibility,

authority, and control with respect to the management and administration of the Plan and the disposition of Plan assets. As the plan sponsor, JPMBank has overall supervisory authority with respect to the Plan, and it exercises such authority together with JPMCo. As Plan sponsor, JPMBank was privy to the Plan's contract with Caremark and prescription drug prices under that contract, and shares direct fault for the overcharges alleged herein. JPMBank also has co-authority and responsibility to appoint the Plan Administrator. As an appointing fiduciary, JPMBank has a fiduciary duty to monitor its appointed fiduciaries and ensure their performance satisfies ERISA's fiduciary duties and other statutory requirements. JPMBank is liable for the fiduciary breaches and other ERISA violations of Plan Administrator as an appointing and monitoring fiduciary, and also as a co-fiduciary under 29 U.S.C. § 1105. Further, JPMBank is responsible for the breaches and other ERISA violations of the JPMorgan U.S. Benefits Executive and/or other persons identified herein because they were acting in the course and scope of their employment, and JPMBank did not make reasonable efforts under the circumstances to remedy the breaches and violations.

20. Defendant JPMorgan Chase U.S. Benefits Executive ("Benefits Executive") is the named Plan Administrator, and as such, a named Plan fiduciary. In addition, the Benefits Executive is a functional fiduciary because the Plan Administrator exercises discretionary responsibility, authority, and control with respect to the management and administration of the Plan.

21. Defendant Bernadette J. Branosky has served as the Benefits Executive and Plan Administrator since at least 2015 according to the Plan's Form 5500s filed with the Department of Labor, and as such, is a fiduciary of the Plan.

22. Defendant Compensation & Management Development Committee ("Compensation Committee") has the stated responsibility to "review and approve changes in the

corporation's qualified benefit plans that result in a material change in costs or the benefit levels provided." The Compensation Committee also purports to oversee "the delegation of authority to the Head of Human Resources and the Chief Financial Officer … to appoint the Plan Administrator for employee benefit plans subject to ERISA; approve the Fiduciary Rules; and receive reports regarding the operation of the employee benefit plans."  In these capacities, among others, the Compensation Committee exercises discretionary responsibility, authority, and control with respect to the management and administration of the Plan and the disposition of Plan assets, and serves as a functional fiduciary of the Plan and a co-fiduciary together with the other fiduciaries.

23.     Defendant Stephen B. Burke is a member of the Compensation Committee who has served on the Committee since 2004, and as such, is a fiduciary of the Plan.

24.     Defendant Linda B. Bammann is a member of the Compensation Committee who has served on the Committee since 2013, and as such, is a fiduciary of the Plan.

25.     Defendant Todd A. Combs is a member of the Compensation Committee who has served on the Committee since 2016, and as such, is a fiduciary of the Plan.

26.     Defendant Virginia M. Rometty is a member of the Compensation Committee who has served on the Committee since 2020, and as such, is a fiduciary of the Plan.

27.     All or most of the Plan's expenses are paid from the JPMorgan Chase VEBA Trust for Active Employees ("the Trust"), which is an employer-sponsored trust established under I.R.C. § 501(c)(9) for the payment of medical benefits, including prescription drug benefits, under the Plan.  The Trust's IRS Form 990 submission states: "The primary exempt purpose of the VEBA trust is to provide life insurance, medical, and/or other benefits for certain JPMorgan Chase active employees and their eligible dependents."  The Trust is funded by a combination of employer and employee contributions, along with investment income.  In the most recent year of reporting, the

Plan's participants made approximately $714.15 million in contributions to the Trust. The funds held by the Trust are assets of the Plan and must be used for the exclusive benefit of the Plan's participants and their beneficiaries. No portion of the Trust may revert to JPMorgan or be used for or diverted to any purpose other than for the exclusive benefit of participants in the Plan and their beneficiaries. The Trust's most recent Form 990 filing with the IRS is signed by Bernadette Branosky. As noted above, Defendant Branosky is the Plan Administrator and Benefits Executive.

## II.    JURISDICTION AND VENUE

28.    This Court has exclusive subject-matter jurisdiction under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this is an action under 29 U.S.C. § 1132. Plaintiffs have been injured by the unlawful conduct alleged herein and have standing to bring this action.

29.    Venue is proper in this district under 29 U.S.C. § 1132(e)(2) because it is the district in which "a defendant resides or may be found." Specifically, JPMorgan is headquartered in New York, New York. In addition, it is the district where at least one alleged breach or unlawful act took place.

## III.    FACTUAL AND LEGAL BACKGROUND

### A.    Prescription-Drug Plans and Fiduciary Duties Under ERISA

30.    Employers are the principal source of health benefits for working-age Americans in the United States. To provide those benefits, many employers sponsor employee benefit plans. The vast majority of employee health benefit plans include coverage for prescription drugs. Broadly speaking, the prescription-drug portion of an employee health plan covers a portion of the costs of an employee's prescription drugs. The employee is responsible for a portion of a monthly or bi-weekly insurance premium and for the full cost of purchased prescriptions until they meet any applicable deductible. Once the employee meets the deductible, the plan begins to cover a portion of the cost, and the employee continues to pay either a co-pay (often a set cost) or co-

insurance (often a percentage of the price the plan agreed to pay) for each prescription. The employee's premium payments are directly based on the plan's actual costs in past years or an actuarial projection of future costs that is heavily influenced by past costs. The employee's deductible, co-pay, and co-insurance amounts are set according to the plan documents. Costs are based on the plan's contractual arrangements with third-party service providers, typically a combination of insurers and PBMs, who work as intermediaries between the plan and the healthcare delivery system by negotiating on behalf of the plan with doctors, hospitals, pharmacies, and pharmaceutical companies.

31.    Prescription-drug plans (or the broader health care plans of which they are often a part), like other employee welfare benefit plans established by private-sector employers, are governed by ERISA. ERISA protects the interests of employee benefit plan participants and their beneficiaries by establishing standards of conduct, responsibilities, and obligations for fiduciaries of employee benefit plans. In ERISA terms, an employer who offers a welfare plan to its employees (and, typically, its employees' family members) is called a "plan sponsor."

32.    Anyone who exercises any discretionary authority or discretionary control over the management of an employee-benefit plan, and anyone who exercises any authority or control respecting management or disposition of the assets of an employee-benefit plan, is a fiduciary of the plan.

33.    ERISA imposes strict fiduciary duties of loyalty and prudence on the fiduciaries of employee-benefit plans, including healthcare plans and prescription-drug plans. The duty of loyalty requires fiduciaries to act "solely in the interest of the participants and beneficiaries … for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). The duty

of prudence requires fiduciaries to exercise the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. Courts have described these fiduciary duties as "the highest known to the law."

34.     Specifically, 29 U.S.C. § 1104(a) states, in relevant part, that:

> (1) [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> > (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

35.     Under ERISA, fiduciaries must act prudently and for the exclusive benefit of participants and beneficiaries in the plan when they select service providers for the plan. Fiduciaries must conduct an independent investigation and consider alternatives when initially selecting service providers, and must continue to monitor and critically review the performance and cost of such service providers after they are appointed. The common law of trusts, which informs ERISA's fiduciary duties, emphasizes the duty to avoid unwarranted costs. The Restatement (Third) of Trusts explains, "[i]mplicit in a trustee's fiduciary duties is a duty to be cost-conscious."

36.     Plan fiduciaries must also ensure that their agreements with service providers and the amounts they pay to those service providers are reasonable. Fiduciaries must seek to minimize the costs for the level of goods and services to be provided, and continuously monitor expenses to

ensure that they remain reasonable and appropriate under the circumstances. Fiduciaries of large plans like the JPMorgan Plan also cannot ignore the power their plans wield to obtain favorable rates. Put simply, wasting beneficiaries' money is imprudent.

37. Fiduciaries cannot discharge their fiduciary duties simply by relying on the advice of third-party service providers, consultants, or experts. As the Restatement explains, "[a]fter obtaining advice or consultation, the trustee can properly take the information or suggestions into account but then … must exercise independent, prudent, and impartial fiduciary judgment on the matters involved." Fiduciaries also cannot discharge their fiduciary duties simply by relying on the advice of third-party service providers, consultants, or experts who have conflicts of interest that may prevent them or inhibit them from providing advice solely for the benefit of the plan.

38. ERISA's fiduciary duties are supplemented by an extensive list of transactions that are strictly prohibited and considered *per se* violations of ERISA because they entail a high potential for abuse. To ensure that plan assets are not wasted through outsourcing of fiduciary functions, Congress presumptively prohibited *all* exchanges of property between an ERISA plan and a third-party service provider, *all* furnishing of services between an ERISA plan and a third-party service provider, and *all* transfers of assets from an ERISA plan and a third-party service provider (referred to as a "party in interest").

39. Specifically, 29 U.S.C. § 1106(a)(1) states, in relevant part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> > (A) sale or exchange, or leasing, of any property between the plan and a party in interest; [or]
> > * * *
> > (C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

40.     These presumptively prohibited transactions become permissible only if the plan fiduciary can demonstrate the applicability of one of the exemptions in 29 U.S.C. § 1108. Generally speaking, a contract between a plan and a third-party service provider will not be exempt from the list of prohibited transactions unless the plan fiduciary can demonstrate that the compensation the plan agreed to pay the third-party service provider is "reasonable," the service is necessary, and the plan fiduciary obtained extensive disclosures from the third-party service provider before entering into the contract, to protect against conflicts of interest.

41.     A plan fiduciary who breaches their fiduciary duties or causes the plan to engage in a prohibited transaction is personally liable for the relief specified in 29 U.S.C. § 1109(a), which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

42.     In addition to this Plan relief, which is specifically available under 29 U.S.C. § 1109(a) and 1132(a)(2), a plan participant or beneficiary may also obtain injunctive relief, surcharge, and other equitable relief under 29 U.S.C. § 1132(a)(3) from a plan fiduciary who breaches their fiduciary duties or causes the plan to engage in prohibited transactions, as well as attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g).

## B. Management and Administration of Prescription-Drug Plans

43.     Prescription-drug transactions work as follows:  When a person with prescription-drug insurance goes to their pharmacy to buy a prescription drug, that person makes a claim on their prescription-drug plan. If the person has yet to meet an applicable deductible, they are responsible for the full cost of the drug at plan rates.  Once they have met their annual deductible or no deductible applies, the plan often covers some or all of the drug's cost.

44.     The pharmacist sends a query to the insured's prescription-drug plan, which more or less instantaneously (*i.e.* while the insured is at the pharmacy counter) determines whether the drug is covered under the insured's plan. The plan communicates to the pharmacy whether the claim was approved or denied and the cost of the prescription when using the plan. If the claim is approved, the pharmacy is informed of the cost of the prescription including any co-pay or co-insurance amount required from the insured.  The pharmacy then collects the co-pay or co-insurance based on the information provided and dispenses the drug.  In a later transaction, the prescription-drug plan pays the remainder of the drug's cost to the pharmacy, at a rate negotiated between the plan and the pharmacy.

45.     To provide prescriptions for plan members, a prescription-drug plan's fiduciaries (either directly or through a designated representative) generally must negotiate rates with a network of pharmacies at which plan participants and beneficiaries may obtain prescription drugs; maintain a list of prescription drugs (called a formulary) that will be covered by the plan; maintain a framework to determine how the cost of those drugs will be shared between the plan and its participants/beneficiaries; process prescription-drug claims when participants/beneficiaries are at the pharmacy counter; and reimburse pharmacies for the plan's portion of the negotiated rates.

46.     The list of prescription drugs that are covered by a prescription-drug plan is called a "formulary."  The formulary is analogous to a commercial health plan's list of covered

procedures: just as a commercial health plan will provide different levels of coverage (or no coverage) depending on the specific medical procedure at issue, a prescription-drug plan will provide different levels of coverage (or no coverage) depending on the specific prescription drug at issue. Formularies are typically divided into multiple tiers—for example, a typical formulary includes several tiers that impact the participant's cost according to the tier designation. Lower tiers often have either a small fixed copay or a limited coinsurance progressing to the specialty tier, typically involving 20% or more in cost-sharing from plan participants. Examples of tiers with applicable cost sharing include preferred generic, non-preferred generic, preferred brand, non-preferred brand, and specialty.

47. A generic drug is a pharmaceutical drug that contains the same chemical substance as a drug that was originally protected by chemical patents and sold under a brand name. Generics are identical to brand-name drugs, but tend to be significantly lower-cost because they are produced by multiple competing manufacturers. As the Food and Drug Administration explains, "generic medicines work in the same way and provide the same clinical benefit and risks as their brand-name counterparts. A generic medicine is required to be the same as a brand-name medicine in dosage, safety, effectiveness, strength, stability, and quality, as well as in the way it is taken. Generic medicines also have the same risks and benefits as their brand-name counterparts."

48. Formularies are powerful tools for plan fiduciaries to control the plan's prescription-drug costs. For example, when a lower-priced generic version of a drug becomes available, a prudent fiduciary will add the generic to its formulary and either remove the brand-name drug or disincentivize its use, in order to reduce costs. This will result in beneficiaries receiving the lower-priced generic instead of the expensive (but chemically identical) brand-name drug, which in turn will lower costs for the plan.

49.     Other aspects of administering a prescription-drug plan also offer cost-saving opportunities for prudent plan fiduciaries.  For example, a prudent fiduciary will negotiate favorable drug prices and will implement systems to process claims efficiently and cheaply.  A fiduciary of a sufficiently large plan like the JPMorgan Plan is also in a position to extract financial concessions from a drug manufacturer (often termed "rebates") in exchange for agreeing to include the manufacturer's drugs on its formulary and/or in a preferred tier on its formulary.

### C.     Pharmacy Benefit Managers and Brokers

#### 1.     General Background on PBMs

50.     Many plan fiduciaries contract with third parties to help manage and administer the prescription-drug portion of their health plans.  These third parties are called "pharmacy benefit managers" or, for short, "PBMs."  PBMs offer various services to prescription-drug plans, including negotiating with pharmacies to establish pharmacy networks where plan participants and beneficiaries can obtain prescription drugs; helping manage plans' formularies; processing participants'/beneficiaries' claims in real-time; and contracting with drug manufacturers to secure price reductions or other financial considerations.

51.     As a general matter, the PBM handles the day-to-day management of its clients' prescription drug programs and serves as the middleman between the benefits plan and network pharmacies.  Accordingly, when a plan participant or beneficiary obtains a prescription drug from a pharmacy, the PBM pays the pharmacy for the cost of the drug (less the participant/beneficiary's out-of-pocket responsibility) and then collects payment from the plan.  As noted in more detail below, however, the PBM may attempt to collect more money from the plan than it paid to the pharmacy, pocketing the difference.

52.     PBMs are service providers to prescription-drug plans.  They are profit-driven entities that seek to profit from their intermediary role in the prescription-drug ecosystem.  The

largest PBMs are owned by publicly-traded companies and accordingly owe fiduciary duties to their shareholders to maximize their own profits. As discussed in more detail below, many PBMs are also part of vertically integrated companies that create obvious conflicts of interest and incentivize them to take actions that are not in the best interest of their plan clients.

53.     There are two dominant pricing models for PBMs. "Traditional" PBMs typically make their money through a combination of spread pricing, rebates, and owning their own pharmacies, as described below. "Pass-through" PBMs, in contrast, typically make their money only through administrative fees. They do not engage in spread pricing, they pass through the full amount of any negotiated rebates to their client plans, and they do not own pharmacies.

### 2.    Traditional PBM Model

54.     In the traditional PBM model, the prices that a prescription-drug plan pays for prescription drugs are determined in negotiations between plan fiduciaries and the PBM. Those prices can be determined in any number of ways, limited by only the parties' willingness to transact.

55.     One way that some plan fiduciaries and PBMs structure their agreements is to set prices for groups of drugs by reference to a specific benchmark price, rather than negotiating a separate price for each drug.

56.     One historically prevalent benchmark is called the "Average Wholesale Price" or "AWP." In theory, the AWP for a drug is a benchmark that describes the average price that pharmacies pay to acquire that drug from wholesalers. In reality, as is widely understood by prudent plan fiduciaries, AWP is not a true representation of actual market prices for either generic or brand drug products, is highly manipulable by manufacturers and wholesalers, and often bears little to no relation to a pharmacy's actual acquisition costs. (A common joke among insiders in the industry is that AWP stands for "Ain't What's Paid.") The difference between the AWP and

a pharmacy's actual acquisition costs can be substantial, and sometimes arbitrarily so. Researchers have found several examples in which the AWP for a drug was 50, 70, or even 100 times higher than the drug's actual cost to pharmacies.

57.     Plan fiduciaries that decide to use a traditional PBM may negotiate a bundled price, relative to AWP, for all generic drugs; a bundled price, relative to AWP, for all brand-name drugs; and a bundled price, relative to AWP, for all "specialty" drugs. For example, a plan may agree to pay its PBM "AWP minus 85%" for generic drugs, "AWP minus 20%" for brand drugs, and "AWP minus 15%" for "specialty" drugs. These prices might vary further based on whether the prescription is for a 30-day supply or a 90-day supply or based on other factors, including whether the prescription is filled at the PBM's own pharmacy. These prices are negotiable between the traditional PBM and the plan fiduciaries.

58.     Critically, however, the prices the plan agrees to pay its traditional PBM for a prescription may not bear any relation to the price the PBM will pay the pharmacy for the same prescription. Any difference between those two amounts is known as the "spread."

59.     The "spread" can be a major revenue stream for traditional PBMs. "Spread pricing" is when a PBM negotiates a price with pharmacies that is lower than the price it charges the prescription-drug plan, and then instead of passing those savings on to its client plan, pockets the difference. For example, a PBM may negotiate with a pharmacy for a price of $17 for each prescription of a certain drug, but then may try to separately negotiate with the plan fiduciaries for a price of $20 for that same drug. The $3 "spread" between these two negotiated rates represents profit for the PBM, at the expense of the plan and its participants and beneficiaries. As an example of how this works in practice, a participant or beneficiary filling this prescription would pay a $5 co-insurance amount to the pharmacy and the PBM would pay the pharmacy $12 more, satisfying

the PBM's agreement to pay the pharmacy $17 for the prescription.  The PBM would then bill the plan the remaining $15 (the $20 negotiated price minus the $5 patient co-insurance).  The result for the PBM in the arrangement is that it received $15 from the plan but paid only $12 to the pharmacy, netting a $3 spread.



60.     For generic drugs, there is even more of a disconnect between an AWP-based price paid by a plan and its participants/beneficiaries to the PBM and the price then paid by the PBM to a pharmacy.  This is because the prices that PBMs pay to pharmacies for generic drugs are generally not based on AWP.  Instead, PBMs pay pharmacies for generic drugs based on prices listed on the PBM's proprietary "Maximum Allowable Cost" or "MAC" list.  A "MAC" list is a PBM-generated list that includes the maximum amount the PBM will pay a pharmacy for generic drugs.  PBMs have essentially free reign to determine their own pricing methodologies for their MAC lists, so long as the prices are not so low that pharmacies will refuse to do business or refuse to stock a drug.  One recent study observed that "proprietary PBM prices (i.e., maximum allowable cost, or MAC) were … highly variable and disconnected from the manufacturer or pharmacy established price for the medication."  PBMs may also have different MAC lists corresponding to

different pharmacies (*e.g.*, the MAC prices may be far higher at the pharmacies they own) and different payers.

61.     Traditional PBMs engaging in spread pricing try to exploit the disconnect between the prices they receive from plans and the prices they pay to pharmacies, pocketing the difference between the two prices.  Because of this dynamic (and also for other reasons), it is imperative that the plan fiduciaries actively monitor PBMs and their pricing, and minimize any excess costs or spread.

62.     Traditional PBMs benefit the most when plan participants and beneficiaries are prescribed drugs with the highest cost to the plan relative to the actual drug acquisition cost, as this maximizes the "spread" retained by the PBM: the higher the cost to the plan, the more the PBM receives as revenue; the lower the drug acquisition cost, the less the PBM must pay to the pharmacy. PBMs in such an arrangement are financially motivated not to make formulary decisions based on which drugs have the lowest cost to the plan and its participants and beneficiaries, but rather based on which drugs allow them to pocket the largest spread.  Prudent fiduciaries therefore closely supervise their formularies and carefully negotiate their payment structures to ensure that PBMs are not acting based on considerations that run contrary to the interests of the plan and its participants and beneficiaries.

63.     Because of the pronounced disconnect between AWP and acquisition cost for generic drugs, many prudent fiduciaries negotiate generic pricing based on pharmacy acquisition costs instead of with reference to AWP.  These fiduciaries negotiate either a fixed, pre-determined price for each medication derived from each medication's acquisition cost, or a formula based on actual pharmacy acquisition costs.  Basing prices on pharmacy acquisition costs rather than AWP significantly reduces overall spending on generic drugs, limits spread pricing, and eliminates the

variability in pricing inherent in AWP-based pricing models. Instead of agreeing to pay prices based on a "discount" from a made-up benchmark (AWP) that does not correspond to the actual cost of prescription drugs, prudent fiduciaries agree to pay reasonable prices based on the actual acquisition cost of the drugs their members use.

64.     Another potential revenue stream for traditional PBMs is through "rebates" and other financial concessions from drug manufacturers. Drug manufacturers often pay "rebates" to the PBM in exchange for securing either formulary or tier placement for their drugs. These "rebates" are generally based on the quantity of drugs dispensed under the plans administered by the PBM, and the manufacturer typically pays the PBM quarterly. For example, a manufacturer may rebate a percentage of the total PBM volume for a specific drug.

65.     Plans and traditional PBMs negotiate over how much of any such rebate or price concession will be retained by the PBM and how much will be passed through to the plan (represented either as a percentage or a flat amount per prescription). Traditional PBMs may attempt to denominate rebates by other names to obscure their nature, or hide these rebates by purchasing medications from a wholly owned group purchasing organization that sells drugs back to the PBM ("GPO") to try to reduce the amounts they are contractually obligated to pass on to their client plans. Any amount the PBM retains is revenue for the PBM.

66.     Prudent fiduciaries negotiate with their PBMs to minimize or eliminate any portion of rebates or other financial concessions from manufacturers that the PBM or its GPO retains instead of passing through to the plan. Prudent fiduciaries likewise ensure that their PBM contract is written with sufficient precision that the PBM cannot hide or obscure these rebates to avoid passing them through to the plan. While such rebates are not per se unlawful, prudent fiduciaries have a responsibility to ensure that the PBM and its affiliated entities are not receiving

unreasonable compensation via such revenue sharing arrangements at the expense of the plan and its participants and beneficiaries.

67.     Some traditional PBMs also earn revenue through ownership of pharmacies. Caremark, for example, is vertically integrated with the mail-order pharmacy CVS Specialty. When PBMs own their own pharmacies, they may attempt to steer beneficiaries of their clients' prescription-drug plans to those pharmacies, including by requiring beneficiaries to pay more out-of-pocket at competitors' pharmacies or by refusing to cover prescriptions obtained at competitors' pharmacies.  In addition, traditional PBMs may "agree" to excessively high reimbursement rates with the pharmacies they own (*i.e.*, reimbursement rates that greatly exceed the pharmacy's actual acquisition costs)—rates that the PBM would never agree to pay in a truly market-based transaction.  Through this arrangement, PBMs can misleadingly represent to plans that they are not engaging in spread pricing (*i.e.*, they can promise that they are charging the plan the same amount they are paying the pharmacy), even though that is technically true only because the PBM "agreed" to pay its own pharmacy excessive amounts.  In reality, the mechanism is the same as spread pricing—*i.e.*, the traditional PBM charges the plan far more than the drug actually costs, and then the PBM or its affiliated pharmacy pockets the difference.

68.     There are several traditional PBMs in the marketplace that are capable of providing a high level of service and that will vigorously compete to win a PBM contract from a Fortune 50 company like JPMorgan.  To ensure that they are continuing to manage the plan's costs and incur only reasonable expenses, prudent fiduciaries conduct open RFP processes to obtain competitive bids for PBM services at regular intervals and ensure that the rates and terms to which they agree continue to reflect the best rates and terms available in light of the plan's size, bargaining power,

and other characteristics.  At a minimum, it is necessary to regularly survey the market to ensure that the plan and its participants and beneficiaries are not paying excessive costs.

### 3. The "Pass-Through" PBM Model

69.    One alternative to the traditional PBM model is the "pass through" model. The payment structure for the pass-through model is more transparent and straightforward, and it provides plan sponsors with a reasonable alternative to traditional PBMs that offers many advantages including reduced costs.[1] In the pass-through PBM model, the amount that the PBM bills the plan is equal to the amount the PBM pays the pharmacy.  In this model, the PBM does not engage in spread pricing and commits to passing through all discounts and rebates, however denominated, to the plan.  The pass-through PBM earns revenue based only on a flat administrative fee it charges to the plan, usually assessed on a per-member, per-month basis (similar to a per-head fee for recordkeeping services to a retirement plan). Pass-through PBMs typically base their costs on actual pharmacy acquisition costs. Pass-through PBMs still negotiate for rebates and discounts from manufacturers, and they more effectively pass those rebates and discounts through to their clients instead of keeping them for themselves.  This keeps incentives aligned.  The rebates and discounts that many pass-through PBMs negotiate are comparable, and in some cases identical, to the rebates and discounts available to traditional PBMs.

70.    Because pass-through PBMs do not benefit from rebates or spread pricing, they have no incentive to favor drugs on any factor other than what is in the best interest of the plan and its participants and beneficiaries.  Whereas a traditional PBM is typically incentivized to select

---

[1]    *See, e.g.,* https://www.cap-rx.com/insights/the-upside-of-a-single-ledger-model-tm-in-pharmacy-benefits (last visited May 10, 2024).

drugs with higher rebates and/or that allow for higher spreads—even if those drugs have higher net costs for the plan—pass-through PBMs have no such incentives or conflicts of interest.

71.     Using a pass-through PBM does not negatively affect the patient experience compared to a traditional PBM, and in many cases improves the experience.  Most pass-through PBMs have network agreements with many or all major pharmacies, allowing plan beneficiaries to obtain their prescriptions from a wide range of pharmacies, including most or all of the pharmacies that are in-network for traditional PBMs.  For example, the pass-through PBM Navitus has network agreements with CVS, Walgreens, Walmart, Rite Aid, Giant, Stop & Shop, Wegman's, Publix, Kroger, Costco, and many others.  Similarly, the pass-through PBM Capital Rx "maintains a national network of more than 65,000 pharmacies, including all national chains and most independent pharmacies."  Pass-through PBMs also partner with mail-order pharmacies, including for specialty drugs, that can provide plan participants and beneficiaries with the same (or greater) level of convenience as a traditional PBM's mail-order pharmacy.

72.     Pass-through PBMs are able to obtain the same drugs from manufacturers as traditional PBMs.  Any prescription-drug plan that wants to include or exclude any specific drug on its formulary can do so with either a pass-through PBM or a traditional PBM.  Pass-through PBMs also offer the same types of services—and, if anything, more personalized services—than traditional PBMs.

73.     There are numerous pass-through PBMs in the marketplace that are capable of providing a high level of service and will vigorously compete to win a PBM contract from a Fortune 50 company like JPMorgan.  To ensure that they are continuing to manage the plan's costs and incur only reasonable expenses, prudent fiduciaries conduct open RFP processes to obtain competitive bids for PBM services at regular intervals from both traditional PBMs and pass-

through PBMs, and also ensure that the rates and terms to which they agree continue to reflect the best rates and terms available in light of the plan's size, bargaining power, and other characteristics. At a minimum, it is necessary to regularly survey the market, including pass-through PBMs, to ensure that the plan and its participants and beneficiaries are not paying excessive costs.

74. Prudent fiduciaries choose carefully among PBMs, analyzing multiple PBMs' offerings to decide which PBM and which payment model will be most beneficial and most cost-effective for the plan. Prudent fiduciaries also negotiate favorable terms with PBMs and continually supervise their PBM's actions to ensure that the plan is minimizing costs and maximizing outcomes for beneficiaries. Prudent fiduciaries retain sufficient control over their plans' formularies to prevent the PBM from making formulary decisions that serve the PBM's interests but not the plan's interests. Prudent fiduciaries also periodically attempt to renegotiate their PBM contracts, conduct marketplace surveys, and/or conduct an open RFP process to solicit proposals from other PBMs and ensure that they have the best possible deal for the plan and plan participants/beneficiaries.

### 4. Brokers

75. Many plan sponsors hire consultants and/or brokers to assist them with soliciting bids from, selecting, and negotiating with a PBM. A plan sponsor's broker may serve as the broker for a range of the plan sponsor's vendor agreements but recommend that the plan sponsor hire a consultant (usually one affiliated with the brokerage) to assist specifically with the PBM selection process. For simplicity, consultants and brokers together are referred to here as "employee benefit consultants" ("EBCs") or "PBM reseller coalitions." EBCs are service providers to prescription-drug plans. They are profit-driven entities that seek to profit from their intermediary role in the prescription-drug ecosystem.

76.     Some EBCs, while purporting to act in the interest of prescription-drug plans, are in fact being paid by PBMs in ways that incentivize them to act against the plan's interests.  For example, PBMs may promise to pay an EBC a commission on every prescription if the EBC recommends the PBM to its client plans.  As one media outlet reported, "[c]onsulting firms can collect at least $1 per prescription from the largest PBMs, according to more than a dozen independent drug benefits consultants and attorneys involved with employers' PBM contracts.  That can go as high as $5 per prescription in extreme cases, three of those people said. Consulting firms and brokerages may receive a certain dollar amount for each covered employee and member.  Or they may share in the rebates that the PBMs pluck from pharmaceutical manufacturers — money that otherwise could be used by employers to lower premiums for their workers."

77.     According to one report, an EBC managing an RFP process refused to allow a PBM to even enter a bid for a plan's contract unless the PBM agreed to pay the EBC $6.50 per prescription.  In an apparent attempt to hide the payment, the EBC asked the PBM to mail the payments quarterly to a PO box in another state.

78.     Industry experts have warned that many EBCs or brokers "not only give bad advice to the employer that's in the broker's self-interest, but the broker also allows the big PBM to write crazy terms into a contract."

79.     Some EBCs, while purporting to manage an open RFP process for their client prescription-drug plans, will refuse to solicit bids from PBMs that decline to offer the EBC kickbacks or other forms of indirect compensation.

80.     Prudent fiduciaries ensure that any EBC they hire to help them select and negotiate with a PBM does not have conflicts of interest that would prevent it from offering objective advice to the plan and operating a truly open RFP process.  Prudent fiduciaries would not hire an EBC

that was receiving kickbacks or other forms of compensation from the PBM it was assisting in selecting or negotiating with, or who would refuse to solicit bids or accept offers from PBMs who were not paying kickbacks or providing other forms of compensation. As one media outlet put it, "[e]mployers … may be neglecting their legal duty by not asking their consultants and brokers to disclose all the sources of their revenue."

81. Prudent fiduciaries exercise—and are required to exercise—independent, prudent, and impartial fiduciary judgment even on matters for which they receive advice from EBCs.

82. Section 202 of the 2021 Consolidated Appropriations Act prohibits covered plans from entering into a contract, renewal, or extension of services for the plan with "covered service providers," which includes EBCs, without first requiring the covered service provider to disclose, in writing, any and all direct and indirect compensation in excess of $1,000 it receives for providing services to the plan. A covered plan's failure to obtain the required disclosures from a covered service provider under Section 202 makes its contract with that service provider a prohibited transaction under ERISA. Prudent fiduciaries obtain the required disclosures from their EBCs and ensure that the disclosures are sufficiently clear and unambiguous, and that no conflict of interest exists, before entering into, renewing, or extending their contract.

### 5. Fiduciary responsibilities with respect to PBMs and EBCs, and consequences of failing to satisfy those responsibilities

83. The fiduciaries of a prescription-drug plan have control over the plan's expenses, formulary, and choice of third-party service providers (including PBMs and EBCs). Their control over the formulary includes which drugs will be covered by the plan and in which tier of the formulary any covered drug will be placed. The fiduciaries are also responsible for hiring third-party service providers, for negotiating the terms of their agreements with those third-party service

providers (including drug prices), and for exercising continued oversight over the service providers and any aspect of the plan for which a third-party service provider is contractually responsible.

84. These fiduciary responsibilities (and how they are carried out) have the potential to dramatically affect the amount of money the plan pays for prescription drugs. Accordingly, fiduciaries of prescription-drug plans must engage in a rigorous process to manage the plan's formulary, oversee any formulary management performed by a third-party vendor, and ensure that the plan pays no more than reasonable amounts for prescription drugs. This is particularly true for Fortune 50 companies like JPMorgan with tens of thousands of employees in their plans, which have the bargaining power to obtain the most favorable terms from third-party vendors.

85. When fiduciaries agree to overpay for prescription drugs, employees—and especially the sickest employees—bear much of the burden.

86. First, employees are typically responsible for the entire cost of covered items until they meet their deductible. After meeting their deductible, employees remain responsible for a co-pay or co-insurance amount thereafter. Accordingly, if plan fiduciaries agree to inflated prices for prescription drugs, the participating employees or beneficiaries receiving those drugs are required to pay some or all of those inflated prices out-of-pocket. This is true for Plaintiffs and many other class members who purchase prescription drugs through the Plan.

87. Second, a co-insurance amount is often calculated as a percentage of the *pre-rebate* (gross) price, so the participant/beneficiary's out-of-pocket responsibility ends up being a higher percentage of the net price than stated in the plan documents. This is true for likewise true for Plaintiffs and other class members who purchase prescription drugs through the Plan.

88. Third, the amounts that a health plan spends on prescription drugs directly affects the premiums that all plan members must pay for the prescription-drug portion of their benefit

plans. At least 85% of the premium cost for large plans like the Plan is attributable to prescription drug outlays and other healthcare expenditures (with the remainder attributable to administrative costs, risk or pooling charges, and reserve set asides). Accordingly, if plan fiduciaries agree to inflated prices for prescription drugs, they pass those inflated prices on to all employees and plan members—even those who did not receive any prescription drugs—through increased premiums. Indeed, the Federal Trade Commission has explicitly found that inflated drug costs "result in higher premiums." U.S. Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* (2024) ("FTC Report"), available at https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf; *see also infra* at ¶¶ 237-241 (citing other sources identifying same causal link). This is true for prescription-drug plans generally and Plaintiffs and the Plan specifically.

89. Fourth, employers often pass higher health care costs on to their employees in the form of depressed wages. In a recent report, the Congressional Budget Office noted that "[e]mployers' spending on health insurance represents a large part of their employees' nonwage compensation, so employers generally take actions to offset increases in health insurance spending in order to maintain their profits." The CBO also cited a recent study finding that increased healthcare spending by employers was "associated with a rise in employees' out-of-pocket costs, an increase in the use of high-deductible health plans, and slower wage growth for employees." UC Berkeley researchers summarized recent academic research on this topic: "Increases in health care costs are coming out of workers' pockets one way or another. . . . When health care costs rise, employers can respond in a variety of ways, such as by increasing worker premium contributions, increasing deductibles or copayment amounts, reducing employment, or increasing their own

premium contributions while reducing or limiting wage growth accordingly." This is true for employers generally and, on information and belief, JPMorgan specifically.

### D. Specialty Drugs

90. PBMs classify some drugs, whether brand or generic, as "specialty" drugs. As originally envisioned, the "specialty" designation referred to expensive branded drugs used to treat complex or rare chronic conditions, required special handling or care, and historically were available only at hospitals, doctors' offices, or specialty pharmacy locations where the patient could receive specialized instruction from a medical professional. Today, however, the "specialty" designation is largely arbitrary. There is no universal standard or agreement regarding what qualifies as a "specialty" drug. Indeed, the three largest PBMs disagree about whether any particular drug is a "specialty" drug about 50% of the time:



91. However defined, there is no question that so-called specialty drugs are a major driver of prescription-drug spending. According to numerous industry experts, specialty drugs account for more than half of all pharmacy spending, with total non-discounted spending in 2022 at approximately $324 billion (compared to $311 billion for non-specialty). This makes the cost

of specialty drugs a significant driver of premiums for all plan participants, including participants in the JPMorgan Plan, regardless of whether they themselves are prescribed specialty drugs and pay out-of-pocket costs for those drugs.

92.     The classification of a generic drug as a "specialty" drug can have a major impact on the price the plan will be required to pay for that drug because, as suggested in the pricing example above, many plans agree to pay traditional PBMs rates for "specialty" drugs that are higher (*i.e.*, have a lower discount from AWP) than the prices they pay for non-specialty drugs. Because there is no definitive set of objective factors to determine whether any given drug is a specialty drug, the classification of a drug as "specialty" can be the subject of negotiations between plan fiduciaries and PBMs, as well as the relative roles of the plan fiduciaries and the PBM in making those classification decisions.

93.     Many traditional PBMs are vertically integrated with their own mail-order "specialty" pharmacies. For example, the PBM CVS Caremark is vertically integrated with CVS Specialty, the PBM Express Scripts is vertically integrated with Accredo, and the PBM OptumRx is vertically integrated with Optum Specialty Pharmacy. These "specialty" pharmacies are typically mail-order pharmacies that do not provide the kind of in-person support that a medical professional would offer at a traditional specialty pharmacy. Instead, the defining feature of these PBM-owned "specialty" pharmacies is merely (and circularly) that they dispense the drugs that the PBM itself deems "specialty."

94.     An arrangement in which a plan's members are incentivized or required to obtain specialty drugs only from the PBM's own pharmacy provides powerful incentives for PBMs to designate generic drugs as "specialty" drugs and/or to inflate the prices of specialty drugs. The PBM's costs are limited to its pharmacy's actual acquisition cost of the drug from the wholesaler

(which is typically even lower than the MAC price), and yet it can continue to charge the plan the high AWP-based price designated for "specialty" drugs.

95.     This model also incentivizes traditional PBMs to favor generic "specialty" drugs with higher AWPs relative to their actual acquisition costs.  If two similar generic "specialty" drugs cost roughly the same for the PBM's pharmacy to acquire, the PBM will be incentivized to favor the one with a higher AWP, as that will maximize the spread between the AWP-based price it receives from the plan and its actual acquisition cost.  The PBM thus might include only the drug with the higher AWP on its formulary, forcing the plan and its participants/beneficiaries to pay more but offering no benefit other than profit for the PBM.

96.     "Specialty" drugs can be a major driver of costs for a prescription-drug plan.  While specialty drugs make up a relatively small percentage of overall prescriptions, they typically account for more than 50% of a prescription-drug plan's overall spending.  Prudent fiduciaries will therefore be extra careful to negotiate favorable contract terms regarding specialty drugs to avoid paying excessive amounts for specialty drugs, closely manage their specialty drug expenditures, closely supervise their PBMs' treatment and designation of specialty drugs, and make changes to their prescription-drug plans as necessary to fulfill their fiduciary obligations.

97.     Some PBMs offer services focused specifically on specialty drugs.  In this kind of arrangement, a plan uses a traditional PBM for most of its prescription-drug needs, but carves out management of all specialty drugs to a specialty-focused PBM.  In the specialty PBM carve-out model, responsibility for the entire specialty benefit is carved out to a PBM with a focus on, and expertise in, management of specialty drugs. These specialty PBMs—who typically use the pass-through model—can incorporate all aspects of specialty drug management, including claims processing, specialty formulary, and specialty pharmacy network management.  Specialty carve-

out PBMs do not need to own a specialty pharmacy and have no financial incentive to artificially promote greater or more expensive drug use—and, as a result, offer substantial savings to plans and their participants/beneficiaries. Many large companies use the specialty carve-out model for their prescription-drug plans. For example, DuPont carved out specialty drugs from its contract with CVS Caremark, and it contracted with the pass-through PBM Archimedes to manage its specialty-drug program, resulting in substantial savings. Similarly, Signet Jewelers carved out specialty drugs from its contract with the traditional PBM OptumRx and contracted with Archimedes to manage its specialty-drug program, with a similar cost-saving effect.

98.     Plan fiduciaries must be cognizant of PBMs' self-interest in maximizing their own profits, and not simply accede to PBMs' preferences without conducting an independent investigation or considering alternatives. For example, instead of accepting a PBM's request that participants/beneficiaries be offered only a version of a drug manufactured by a company vertically integrated with the PBM itself, fiduciaries must consider whether participants/beneficiaries (and the plan writ large) would be better off if they were permitted or encouraged to purchase a lower-priced version of a medically-equivalent drug manufactured by a different company. Plan fiduciaries must also engage in a prudent decision-making process with respect to whether to carve out their specialty-drug program from their broader PBM contract.

**E.     Formulary Management - Brand vs. Generic**

99.     When a pharmaceutical company discovers or designs a potential new drug, it incurs significant cost in doing research, development, and clinical trials. As part of the process, the pharmaceutical company obtains a patent for the drug. In the United States, patents for brand-name drugs generally last 20 years. When the brand-name drug is the only version available on the market, the price is often quite high because the pharmaceutical company seeks to cover the cost of the research, development, and clinical trials of the drug, and then turn a profit.

100. Once the patent on the brand-name drug expires, other pharmaceutical companies may produce their own version of the drug. These versions are known as "generic" versions. The companies that produce generic versions of a drug are able to sell them for much less than the brand-name drug, as they did not incur any costs for research or clinical trials. There is no limit to the number of generic versions of a drug that can be produced, so there are often several pharmaceutical companies that will produce generic versions of a brand-name drug. This creates competition in the market and drives prices lower.

101. Prudent fiduciaries of prescription-drug plans will generally replace brand-name drugs on the formulary when lower-cost, FDA-approved generics become available. Alternatively, prudent fiduciaries will add the generics to the formulary at lower prices and then incentivize plan participants and beneficiaries to obtain these lower-cost generics instead of the more expensive brand-name drugs. As CVS's chief medical officer has put it, "[i]n situations where the medications are equivalent, from a medical point of view it makes sense to do this in order to reduce cost."

102. Prudent fiduciaries are aware of the conflicts of interest that PBMs have in making formulary decisions. The manufacturers of brand-name drugs typically pay rebates or other financial concessions to PBMs when their drugs are included on formularies and dispensed by the PBM's prescription-drug plan clients. PBMs may pass some of these rebates through to the plan, but any retained amounts represent revenue for the PBM. From the PBM's perspective, an expensive brand-name drug from which the PBM is paid a rebate or other financial concession is more lucrative than a generic drug for which the manufacturer pays no rebate or a smaller rebate. The PBMs retaining these rebates therefore are incentivized to include higher-priced drugs on a plan's formulary to maximize their own profits, even when including a lower-priced drug (*e.g.*, a

generic) would be more cost-effective for the plan. Prudent plan fiduciaries are aware of these dynamics and ensure that formulary decisions are being made in the interest of the plan and its participants and beneficiaries rather than third-party vendors with conflicts of interest.

## IV.   DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

### A.   Defendants Mismanaged the Plan's Generic-Drug Program

103.   Defendants imprudently managed the Plan's generic-drug program, and failed to act in the best interest of participants/beneficiaries and ensure that expenses were reasonable. Defendants' mismanagement has caused the Plan and its participants/beneficiaries to vastly overpay for prescription drugs, and has cost the Plan and its participants/beneficiaries (including Plaintiffs) millions of dollars over the Class Period.

104.   On one or more occasions during the Class Period, Defendants entered into and/or renewed a contract with Caremark, a traditional PBM, under which Caremark agreed to serve as the Plan's PBM and Defendants agreed (or caused the Plan to agree) to various terms regarding drug prices, formulary management, pharmacy networks, and administrative services.

105.   On information and belief, the process by which Defendants chose Caremark as the Plan's PBM was not an open RFP process, was not otherwise diligent or consistent with applicable fiduciary standards of care, and did not consider the full range of available options for PBM services.

106.   On information and belief, Defendants allowed their selection of a PBM for the Plan to be guided or managed by a broker with a conflict of interest—*i.e.*, a financial interest in steering Defendants toward certain PBMs or including certain provisions in the PBM contract, in ways not necessarily correlated with the financial and other interests of the Plan and its participants/beneficiaries.

107. The contract between Defendants and Caremark is not public. However, an analysis of the prices that Defendants agreed and/or allowed the Plan and its participants/beneficiaries to pay for generic drugs reveals a staggering markup from acquisition costs for those drugs, a staggering markup from the prices that would be charged by a "pass-through" PBM, and a staggering markup from prices charged to comparable plans by other traditional PBMs. These prices greatly exceed the prices that any prudent fiduciary would agree to pay and are not reasonable.

108. Defendants agreed and/or allowed for the Plan and its participants/beneficiaries to pay unreasonable markups above what it costs for pharmacies to acquire those same drugs. Most of these markups represent profit the PBM, with no corresponding benefit for the Plan or its participants/beneficiaries. The markups that Defendants agreed to and/or allowed are higher than what a pass-through PBM would charge and higher than the amounts even traditional PBMs charge to their other clients. Defendants squandered their bargaining power and, for many drugs, agreed and/or allowed for the Plan and its participants/beneficiaries to pay more than someone would pay if they just walked into a retail pharmacy and filled the same prescription *without* using insurance. Put another way, it would be more prudent for Defendants to tell employees *not* to use their insurance and instead to give them a company credit card that the Plan was responsible for paying. This despite JPMorgan having significant bargaining power as a Fortune 50 company with over 300,000 employees. Had Defendants prudently negotiated and continued to monitor the terms of their PBM contract with Caremark in light of market developments, or had Defendants conducted a prudent process to inquire as to different PBMs (through an RFP process, market surveys, or otherwise), the Plan and its participants/beneficiaries would have saved millions of dollars.

### 1. Pricing Analysis of JPMorgan Plan

109. The federal government's Centers for Medicare and Medicaid Services compiles the National Average Drug Acquisition Cost ("NADAC") database. The NADAC database uses survey data to determine the average pharmacy "acquisition cost" for many prescription drugs. The "acquisition cost" is the amount that a pharmacy pays to acquire a prescription drug from its suppliers (typically wholesalers who purchase directly from manufacturers).

110. A prescription drug's NADAC is a widely-accepted benchmark that describes the average price that pharmacies pay to acquire that drug. As one industry source has explained, NADAC "offers a standardized benchmark for drug pricing, promoting fairness and transparency in the healthcare system." Accordingly, the difference between a prescription drug's NADAC and the price that a prescription-drug plan and its participants/beneficiaries pay for that prescription drug represents the markup to which the plan's fiduciaries have agreed.

111. NADAC is commonly used by other plans as a benchmark for the prices they pay for prescription drugs. For example, the PBM Capital Rx uses NADAC prices as a benchmark for the prices it charges its plan clients and does not engage in any additional spread pricing. Its clients simply pay a small markup above NADAC prices. Similarly, even Express Scripts (a traditional PBM) offers a "ClearNetwork" product with prices to plans based on the lowest of three benchmarks, one of which is NADAC. This shows that NADAC is not only a commonly-used benchmark, but a conservative one, as the ClearNetwork product's prices are based on the *lower* of NADAC and two other benchmarks. And as shown below, many drugs are available from many pharmacies at amounts below NADAC averages. Defendants, however, imprudently agreed to a pricing model in which the prices the Plan and its participants/beneficiaries pay for generic drugs are based on AWP rather than on NADAC or a fixed unit-price schedule.

112.     The Plan provides its beneficiaries/participants with two formulary documents: the "Performance Drug List - Standard Control for Clients with Advanced Control Specialty Formulary® for JPMorgan Chase Drug List" and the "Advanced Control Specialty Formulary for JPMorgan Chase®." For 366 of the 404 generic drugs on these formularies, NADAC information is publicly available, allowing a comparison between the prices Defendants agreed or allowed to make the Plan and its participants/beneficiaries pay for a prescription of each drug and the acquisition cost of the same drug, quantity, and dosage for the average pharmacy. **Across all 366 generic drugs, Defendants' negotiated prices reflect, on average, a markup of *211.1%* above pharmacy acquisition cost.**  Put another way, the total acquisition cost for one prescription of each of the 366 drugs would be $38,445.60, but Defendants agreed and/or allowed for prices that would result in one prescription of each of the 366 drugs costing the Plan and its beneficiaries over *three times as much*, or $119,617.92.  No prudent fiduciary would agree or allow their PBM to receive an average 211.1% markup above pharmacy acquisition cost, especially where the PBM itself owns the pharmacy.

113.     Many of the markups for specific prescription drugs were particularly high.  Several of these drugs are highlighted below.

114.     Teriflunomide is a generic medication used to treat multiple sclerosis.  According to the NADAC database, the acquisition cost for pharmacies for teriflunomide is $0.54 per tablet, or $16.20 for a 30-unit prescription.  Defendants, however, agreed and/or allowed for the Plan and its participants/beneficiaries to pay Caremark *$6,229.23* for each 30-unit teriflunomide prescription.  This price reflects an *38,352.04%* markup**.** Teriflunomide is widely available at retail pharmacies, including Rite Aid, Wegmans, Shoprite, Walgreens, Costco, and others.  The cash price (*i.e.*, the price a person would pay if they did not use insurance) for an teriflunomide

prescription at *every one* of these pharmacies is lower than the price Defendants accepted for the Plan and its participants/beneficiaries. While Defendants accepted a price of *$6,229.23* for each 30-unit teriflunomide prescription, the same prescription is available from Rite Aid for $34.76, Wegmans for $36.20, ShopRite for $30.55, or from Cost Plus Drugs online pharmacy for $11.05. No prudent fiduciary would agree and/or allow for its plan and participants/beneficiaries to pay a price that is up to five hundred sixty times higher than the price at which the drug is widely available.

115.    Imatinib is a generic oral therapy medication used to treat certain types of leukemia and bone marrow disorders. According to the NADAC database, the acquisition cost for pharmacies for imatinib is $2.23 per tablet, or $66.90 for a 30-unit prescription. Defendants, however, agreed and/or allowed for the Plan and its participants/beneficiaries to pay Caremark *$6,109.59* for each 30-unit imatinib prescription. This price reflects an *9,032.42%* markup. Imatinib is widely available at retail pharmacies, including ShopRite, Rite Aid, Costco, Wegmans, Walgreens, Duane Reade, and others. The cash price (*i.e.*, the price a person would pay if they did not use insurance) for an imatinib prescription at *every one* of these pharmacies is lower than the price Defendants accepted for the Plan and its participants/beneficiaries. While Defendants accepted to a price of *$6,109.59* for each 30-unit imatinib prescription, the same prescription is available from ShopRite for $85.85, Rite Aid for $86.17, Wegmans for $83.17, or from Cost Plus Drugs online pharmacy for $34.50. No prudent fiduciary would agree and/or allow for its plan and participants/beneficiaries to pay a price that is up to one hundred seventy times higher than the price at which the drug is widely available.

116.    Silodosin is a generic drug used to treat problems caused by an enlarged prostate. According to the NADAC database, the average acquisition cost for pharmacies for silodosin is

$0.61 per 8mg tablet, or $54.90 for a 90-unit prescription. Defendants, however, agreed and/or allowed for the Plan and its participants/beneficiaries to pay Caremark ***$165.68*** for each 90-unit silodosin prescription. This price reflects a ***201.79%*** markup**.** Silodosin is widely available at retail pharmacies, including ShopRite, Rite Aid, Costco, Wegmans, Walgreens, Duane Reade, and others. The cash price (*i.e.*, the price a person would pay if they did not use insurance) for a silodosin prescription at *every one* of these pharmacies is lower than the price Defendants accepted for the Plan and its participants/beneficiaries. While Defendants accepted a price of ***$165.68*** for each 90-unit silodosin prescription, the same prescription is available from ShopRite for $20.70, Rite Aid for $18.60, Wegmans for $20.70, Costco for $31.99, or from Cost Plus Drugs online pharmacy for $19.83. No prudent fiduciary would agree and/or allow for its plan and participants/beneficiaries to pay a price that is up to nine times higher than the price at which the drug is widely available.

117. Ezetimibe-simvastatin is a generic drug used to treat high cholestorol. According to the NADAC database, the average acquisition cost for pharmacies for ezetimibe-simvastatin is $0.36 per 10-80mg tablet, or $32.40 for a 90-unit prescription. Defendants, however, agreed and/or allowed for the Plan and its participants/beneficiaries to pay Caremark ***$242.98*** for each 90-unit ezetimibe-simvastatin prescription. This price reflects a ***649.94%*** markup**.** Ezetimibe-simvastatin is widely available at retail pharmacies, including ShopRite, Rite Aid, Costco, Wegmans, Walgreens, Duane Reade, and others. The cash price (*i.e.*, the price a person would pay if they did not use insurance) for an ezetimibe-simvastatin prescription at *every one* of these pharmacies is lower than the price Defendants accepted for the Plan and its participants/beneficiaries. While Defendants accepted a price of ***$242.98*** for each 90-unit ezetimibe-simvastatin prescription, the same prescription is available from ShopRite for $41.11, Rite Aid for $59.24, Wegmans for

$60.70, Costco for $62.46, or from Cost Plus Drugs online pharmacy for $14.49. No prudent fiduciary would agree and/or allow for its plan and participants/beneficiaries to pay a price that is up to sixteen times higher than the price at which the drug is widely available.

118.    Venlafaxine is a generic drug used to treat depression and anxiety. According to the NADAC database, the average acquisition cost for pharmacies for venlafaxine is $0.14 per 100mg tablet, or $37.80 for a 270-unit prescription. Defendants, however, agreed and/or allowed for the Plan and its participants/beneficiaries to pay Caremark ***$219.16*** for each 270-unit venlafaxine prescription. This price reflects a ***479.79%*** markup**.** Venlafaxine is widely available at retail pharmacies, including ShopRite, Rite Aid, Costco, Wegmans, Walgreens, Duane Reade, and others. The cash price (*i.e.*, the price a person would pay if they did not use insurance) for a venlafaxine prescription at *every one* of these pharmacies is lower than the price Defendants accepted for the Plan and its participants/beneficiaries. While Defendants accepted to a price of ***$219.16*** for each 270-unit venlafaxine prescription, the same prescription is available from ShopRite for $32.40, Rite Aid for $38.54, Wegmans for $32.40, Costco for $53.46, or from Cost Plus Drugs online pharmacy for $27.27. No prudent fiduciary would agree and/or allow for its plan and participants/beneficiaries to pay a price that is up to eight times higher than the price at which the drug is widely available.

119.    Entecavir is a generic drug used to treat liver infection. According to the NADAC database, the average acquisition cost for pharmacies for entecavir is $0.33 per 1mg tablet, or $9.90 for a 30-unit prescription. Defendants, however, agreed and/or allowed for the Plan and its participants/beneficiaries to pay Caremark ***$749.30*** for each 30-unit entecavir prescription. This price reflects a ***7,468.69%*** markup. Entecavir is widely available at retail pharmacies, including Rite Aid, Wegmans, Costco, CVS, Shoprite, Walgreens, Target, and other pharmacies. The cash

price for an entecavir prescription at *every one* of these pharmacies is lower than the price Defendants accepted for the Plan and its participants/beneficiaries. While Defendants accepted a price of *$749.30* for each 30-unit entecavir prescription, the same prescription is available from Rite Aid for $24.72, Wegmans for $25.75, Costco for $37.94, CVS for $21.80, or from Cost Plus Drugs online pharmacy for $37.13. No prudent fiduciary would agree and/or allow for its plan and participants/beneficiaries to pay a price that is up to almost sixty times higher than the price at which the drug is widely available.

120. Cinacalcet is a generic medication used to treat certain types of chronic kidney disease. According to the NADAC database, the average acquisition cost for pharmacies for cinacalcet is $0.85 per 90mg tablet, or $25.50 for a standard 30-unit prescription. Defendants, however, agreed and/or allowed for the Plan and its participants/beneficiaries pay Caremark *$1,310.99* for each 30-unit cinacalcet prescription. This price reflects a *5,041.14%* markup. Cinacalcet is widely available at retail pharmacies, including CVS, ShopRite, Rite Aid, Costco, Wegmans, Walgreens, Target, and other pharmacies. The cash price for a cinacalcet prescription at *every one* of these pharmacies is lower than the price Defendants accepted for the Plan and its participants/beneficiaries. While Defendants accepted a price of *$1,310.99* for each 30-unit imatinib prescription, the same prescription is available from CVS for $15.59, ShopRite for $17.50, Rite Aid for $9.88, or from Cost Plus Drugs online pharmacy for $17.51. No prudent fiduciary would agree and/or allow for its plan and participants/beneficiaries to pay a price that is one-hundred thirty times higher or more than the price at which the drug is widely available.

121. The Plan's prices for the 38 generic drugs covered by JPMorgan for which CMS *does not* publish a NADAC (*i.e.*, those not included in the 211.11% markup calculation above) are just as unreasonable. While NADAC information showing average pharmacy acquisition costs is

not available as a benchmark, many of those drugs are available at retail or online pharmacies for prices far lower than Defendants agreed and/or allowed for the Plan and its participants/beneficiaries to pay, indicating that the acquisition costs are far lower as well, and that Defendants accepted unreasonable markups for those drugs. Four examples follow:

122. A 30-day supply of bexarotene gel (generic for Targretin) is available for a cash price (*i.e.*, without using insurance) of $3,750 at Rite Aid, $8,316 at Wegmans, and $7,256 at Walgreens. Defendants agreed and/or allowed for the Plan and its participants/beneficiaries to pay $16,594.75. To repeat: if a beneficiary of the Plan fills a prescription for bexarotene gel at Rite Aid and *does not use their insurance*, Rite Aid will charge only $3,750. But if that same beneficiary fills the exact same prescription at the exact same Rite Aid and *uses their JPMorgan health insurance*, Defendants agreed and/or allowed to make them and the Plan pay a combined $16,594.75.

123. A 30-day prescription of efavirenz-lamivudine-tenofovir (generic for Symfi) is available for a cash price of $212.03 at Rite Aid, $400.71 at CVS, $385.62 at Walgreens, $437.47 at ShopRite, and $950.97 at Cost Plus Drugs. Defendants agreed and/or allowed to make the Plan and its participants/beneficiaries pay $1,449.76.

124. A 120 unit supply of lapatinib (generic for Tykerb) is available for a cash price of $1,810 at ShopRite, $1,590 at Walgreens, $1,453 at Rite Aid, and $1,590 at Duane Reade. Defendants agreed and/or allowed to make the Plan and its participants/beneficiaries pay $6,062.43.

125. A 60-tablet prescription of sorafenib (generic for Nexavar) is available for a cash price of $2,610 at Rite Aid, $2,779 at Walgreens, $3,257 at ShopRite, $2,779 at Duane Reade, and

$1,997.33 at Cost Plus Drugs. Defendants agreed and/or allowed to make the Plan and its participants/beneficiaries pay $6,326.58.

126. For many or most of the generic drugs on the Plan's "Advanced Control Specialty Formulary," there is no medical necessity for the "specialty" designation. As demonstrated above, most of these drugs are available at traditional retail pharmacies, do not require handling that traditional retail pharmacies are unable to provide, and do not require the kinds of medical services traditionally provided by specialty pharmacies. For many or most of the generic-specialty drugs on the Plan's formulary, no special handling is provided by the pharmacies at which Plan beneficiaries obtain generic-specialty drugs, including at CVS Specialty, which is vertically integrated with Caremark.

127. Plaintiffs filled prescriptions for several overpriced generic drugs while they were enrolled in the Plan. The following table lists prescriptions filled by Plaintiffs through the JPMorgan Plan and compares the prices Defendants agreed to make the Plan and Plaintiffs pay to the average acquisition cost for those drugs, revealing unreasonable markups:

| Generic Drug Name | Quantity | Pharmacy Acquisition Cost | Price JPMorgan Agreed To Pay | Markup % |
|---|---|---|---|---|
| ███████████ | 30 | $2.40 | $9.31 | 287.43% |
| ███████████ | 30 | $18.35 | $29.78 | 62.28% |
| ███████████ | 30 | $2.16 | $4.96 | 129.31% |
| ███████████ | 30 | $4.97 | $36.15 | 627.22% |
| ███████████ | 100 | $2.74 | $4.73 | 72.44% |
| ███████████ | 60 | $2.01 | $8.25 | 309.59% |
| ███████████ | 90 | $5.69 | $45.73 | 703.97% |
| ███████████ | 90 | $4.30 | $18.34 | 326.51% |
| ███████████ | 90 | $21.12 | $60.26 | 185.32% |
| ███████████ | 30 | $1.87 | $7.19 | 284.49% |
| ███████████ | 90 | $8.44 | $11.74 | 39.10% |

128. The Plan's extraordinarily high prices for generic drugs are not offset by special discounts from Caremark for other kinds of drugs. For the 50 most common high-cost brand-name drugs, Defendants agreed to prices and rebates that are roughly equivalent to pharmacy acquisition

cost and industry-standard rebates for those drugs. These prices are consistent with market pricing, and do not reflect special discounts that would offset or justify the atypical and extraordinary overcharges for generic drugs under the Plan. Defendants' failure to act prudently in negotiating the prices of generic drugs has cost the Plan and its participants/beneficiaries millions of dollars each year, which has not been offset by any corresponding discounts on other drugs.

### 2. Defendants Imprudently Agreed to Steer Participants/Beneficiaries Toward A Higher-Priced Drug Manufactured By Their PBM.

129. Caremark, the Plan's PBM, is vertically integrated with Cordavis, which works with manufactures to jointly develop biosimilar drugs. Defendants agreed to require Plan beneficiaries/participants to purchase one such drug from Cordavis, even though equivalent lower-cost options are available.

130. The prescription drug Humira is an immunosuppressive used to treat rheumatoid arthritis and other inflammatory conditions. Humira is a "biologic," which means that it is derived from living organisms. Because Humira is no longer patent-protected, several companies now manufacture Humira "biosimilars." A biosimilar is roughly equivalent to generic versions of a standard, non-biologic drug. There are currently 10 FDA-approved Humira biosimilars.

131. Defendants agreed and/or allowed to make only one Humira biosimilar available under the Plan. That biosimilar is Hyrimoz, which is manufactured by Cordavis—which, again, is vertically integrated with Caremark. Defendants agreed and/or allowed to make only Hyrimoz available under the Plan even though it is significantly more expensive than other biosimilars.

132. Defendants agreed and/or allowed to make the Plan and its participants/beneficiaries pay $1,257.88 for a 28-day supply of Hyrimoz:



**Cost details**

**Drug:** Hyrimoz 40/0.8ml Inj
**Days Supply:** 28
**Total Quantity:** 1.6
**NDC:** 83457010201
**Channel:** Specialty Pharmacy

| Your estimated cost | Your plan pays | Total cost |
|---|---|---|
| **$200.00** | **$1,057.88** | **$1,257.88** |
| Annual: $2,400.00 | Annual: $12,694.56 | Annual: $15,094.56 |

Co-pay or coinsurance: $200.00
Amount applied to deductible: $0.00
Additional Charges: $0.00 ⓘ
HRA: $0.00

Total cost is the negotiated rate, reflected as a dollar amount, for an in-network provider for the requested item or service fee. The negotiated rate includes the dispensing fee and tax.

*Your estimated cost-Annual represents the cost you pay for a drug in a one-year period.

Total cost is the amount of the prescription in accordance with the plan participant's applicable benefit plan, which may be a deductible, a percentage of the prescription price, a fixed amount or other charge, plus the balance, if any, paid by the benefit plan.

Your estimated cost is the amount the member is required to pay to obtain the prescription in accordance with the member's benefit plan.

`Close`

133. Other Humira biosimilars are available for far less money, but Defendants chose to exclude them from the Plan's formularies. For example, a 28-day supply of the Humira biosimilar Yusimry is available from Cost Plus Drugs for a total price of $584.25—less than half the price that Defendants agreed and/or allowed to pay for Hyrimoz. Likewise, a 28-day supply of the Humira biosimilar adalimumab-adbm is widely available for $550.





134.    Even though these biosimilars are substantially cheaper than Hyrimoz and medically equivalent to Hyrimoz, they are not available under the Plan.



135.    No prudent fiduciary would allow (much less force) plan participants/beneficiaries to purchase the most expensive biosimilar version of a drug. A prudently-administered plan would steer beneficiaries toward the option with the lowest overall price, or at least would not make the *only* option the one that is most expensive and manufactured by a company that is vertically integrated with the Plan's PBM. Defendants' imprudent decision to favor its PBM's higher-priced product over better-priced equivalents has increased overall spending by the Plan, thereby leading to increased premiums for all participants/beneficiaries, and also resulted in higher out-of-pocket costs for participants/beneficiaries.

### 3.    Defendants Failed to Implement Cost-Saving Recommendations from Organizations of Which JPMorgan is a Member.

136.    JPMorgan is a member of the Purchaser Business Group on Health ("PBGH"), which describes itself as "a purchaser-only coalition of the country's largest and most influential private employers and public purchasers working to create the health care system they are proud to offer American workers and their families." Among other things, PBGH shares with its members strategies for reducing spending on employee healthcare benefits, including prescription-drug coverage. PBGH claims that it has "helped large employers save millions of dollars on pharmaceutical spending."

137.    Many of PBGH's recommendations to its members, including JPMorgan, are the exact things detailed above that JPMorgan did not do.

138.    For example, PBGH warns against using traditional PBMs, explaining that "traditional PBMs have adopted opaque and deceptive business practices that enable them to capture revenue from multiple sources, often increasing the benefit cost," and that traditional PBMs "have proliferated due to misleading contracting practices, unscrupulous operating practices, limited audit rights, nontransparent financial alignment with pharmacy benefit consultants and by leveraging status quo bias." PBGH notes that in contrast, "many of the newer 'next gen' PBMs are committed to principled business practices that could be more cost effective and result in better clinical outcomes." Despite this recommendation, Defendants continue to use Caremark, one of the traditional PBMs that PBGH expressly cautioned against.

139.    PBGH also warns against the use of AWP as a benchmark for drug prices. PBGH states that "one means used by PBMs to manipulate purchasers' perception of their performance is the use of Average Wholesale Prices (AWP). Despite the name, these are not wholesale prices and particularly in the case of generic drugs, bear absolutely no rational relationship to wholesale or retail prices." PBGH explains that "purchasers should be weary [sic] of the arbitrary and exploitable nature of the AWP benchmark." PBGH encourages its members to "examine alternative pricing benchmark approaches," including by using NADAC. Despite this recommendation, Defendants continue to pay for prescription drugs based on AWP.

140.    PBGH warns against spread pricing, identifying it as one of two "primary avenues for profiteering by PBMs." PBGH advises its members to prohibit spread pricing in their PBM contracts, and provides the following recommended contract language: "There will be no variation between the amount paid to the pharmacy and the amount reimbursed by the plan sponsor." PBGH

also provides the following recommended contract language: "Reimbursement to pharmacies will be equal to the amount billed to the client. There will be no 'Spread Pricing' at any pharmacy." Despite this recommendation, Defendants continue to allow Caremark to utilize spread pricing.

141. PBGH warns against allowing a PBM to self-preference its own biosimilars regardless of cost. PBGH recommends that its plan sponsor members, including JPMorgan, use the following contract language: "In the case that multiple versions of the same Generic or Biosmilar is available for a Brand or reference product, the least expensive Biosimilar will be placed in a lower cost sharing tier." Despite this recommendation, Defendants continue to cover only Hyrimoz, instead of lower-cost alternatives manufactured by companies that are not vertically integrated with Caremark.

142. PBGH also recommends that members "remove waste from drug formularies and achieve savings." PBGH explains that "[t]he revenue model where Pharmacy Benefit Managers (PBMs) keep a portion of the spread, rebate, or other fees paid by drug manufacturers creates a financial incentive for PBMs to prefer or allow drugs with high prices and large rebates or large spreads, which often results in having wasteful drugs on the formulary." PBGH states that "all plan sponsors should check if their drug formularies contain wasteful drugs." Defendants did not follow these recommendations. For example, PBGH identifies the brand name drug Vimovo as a wasteful drug and recommends that plans remove it from the formulary and cover only the generic. Defendants, however, do the opposite—the Plan covers only Vimovo (at $459.36 for a 30-day supply) and not the generic (which, according to PBGH, would cost $22.80).

143. JPMorgan is also a member of the Health Transformation Alliance ("HTA"), which claims that it has "developed value-driven solutions in data and analytics, pharmacy, medical, and consumer engagement specifically designed to improve patient care and lower costs." Among

other things, HTA shares with its members strategies for reducing spending on employee healthcare benefits, including prescription-drug coverage. According to HTA, its "highly engaged member companies, who fully utilize [HTA's] services, typically spend 15% less on healthcare than the rest of the market."

144. One of HTA's "solutions" for employers is to carve out "specialty" drugs from their main PBM contract and to instead contract with a separate PBM for those drugs. HTA's website touts that "HTA Members who Carve Out Specialty Drugs from PBM Arrangement Reduce Specialty Spend ~47%." The following table from HTA's website ("PMPM" stands for "per-member, per-month") shows that HTA's members who carve out specialty drugs from their main PBM contract save 47.2% on specialty drugs and 39.8% across their entire prescription drug plan.

| HTA Members who Carve Out Specialty Drugs from PBM Arrangement Reduce Specialty Spend ~47% | | |
|---|---|---|
| | HTA Member Companies w/no Specialty Carve Out | HTA Member Companies with Specialty Carve Out |
| Non-Specialty Plan Cost PMPM | $30.74 | $22.77 |
| Specialty Plan Cost PMPM | $58.07 | $30.66 |
| Total Plan Cost PMPM | $88.81 | $53.43 |

145. Despite the recommendation from HTA, Defendants did not carve out specialty drugs from the Plan's PBM contract with Caremark.

146. According to HTA, following this one recommendation would save the Plan and its participants/beneficiaries 39.8% on prescription drugs. For a company the size of JPMorgan, with approximately 150,000 Plan participants each year, the numbers in the above table suggest

that Defendants could have saved the Plan and its participants/beneficiaries over $60 million *per year* simply by following HTA's recommendation about specialty carve-out.

### 4. Defendants Acted Disloyally by Prioritizing JPMorgan's Banking Business Over Plan Interests.

147. Defendants knew they could reduce costs for the Plan and its participants/beneficiaries by replacing the Plan's PBM and implementing various healthcare cost-reduction measures. However, after initially pursuing these cost-savings initiatives through Haven Healthcare, Defendants abandoned these efforts under pressure from CVS and other banking clients, subordinating the Plan's interests to JPMorgan's business relationships.

148. JPMorgan CEO Jamie Dimon demonstrated his awareness of potential Plan saving opportunities by spearheading the formation of Haven Healthcare, a joint venture with Amazon and Berkshire Hathaway that officially launched on January 30, 2018. Haven Healthcare was explicitly aimed at improving the Plan and reducing JPMorgan's employee healthcare costs. Dimon stated that the goal of the venture was "to create solutions that benefit our U.S. employees, their families and, potentially, all Americans." Contemporaneous reporting likewise stated that the venture "aims to overhaul health care for the three companies' legions of employees" and Haven's COO Jack Stoddard testified that the venture was "likely to significantly overhaul benefit design."

149. Haven Healthcare focused on both pharmacy benefits and medical benefits more broadly. An internal document from December 2017 stated that prior efforts to reduce health care costs didn't work "because they conceded the existence and role of intermediaries like PBMs, insurance administrators, wholesale distributors and pharmacies, which have a vested interest in maintaining the status quo." The same document proposed that JPMorgan manage pharmacy benefits in house instead of using a PBM. Dimon accordingly noted in an interview that the venture was analyzing the company's PBM arrangements, among other work.

150.     The announcement of Haven Healthcare on January 30, 2018 triggered an immediate decline in stock prices for PBMs and insurers such as Express Scripts (8.8%), CVS (5.6%), Anthem (5%), and Cigna (6%).

151.     In the days after Haven Healthcare's launch, JPMorgan received complaints from healthcare companies "worried that it could cut into their business," according to reporting at the time. In an interview, Dimon explained that "quite a few" healthcare companies that JPMorgan does business with were "pissed off" by the new venture. Dimon said he spoke with many of the healthcare companies who saw stock price drops after the announcement. The Wall Street Journal reported that "JPMorgan Chief Executive James Dimon got involved personally, speaking with some health-care executives to allay fears that the bank would become their rival." On information and belief, that included conversations between Dimon and PBMs, including Caremark and/or CVS. JPMorgan's healthcare bankers and merger and acquisition advisors also received calls from clients "concerned and confused" about the new venture's impact. At least two of the five largest insurers voiced concerns to JPMorgan following the announcement. Reporters noted that JPMorgan "is eager to avoid even a small disruption to its health-care investment-banking franchise, a powerhouse on Wall Street."

152.     CVS Chairman Dave Dorman discussed the venture in a February 9, 2018 interview: "Jamie Dimon is a tough guy. He's looking at his costs going up 10% a year as a big part of his overall employee cost and says, 'What can we do about it?' […] The fact is, the doctor on Main Street isn't controlled by them, isn't managed by them, their employees have to make individual good decisions that will lead to their health. So, good luck. I think it's a very deep pool. We supply JPMorgan PBM benefits today. I suspect that we'll see a lot of things churning here." On information and belief, Dorman's comments about Dimon were based on their direct

interactions regarding Haven Healthcare and JPMorgan's employee drug and health benefits in the prior weeks.

153. In a CVS company meeting on February 12, 2018, CVS's then-CEO Larry Merlo discussed CVS's pending merger with Aetna in relation to the recent announcement of Haven Healthcare. Merlo explained that the announcement "turned the healthcare industry upside down because three companies that are tremendously well-respected with terrific leaders said they want to form a new company that's going to reduce healthcare costs."

154. Amid this industry backlash, including from JPMorgan clients, Haven Healthcare abandoned its goal of replacing PBMs. On information and belief, this happened shortly after Dimon and Dorman discussed JPMorgan's employee drug benefits.

155. In January 2021, Haven Healthcare was formally disbanded following push back for self-serving business reasons. As an actuary involved in the project explained: "Unfortunately all the constituencies within the various firms sort of raised their heads saying wait a minute, we're investing for all these mainstream healthcare providers. We don't want to make them mad. A lot of noise on the financial aisles of these firms eroded the momentum from the get go of what we could do." On information and belief, this "noise" included the conversations Dimon had with leading insurers and PBMs.

156. JPMorgan's abandonment of Haven Healthcare, along with Haven Healthcare's ineffectiveness while it existed, resulted in large part from Jamie Dimon's and Defendants' prioritization of JPMorgan's business relationships and interests over fiduciary duties to the Plan and its participants and beneficiaries. Had Defendants not breached their duty of loyalty, Plaintiffs would have saved money on their medical and prescription drug benefits through lower premiums, lower out-of-pocket costs, and higher quality of services.

157.     In May 2021, JPMorgan announced the formation of Morgan Health. In stark contrast to Haven Healthcare, Morgan Health reflects JPMorgan's capitulation to industry interests. Morgan Health, while again personally spearheaded by CEO Jamie Dimon, emerged largely as an investment vehicle that plans to "invest $250 million of JPMorgan Chase & Co. capital in promising health care companies." Unlike Haven Healthcare's reform mission, Morgan Health has not attempted to improve the Plan's prescription-drug benefits or move away from Caremark. Unlike the announcement of Haven Healthcare, which caused the stock of healthcare companies like CVS to plummet, JPMorgan's announcement of Morgan Health featured industry support. CVS CEO Karen Lynch was quoted in JPMorgan's press release saying: "We are looking forward to working with Morgan Health. We have a long-standing relationship with JPMorgan Chase and will continue to collaborate to make healthcare better for all employers."  Morgan Health CEO Dan Mendelson described CVS as a partner with whom his team has "great relationships." Dan Mendelson, the CEO of Morgan Health, joined immediately after running his own healthcare consulting firm where CVS was a client.  In 2017, Mendelson publicly praised the merger of CVS and Aetna despite consumer advocates and antitrust experts warning that the merger would result in higher prescription drug prices.  A Morgan Health Executive Director previously worked at CVS managing communications for Caremark.

### 5.      Defendants Succumbed to Conflicts of Interest

158.     In failing to take prudent and appropriate measures to monitor the Plan's PBM and minimize costs for prescription drugs, Defendants disloyally placed JPMorgan's business interests ahead of the interests of the Plan and its participants, and succumbed to those conflicts of interest.

159.     JPMorgan is one of the largest and most sophisticated financial services companies in the world, and is a key player in the global pharmaceutical market.

160.    The pharmaceutical industry is a major source of investment banking revenue for JPMorgan.   JPMorgan advises and manages the largest pharmaceutical industry mergers, acquisitions, and transactions each year.   In 2024, JPMorgan collected nearly $3 billion in fees from M&A transactions.   While JPMorgan's earnings on many deals are undisclosed, the firm boasts that is the global leader in investment banking fees.

161.    In 2019, JPMorgan's $123 million fee on pharmaceutical group AbbVie's acquisition of Allergan was the largest ever disclosed fee to a bank for advising an acquisition (in any industry).   Financial Times reported that JPMorgan's record fees "shine a light on the lucrative work of bankers who spend years building relationships with companies to cash in on big takeovers."

162.    In 2024, JPMorgan advised Novo Nordisk's $16.5 billion acquisition of drugmaker Catalent—the largest pharmaceutical industry deal of the year—and received a fee of approximately $58 million.

163.    In 2023, JPMorgan had a lead role in Pfizer's $31 billion acquisition of drugmaker Seagen, the industry's largest deal of the year. That year JPMorgan also advised Johnson & Johnson's $42 billion spinoff of its consumer health unit Kenvue, AbbVie's $10.1B acquisition of ImmunoGen, and Roche's $2.7B acquisition of Carmot Therapeutics.

164.    In 2022, JPMorgan advised Horizon Therapeutics' merger with Amgen, the largest healthcare merger of the year, worth $27.8 billion.   JPMorgan also advised Johnson & Johnson's $16.6 billion acquisition of Abiomed.

165.    JPMorgan has been paid to advise, manage, and finance significant transactions for CVS, Caremark and Aetna.   JPMorgan participated in the financing of CVS's $69 billion merger with Aetna in 2018, acting as a Bridge Commitment Party. JPMorgan also acted as an Underwriter

and Bookrunning Manager for CVS's nearly $40 billion bond sale in March 2018. In 2020, JPMorgan served as Dealer Manager for CVS's $6 billion bond buyback. Between 2019 and 2024, JPMorgan acted as an Underwriter for CVS on at least five bond sales worth a combined $17.5 billion. In 2015, JPMorgan arranged a $2 billion stock buyback for CVS. Between 2011 and 2017, JPMorgan acted as a Syndication Agent for at least four multi-year credit agreements for CVS. JPMorgan acted as Administrative Agent, Joint Lead Arranger, and Bookrunner for a five-year credit agreement with Aetna starting in 2012, and as an underwriter for a $1 billion bond deal in 2017.

166.    In 2006 and 2007, JPMorgan served as a financial advisor to the Caremark Board of Directors as it considered potential mergers with both CVS and with Express Scripts; with the advice of JPMorgan, Caremark opted to be acquired by CVS for $21 billion in what was "by far" CVS's largest transaction to date.  The exact fee JPMorgan received was not disclosed, but Caremark reported JPMorgan was paid "customary fees for their financial advisory services in connection with the merger, portions of which were payable in connection with their opinions and significant portions of which are contingent upon the completion of the merger."

167.    JPMorgan hosts the largest annual healthcare industry conference, which the company has described as "the birthplace of deals."  The 2025 JPMorgan Healthcare Conference drew roughly 8,000 attendees, featured presentations from more than 500 companies, and was expected to generate over $90 million in economic activity for the host city of San Francisco.  The conference routinely features speakers from the PBM industry, including CVS.  In 2023 and 2024, CVS CEO Karen Lynch spoke at the JPMorgan Healthcare Conference about its pharmacy benefit management business.

168.     JPMorgan also generates revenue from pharmaceutical industry clients through services such as commercial lending, equity and debt underwriting, cash flow management, market research, investment management, and international asset exchange.

169.     Defendants did not act with an eye single to the Plan and its participants and beneficiaries, but instead had these business and financial interests in mind at all times, in connection with their actions (and failures to act) set forth herein.

**B.     Defendants' Fiduciary Processes Were Fundamentally Flawed**

170.     Defendants failed to engage in a loyal, prudent, and reasoned decision-making process focused exclusively on the interests of the Plan and its participants/beneficiaries before agreeing to a PBM contract (and extending/renewing a contract) that requires the Plan and its participants/beneficiaries to pay Caremark the above-described prices.  Prudent and loyal plan fiduciaries would have taken readily available steps to reduce the Plan's costs, which Defendants failed to take.  Because of the extraordinarily high prices to which Defendants agreed, the Plan paid substantially more for prescription drugs than it would have paid absent the conduct described herein.  Likewise, participants and beneficiaries of the Plan paid more in premiums and out-of-pocket costs than they would have paid absent the conduct described herein.

171.     ***First***, even setting aside whether prudent and loyal fiduciaries would have contracted with Caremark for all of their prescription-drug benefits, Defendants failed to adequately negotiate (or re-negotiate) the Plan's contract with Caremark and failed to prudently exercise their rights under that contract.  As a Fortune 50 employer with tens of thousands of employees, JPMorgan has substantial bargaining power with vendors, including PBMs.  Prudent fiduciaries would have—and other similarly sized companies' plan fiduciaries have—used that bargaining power to demand and obtain substantially better contractual terms, including terms relating to prices and the way in which prices are determined.  Defendants could have taken these

steps and obtained savings while retaining their prescription-drug plan's essential features and level of PBM services.

172.    For example, prudent fiduciaries would have—and Defendants could have—ensured that the Plan's prices for generic drugs are set forth in a fixed unit-cost schedule or NADAC-based price instead of with reference to AWP.  By taking this one step, Defendants would have reduced their spending on generic drugs by 30% or more.  Fiduciaries of comparable plans have done exactly that in their negotiations with Caremark and have reduced their prescription-drug spending by 30% or more as a result.  This option was available to Defendants and would have saved the Plan and its participants/beneficiaries millions of dollars across the prescription-drug program as a whole.  Put another way, Defendants' fiduciary breaches caused the Plan and its participants/beneficiaries to overpay by millions of dollars each year on prescription-drug costs compared to available alternatives.

173.    Prudent fiduciaries also would have—and Defendants could have—ensured that generic specialty drugs are priced as generic drugs and not placed in the specialty drug category with branded specialty drugs.  Prudent fiduciaries also would have—and Defendants could have—more closely supervised Caremark's formulary management and more effectively exercised their own rights to make decisions about formulary inclusion and placement.  Had Defendants adequately negotiated with Caremark and exercised their rights under the Plan's contracts, the Plan and its participants/beneficiaries would have saved millions of dollars.

174.    *Second*, Defendants failed to adequately consider contracting with a different PBM for all of the Plan's prescription-drug needs.  Fiduciaries of similar plans across the country have conducted comprehensive plan reviews and concluded that their plans' interests were best served by switching from a traditional PBM to a pass-through PBM.  This option was equally available

to Defendants. Given the extremely high prices that Defendants agreed to pay, the Plan and its participants/beneficiaries would have been better served by switching from a traditional PBM to a pass-through PBM, and those benefits would have been clear at the time of contracting. Defendants failed to adequately solicit bids from pass-through PBMs, or alternatively, did solicit such bids but failed to act in the best interests of the Plan and its beneficiaries when choosing among competing bids. A prudent process would have made clear that the Plan would save a substantial amount of money by contracting with one or more pass-through PBMs instead of entering into and continuing its contract with Caremark, without meaningfully (or at all) sacrificing availability of drugs, scope of pharmacy network, quality of service, convenience, or any other factor related to plan features or services. Had Defendants adequately considered alternative PBMs and made the prudent choice, the Plan and its participants/beneficiaries would have saved millions of dollars.

175. SmithRx is a pass-through PBM that services a wide range of employer healthcare plans. SmithRx is capable of providing a high level of service comparable or superior to that provided by Caremark, and it currently services multiple clients who formerly used Caremark as their PBM. Defendants could have, but did not, include SmithRx in their procurement process. If Defendants had contracted with SmithRx instead of agreeing to contract with Caremark, Defendants would have saved the Plan and its participants/beneficiaries substantial amounts of money while retaining the prescription-drug plan's efficacy and level of PBM services.

176. Comparable savings were available to Defendants by contracting with other pass-through PBMs as well. For example, Navitus is a pass-through PBM that services hundreds of healthcare plans covering over 14 million lives. It is capable of providing a high level of service comparable or superior to that provided by Caremark. For 2022, Navitus's commercial clients paid

an average of $89.73 in net total costs per-member, per-month. On information and belief, the Plan in 2022 paid substantially more in net total costs per-member, per-month under the terms of the contract Defendants negotiated with Caremark.

177.     As another example, Capital Rx is a pass-through PBM that services a wide range of healthcare plans covering over 3 million lives.  It is capable of providing a high level of service comparable or superior to that provided by Caremark.  Instead of engaging in spread pricing and rebate retention, it bases its prices on NADAC and charges its clients only a flat administrative fee. Capital Rx's clients pay far less than Caremark for the same goods and services. Put another way, Defendants' fiduciary breaches caused the Plan and its participants/beneficiaries to overpay by millions of dollars each year on prescription-drug costs compared to available alternatives.

178.     *Third*, Defendants failed to adequately consider carving out their specialty-drug program from their broader contract with Caremark.   As described herein, fiduciaries of similar plans across the country have conducted comprehensive plan reviews and concluded that their plans' interests were best served by carving out specialty pharmacy benefits from their overall PBM contract.  This option was equally available to Defendants.  A prudent and loyal process would have revealed that the Plan would save money by carving out the specialty-drug program from the Plan's contract with Caremark.  Had Defendants adequately considered this option and made the prudent choice, the Plan and its participants/beneficiaries would have saved millions of dollars.

### C.     An Attentive Fiduciary Would Have Recognized and Avoided the Flaws in Defendants' Approach

#### 1.     Published Warnings and Guidance

179.     Prominent media outlets, industry publications, governmental entities, and research organizations have long reported on the PBM tactics and conflicts of interest detailed above, and

have warned plan administrators about the financial harms that result when they fail to act prudently and instead allow PBMs to enrich themselves at the expense of plans and their participants/beneficiaries. Prudent fiduciaries would heed this advice—and many prominent companies' fiduciaries have heeded this advice—by taking steps to protect their plans from these widely-reported tactics. Defendants knew or should have known that their PBM contracts unreasonably failed to heed these warnings and failed to protect the Plan and its participants/beneficiaries from these widely reported tactics, despite having ample bargaining power. Defendants' failure to act prudently and their decision to enter into unreasonable arrangements with their PBM cost the Plan and its participants/beneficiaries millions of dollars during the class period.

180. As early as 2010, the International Foundation of Employee Benefit Plan was reporting on the ways in which PBMs use specialty drugs to extract profits from plans. One notable article written by a PBM expert warned that "most PBMs increase their profit margins by buying specialty drugs at low prices and selling them at far higher prices, rather than using their marketplace leverage to decrease their clients' costs." The article advised plans to "require your PBM to provide pass-through pricing for every specialty drug dispensed" and to "invoice your plan based on the PBM's actual acquisition cost." The article also recommended that plans "can—and should—position [themselves] contractually to carve out specialty drugs after the contract begins, ensuring that you can consistently obtain the best minimum guaranteed discount available, throughout the life of the contract." The article advised plans that they should "make sure to eliminate … exclusivity provisions and replace them with provisions that allow you to carve out specified services, including the provision of some or all specialty drugs, and the right to negotiate contracts with alternative specialty drug pharmacies."

181.    A 2013 article in Fortune Magazine reported that traditional PBMs "effectively pad bills by $8 to $10 a prescription" and, quoting a consultant who had audited more than 100 PBM contracts, that "[t]he nation's employers are being taken for a ride" by traditional PBMs.

182.    A 2017 article reported that "[c]ontrolling the formulary gives PBMs a crucial point of leverage over the system" and warned that "PBMs place drugs on their formularies based on how high a rebate they obtain, rather than the lowest cost or what is most effective for the patient." The same article warned that "[t]he MAC list that goes to the pharmacy does not necessarily match the one for the health plan. By charging the plan sponsor more than they pay the pharmacy in a reimbursement, PBMs can make anywhere from $5 to $200 per prescription."

183.    A 2017 article from Bloomberg titled "Drug Costs Too High?  Fire the Middleman" reported that PBMs "keep about 10 percent of the rebates from manufacturers vying to get their medicines covered; they sometimes charge health-plan clients more for generics than they reimburse the pharmacies dispensing them; and they channel clients to their own specialty or mail-order pharmacies."  The article recounted numerous success stories of companies that had moved away from the traditional PBM model and delivered millions of dollars in savings to their plans and their employees.

184.    A 2018 article from Axios reported that PBM contracts are often "written with the PBM's financial interests in mind" and that "those kinds of provisions can result in lost savings for everyone, especially for small companies and their employees."  The article warned that "[e]ven some of the largest companies think they are protected because they have in-house and outside attorneys vetting contracts, yet that's not necessarily the case."  The article warns that "a major tactic to maximize profits" by PBMs is controlling how different drugs are designated on the formulary.

185.    A 2018 article from Axios quoted a prominent consultant who warned that "One of the key components of the system is that transition of brand-name drug to generic drug … [a]nd if you would allow a PBM or any third-party vendor to over-inflate that amount ... you are being set up to lose every time."

186.    A 2018 report by drug price nonprofit 46Brooklyn Research detailed PBMs' use of spread pricing to reap massive profits, at the expense of payers, on generic imatinib mesylate.  As that report explained, payers who agree to pay prices that are determined independently of what PBMs pay to pharmacies "lose all visibility into what their underlying drugs actually cost, handing the keys over to the PBM," while "the PBM can effectively just sit back as generic prices plummet, knowing that it is under no requirement whatsoever to pass the full extent of those savings back" to the payer.

187.    An extensive probe by the Columbus Dispatch, reporting on which began in 2018, revealed "that CVS Caremark routinely billed the state [of Ohio] for drugs at a far higher amount than it paid pharmacies to fill the prescriptions," retaining "tens of millions of dollars" in spread pricing.  Among many other things, the Dispatch reported that the traditional PBM "system has a built-in incentive for CVS Caremark and other PBMs to maximize the price spreads: They get to keep the money" and that "the largest spreads occurred among generic drugs."  The Dispatch's reporting was picked up and widely reported by national outlets.

188.    A 2018 USA Today article about PBMs quoted a prominent consultant describing a supposedly new pricing model by CVS Caremark as follows: "CVS Caremark is using different language only to make it appear that it is being more transparent. And the new pricing approach also doesn't eliminate rebates on brand-name drugs or spread pricing.  When negotiating contracts with manufacturers, CVS Caremark can label manufacturers' payments with whatever labels

Caremark wants: rebates, manufacturer fees, health management fees, etc. Therefore, the question is what percentage of total manufacturer payments Caremark passes through."

189.    A 2019 article quoted a prominent consultant who identified "[a] lack of clear definitions of types of drugs" as an important issue, and explained that "PBMs often play with the definitions of [specialty] drugs in ways that promote the health of their own bottom line."  The consultant advised that a payer "should make its own list of specialty drugs" and "set minimum guaranteed discounts off public prices for each."  The same consultant stated: "If you write a better contract, you can eliminate a lot of this stuff."

190.    A 2020 report commissioned by The Florida Pharmacy Association and American Pharmacy Cooperative, Inc. warned that "as more brand name specialty drugs … lose patent exclusivity in the coming years, there is growing risk that the extreme pricing manipulation and steering we have identified on imatinib mesylate could become more commonplace," and recommended moving "to an acquisition cost-based model to mitigate the risk of a dramatic rise in price exploitation on specialty generic drugs."

191.    A 2020 report on pharmacy benefits advised that traditional PBMs have "misaligned incentives which can lead to price increases without providing equivalent value for the purchasers of benefits" and advised that "Employers need to: • Think differently about how to manage the pharmacy benefit. • Take action on addressing waste, low-value drugs and excess costs often caused by PBMs and other pharmacy benefit middlemen. • Make ethical and logical decisions over what a drug is worth and the employer's ability to pay – as plan sponsor and fiduciary, it's critical that dollars are used efficiently for plan beneficiaries. • Focus on innovative approaches to specialty drug management."

192.     A 2021 report prepared by the House Committee on Oversight and Reform Minority Staff warned that "PBMs engage in a number of questionable practices, one of which is spread pricing, in which PBMs pay a pharmacy a lower amount than they report to a health plan sponsor." The report further stated that PBMs use their control of formularies to "drive patients to more expensive drugs."

193.     A 2022 BenefitsPro article directed at human resources officers advised that "plan sponsors have more power than they may realize when evaluating a PBM," that "your PBM contract must be free of any ambiguities regarding the PBM's obligation to act in your best interests at all times," that plan fiduciaries should "prohibit the PBM from using any internal 'proprietary' algorithm that determines whether a drug will be priced as a brand or generic drug," that plan fiduciaries should "prohibit the MAC Game by requiring the PBM to use the same MAC List to pay the pharmacy and to bill you for generic drugs," that plan fiduciaries should "make it clear that … the PBM must pass through and not retain any rebates" and "define the term 'rebate' to include any and all renumeration that the PBM receives from drug manufacturers based on your plan's utilization," that plan fiduciaries should "require the PBM to … place drugs on your formulary based on efficacy, safety and the true net cost of the drugs," and that plan fiduciaries should "audit your PBM to confirm that the PBM has delivered the contracted pricing and has implemented your plan designs correctly."

194.     A February 2022 white paper on specialty drug management reported that "the savings with Specialty PBM Carve-Out can be quite substantial, with savings ranging from 25-50%. Sources of savings go beyond the supply chain elements of rebates and drug discounts to incorporate benefits of the clinical and coverage model, including a more cost-effective formulary,

health economics-based coverage, more rigorous [prior authorization], and more robust copay assistance programs."

195. A 2022 white paper from the University of Southern California (USC) reported that "U.S. consumers and employers and the government often overpay for generics as pharmacy benefit managers (PBMs) and their affiliated insurer companies game opaque and arcane pricing practices to pad profits." The paper continues: "Commercial tactics such as spread pricing, copay clawbacks and formularies that advantage branded drugs over less expensive generics have funneled the savings from low-cost generics into intermediaries' pockets, rather than the pockets of patients."

196. A 2023 report documented that PBMs regularly decline to replace expensive brand-name drugs on formularies with newly released generics, stating that "PBMs are persistently excluding generic competition from the market, resulting in higher prices and less choice for patients and the healthcare system." The report explained that "PBMs prefer the high-list price, high-rebate drugs because they benefit from it."

197. A 2023 guide to PBM contracting for employers identified "[t]he lack of unit cost pricing for ALL generics" as the "most substantial cost excess seen in PBM contracting," and informed employers that "[a]n objective ($/unit) price for EVERY generic entity must be presented in the proposal and integrated into the executed PBM contract." The same guide warns that "[i]f a plan sponsor (fiduciary) allows generics to be priced at AWP-X%, ALL cost modeling and projections are not credible."

198. A 2023 article reported on the "flow of money between major consulting conglomerates and PBMs," and quoted an industry attorney's statement that "[t]he broker not only gives bad advice to the employer that's in the broker's self-interest, but the broker also allows the

big PBM to write crazy terms into a contract." The article further warned employers that "PBMs … favor brand-name drugs over generic equivalents, delay coverage of new generics and biosimilars, mark up prices of generic drugs, and require employers to use the PBM's mail-order pharmacy," all to "boost the PBM's bottom line."

199. The federal government has long recognized the cost savings that result from basing prices on actual pharmacy acquisition costs rather than an AWP-based model. The United States Office of Personnel Management ("OPM"), which manages the civil service of the federal government, regularly issues guidelines and standards applicable to insurance carriers that provide health care coverage to federal employees. Since at least 2011, those standards have required that carriers' contracts with PBMs "base Carrier costs on negotiated price with network pharmacies or the actual acquisition cost for PBM-owned or affiliated pharmacies." According to the latest guidelines, carriers must ensure that the price of drugs filled by pharmacies not affiliated with the PBM are based on the negotiated price in each pharmacy agreement plus a dispensing fee, without spread pricing. Likewise, carriers must ensure that the price of drugs filled by PBM-owned or affiliated pharmacies are based on the actual acquisition cost, plus a dispensing fee, without spread pricing. PBMs must also disclose to carriers the MAC lists used for carriers' pricing.

200. OPM also requires carriers to negotiate for full audit rights to all PBM network pharmacy contracts, claims data, manufacturer payments (including all rebates, however denominated), invoices, and clinical services coverage criteria. OPM further requires carries to include in their PBM contracts terms related to having access to information at each claim and aggregate level between PBMs and pharmacies (including PBMs and PBM-owned or affiliated pharmacies).

### 2. Defendants' Own Business and Trade Experience

201. Defendants were also aware, from their own business and trade experience, of the mischief in which PBMs like Caremark engage, and appropriate steps that can and should be taken to avoid such mischief and reduce prescription drug costs.

202. As noted above, JPMorgan's own industry trade groups, PBGH and HTA, issued a number of pertinent warnings and/or recommendations. *See supra* at ¶¶ 136-46.

203. JPMorgan's joint venture, Haven Healthcare, also highlighted the problems associated with traditional PBMs and counseled against retaining them altogether. *See supra* at ¶ 149.

204. Similarly, JPMorgan itself advises companies outside the pharmaceutical industry on intelligence from the industry through market research, business consulting, and other client services. JPMorgan has produced documents warning company benefits providers that "most health care brokers are paid commissions by the health plans their clients select" and that "[n]ew products may not offer your broker the same incentives as long-standing plans, so they may be less likely to share them with you unless you request them explicitly."

### 3. Practices of Other Plans

205. Throughout the class period, the fiduciaries of other prescription-drug plans publicly took one or more of the steps detailed above and saved their plans and their beneficiaries millions of dollars, with savings that far outweighed any costs (financial or otherwise) of implementation. These options were equally available to Defendants, who could have retained their prescription-drug plan's features and level of PBM services while obtaining substantial savings for the Plan (in the form of lower payments for prescription drugs) and their participants/beneficiaries (in the form of lower premiums, lower our-of-pocket costs, lower deductibles, lower coinsurance, lower copays, and higher wages or greater wage growth).

206. The following examples are illustrative and taken from public reporting. Many other companies have taken similar steps and achieved similar results.

207. Charter Communications is a telecommunications company that provides prescription-drug benefits for approximately 175,000 employees and their dependents. Like JPMorgan, Charter Communications uses Caremark as its PBM, but Charter Communications has used its bargaining power to secure prices for generic drugs that are far lower than JPMorgan's prices. Across the 356 generic drugs described in paragraph 112 that are also available under the Charter Communications plan, Defendants agreed to make the Plan and its participants/beneficiaries pay, on average, *2.4 times as much* as Charter Communications' plan and participants/beneficiaries pay for the same drugs. Put another way, a single prescription of each of the 356 drugs would cost $49,317 for the Charter Communications plan and its participants/beneficiaries, while a single prescription of each of the 356 drugs would cost $117,532 for the JPMorgan plan and its participants/beneficiaries.

208. Caterpillar Inc. is an equipment manufacturer that provides prescription-drug benefits for approximately 100,000 employees and their dependents. In 2010, Caterpillar began exercising full control over its formulary instead of deferring to the formulary recommendations of its traditional PBM, and used that control to ensure that decisions about formulary inclusion and placement were being made in the interests of its plan rather than its PBM. Since making these changes, Caterpillar has saved millions of dollars per year on its prescription-drug costs, with far lower per-patient and per-prescription costs. Bloomberg News reported on Caterpillar's success in exercising formulary control, reporting that "Caterpillar has saved tens of millions of dollars a year" and quoting the company's global benefits manager stating that Caterpillar's "model is as successful today as it's ever been."

209.     Wayne Farms is a poultry processor that provides prescription-drug benefits for approximately 12,000 employees and their dependents.  In August 2020, Wayne Farms carved out specialty drugs from its traditional PBM contract and implemented a pass-through PBM model for its specialty drugs through Archimedes, a pass-through PBM.  This change resulted in substantial savings for Wayne Farms: When comparing the first six months of the specialty carve-out program to the same time period in the year prior, Wayne Farms' expenditures on specialty drugs decreased from $26.75 to $16.03 in per-member per-month costs ("PMPM," a common cost metric for prescription-drug plans), representing a 40% decrease in plan spend.  Net of fees, Wayne Farms experienced a 31% decrease in plan spend for the first six months compared to the same period the prior year.  This change in plans was implemented with negligible member disruption.  Wayne Farms's Director of Compensation and Benefits stated: "Implementing this program was one of the best decisions our team has made. The savings are exceeding projections and our members are extremely happy."

210.     American Casino & Entertainment Properties LLC ("ACEP") was a gaming company (which has since been acquired by a larger gaming company) that provided prescription-drug benefits for thousands of employees and their dependents.  In 2012, ACEP dropped its traditional PBM and switched to Navitus, a pass-through PBM.  Its prescription-drug costs decreased by 28 percent as a result of the switch.  ACEP's Corporate Vice President of Human Resources stated that the company was able to "maintain excellent coverage while providing substantial savings to our employees."

211.     Dean Foods was a food and beverage company (which has since been acquired by another company) that provided prescription-drug benefits for approximately 15,000 employees and their dependents.  In 2019, Dean Foods carved out all specialty drugs from its traditional PBM

contract, and Vivio, a pass-through PBM, began managing all specialty drug benefits under Dean Foods' prescription-drug plan. Prior to carving out specialty drugs, Dean Foods was projected to spend approximately $8.798 million on specialty drugs in 2019. But after carving out specialty drugs, Dean Foods spent only $5.569 million in specialty drugs in 2019, for a savings of $4.35 million in a single year.

212.    Self-Insured Schools of California (SISC) is a public school Joint Powers Authority that provides health care benefits to staff and their families at over 400 school districts in California, covering approximately 330,000 total members.    In 2014, SISC engaged in a comprehensive review of its prescription-drug benefit and concluded that it could save money by no longer deferring to its traditional PBM's formulary management decisions (which SISC recognized were favoring more expensive drugs with large rebates over cheaper drugs without rebates) and by identifying a PBM that was not focused on driving usage of its own mail-order pharmacy. SISC conducted a prudent process, hired a non-conflicted consultant, and eventually contracted a pass-through PBM. By working with its pass-through PBM to design a custom formulary, and through the more favorable pricing model of pass-through PBMs, SISC achieved substantial savings with minimal member disruption. SISC's Deputy Executive Officer stated: "We were very surprised with what we were uncovering and confident that we weren't cutting into effectiveness, just trimming waste. Clinical effectiveness and safety always came first."

213.    The University of Southern California (USC) is a private research university that provides prescription-drug benefits for more than 20,000 employees and their dependents.    By refusing to accept the formularies offered by its PBM and designing its own higher-value formulary, USC reduced its drug spend by 40 percent in one year.

214.     Golden Entertainment, Inc. is a gaming company that provides prescription-drug benefits for more than 5,000 employees and their dependents.  In or around 2019, Golden Entertainment switched from a traditional PBM to a pass-through PBM.  Just four months after implementation of its new approach, Golden Entertainment achieved overall plan and member savings of 33.5%, including a 24% decrease in member cost and a 29% decrease in PMPM costs.

215.     The city of Kenosha, Wisconsin provides prescription-drug benefits for approximately 2,400 employees and their dependents.  In 2018, Kenosha replaced its traditional PBM with a pass-through PBM.  In its first three years with the pass-through PBM, Kenosha saved $2.3 million in pharmacy costs, achieved a 38% decrease in net plan PMPM costs, and achieved a 318% increase in rebates received.  Kenosha's Director of Human Resources referred to the move to a pass-through PBM as "a rousing success" with "complete transparency and significant cost savings," and reported that "the City's pharmacy costs have dropped 38 percent, resulting in more than $2.3 million in cumulative savings."

216.     The Montana Credit Union League (MCUL) Group Benefit Trust provides health and life insurance benefits to nearly half of the 45 credit unions in the state of Montana. In 2021, MCUL issued an RFP for a new pharmacy benefits manager and contracted with a pass-through PBM.  By making the change, MCUL achieved significant reductions in PMPM costs, from $143 in 2021 to $88 in 2022.

217.     Foot Locker is a sportswear and footwear retailer that provides prescription-drug benefits for approximately 8,500 employees and their dependents.  In 2021, Foot Locker switched from a traditional PBM to Navitus, a pass-through PBM.  During the first year after the switch, spending on drugs dropped 5%.

218.    Phifer Incorporated is a fabrics company that provides prescription-drug benefits for approximately 1,000 employees and their dependents.  At the end of 2022, Phifer dropped its traditional PBM in favor of MedOne Pharmacy Benefit Solutions.  According to Phifer's vice president of human resources, Phifer was able to hold its premiums for 2024 flat because of the money it saved on drug spending.

219.    The Teamsters Health and Welfare Trust Fund of Philadelphia and Vicinity, a union fund that provides prescription-drug benefits for approximately 16,000 employees and their dependents, replaced their traditional PBM with Capital Rx in 2019.  The fund saved 17% on drug spending in its first year away from its traditional PBM, and has saved more on drug spending each year than it projected.  The executive director of the fund referred to the fund's decision to move away from a traditional PBM as the "best decision ever."

220.    Texas Association of Counties is the representative for all Texas counties and county officials.  Brian Naiser, the Financial Manager Health & Benefits Services has stated: "Five years ago, we left our previous PBM, one of the big three providers, and turned to Navitus to provide the transparency, insights and flexibility we need to help deliver lower-cost, exceptional service to our members… In the first year alone, we reduced pharmacy costs by 28% and continue to outperform industry trends, to date saving more than $160 million with Navitus."

## V.    ADDITIONAL FACTS REGARDING NAMED PLAINTIFFS

221.    Plaintiff Seth Stern is enrolled in the Plan and has been enrolled throughout the Class Period.  Stern has paid and will continue to pay premiums for his health insurance coverage, part of which is for prescription-drug coverage.  He also has paid and will pay co-pays and other out-of-pocket amounts attributable to his use of prescription drugs.  As set forth below, Stern has paid and will continue to pay more in premiums and out-of-pocket costs than he would have paid absent Defendants' fiduciary breaches and prohibited transactions.

222.    Plaintiff Angela Bindner was enrolled in the Plan while she worked at JPMorgan. While she was enrolled in the Plan, Bindner paid premiums for her health insurance coverage, part of which was for prescription-drug coverage. She also paid co-pays and other out-of-pocket amounts attributable to her use of prescription drugs. As set forth below, Bindner paid more in premiums and out-of-pocket costs than she would have paid absent Defendants' fiduciary breaches and prohibited transactions.

223.    Plaintiff Marianne Schmitt was enrolled in the Plan while she worked at JPMorgan. While she was enrolled in the Plan, Schmitt paid premiums for her health insurance coverage, part of which was for prescription-drug coverage. She also paid co-pays and other out-of-pocket amounts attributable to her use of prescription drugs. As set forth below, Schmitt paid more in premiums and out-of-pocket costs than she would have paid absent Defendants' fiduciary breaches and prohibited transactions.

A.    **Defendants' Unlawful Conduct Caused Plaintiffs and Class Members To Pay More in Premiums.**

224.    The Medical Plan component of the Plan, specifically including the prescription drug component, is "self-funded" or "self-insured." Self-funded health plans like the JPMorgan Plan cover 100% of the cost of their claims through premium contributions from participants/beneficiaries and the sponsoring employer. Although a third-party insurer may *administer* a self-funded plan, any such third-party administrator is not responsible for any of the plan's expenses or actuarial risks, which are borne exclusively by the participants/beneficiaries and the sponsoring employer. In this way, a self-funded plan functions much like an individual employee healthcare reimbursement account which is funded by employee salary deferrals and any deposits the employer may make as part of its overall benefits package. Claims costs are paid

directly out of the premium contributions deposited into the trust account by participants/beneficiaries and their employer, with no ability to shift costs to a third party.

225. Plaintiffs were enrolled in the Plan and paid premiums for their health insurance coverage, part of which were for prescription drug coverage. As a result of Defendants' fiduciary breaches and other ERISA violations, Plaintiffs paid more in premiums than they would have paid absent the fiduciary breaches and other ERISA violations described herein.

226. Enrollees in the Plan share in the cost of healthcare coverage with JPMorgan. In particular, the Plan's expenses are paid from the Trust, and the Trust is funded by a combination of employer and employee contributions, along with investment income. Employee contributions are generally made through payroll deductions.

227. Defendants set the amount of the required employer and participant contributions each calendar year based on the Plan's projected costs in that year. As the Plan's most recent Form 5500 states, "Employer and Participant contributions for any self-insured plans are determined based on the projected total annual Plan costs." Accordingly, when the Plan's healthcare expenses (including for prescription drugs) increase in a given year, employees face higher premiums in subsequent years. Consequently, the Plan's overpayments for prescription drugs lead directly to increases in premiums for the Plan's participants.

228. In each year during the class period, Defendants intentionally set employee contributions at amounts they projected would result in employees contributing premiums equal to 30% of overall Plan healthcare costs, with JPMorgan contributing the remaining 70%. Throughout this period, it was Defendants' goal to maintain a consistent ratio of employer contributions to employee contributions, and any minor variation was due to forecasting error. If

the Plan's costs were higher or lower in any given year, Defendants would have maintained the same static split of employee and employer contributions.

229. The targeted 30/70 split is consistently reflected in the reported data for the past nine years for which data is available (from 2015 to 2023). Specifically, Defendants set employee contributions at amounts they projected would result in employees contributing premiums equal to 30% of overall Plan healthcare costs, with JPMorgan contributing the remaining 70%. In 2015, employees made 30.93% of overall contributions to the Trust; in 2016, employees made 31.18% of overall contributions to the Trust; in 2017, employees made 32.26% of overall contributions to the Trust; in 2018, employees made 30.56% of overall contributions to the Trust; in 2019, employees made 30.95% of overall contributions to the Trust; in 2020, employees made 35.49% of overall contributions to the Trust; in 2021, employees made 29.93% of overall contributions to the Trust; in 2022, employees made 30.85% of overall contributions to the Trust; in 2023, employees made 29.32% of overall contributions to the Trust.

230. The slightly higher percentage in 2020 was a result of the COVID-19 pandemic's unanticipated effects on healthcare spending rather than any intentional effort by Defendants to change the 30/70 employee-employer split of contributions. As JPMorgan's own analysis shows, healthcare spending declined during the COVID-19 pandemic because, among other things, "people avoided interacting with healthcare facilities for minor, lower-cost issues, such as routine procedures or check-ups." JPMorgan set 2020 employee contributions at the level they expected would lead to a 30/70 split based on pre-pandemic data, but because 2020 overall spending was lower than expected, the employee portion ended up being slightly higher than the anticipated 30%. *See* JPMorganChase Institute, *Healthcare spending through the Pandemic*, May 2022,

https://www.jpmorganchase.com/institute/all-topics/financial-health-wealth-creation/spending-during-the-pandemic.

231.    As the above numbers show, the employee contribution percentage has remained remarkably stable. This stability in employee contribution percentage is the result of Defendants' intentional efforts to maintain a consistent ratio between employer and employee contributions. Over the period described above (omitting the 2020 COVID year), the average employee contribution has been 30.75%, with a standard deviation of just 0.87%.

232.    This consistent employee contribution percentage reflects Defendants' intentional efforts to maintain a consistent ratio between employer and employee contributions.  In light of these efforts, any reduction in overall healthcare spending—*e.g.*, if Defendants stopped causing the Plan to overspend on prescription drugs by millions of dollars each year—would result in proportionally lower employee contributions, in accordance with the established contribution ratio that Defendants have steadfastly maintained.  And similarly, because Defendants caused the Plan to overspend on prescription drugs, overall healthcare spending increased, and employee contributions in the form of premiums increased in tandem.

233.    If Defendants had not committed the fiduciary breaches and engaged in the prohibited transactions alleged here, the Plan's annual spending would have been substantially lower, which in turn would have reduced the amount of the required employee contributions each year, including the contributions made by Plaintiffs.  They paid more in premiums than they would have paid absent Defendants' fiduciary breaches.

234.    The fact that employee contributions in the form of premiums will increase when plans overspend on prescription drugs is also supported by numerous independent and/or government studies.

235. In 2024, the Federal Trade Commission ("FTC") issued a report on PBMs. The FTC's Report found that, in addition to directly affecting patients' out-of-pocket costs, "inflated drug costs over time also result in higher premiums" for patients who utilize commercial health insurance such as employer-provided insurance. FTC Report at 47.

236. A 2023 report by the Center for American Progress, an independent nonpartisan policy institute, similarly found that inflated drug prices "ultimately raise[] costs for consumers through higher cost sharing and premiums." The Center for American Progress, *Following the Money: Untangling U.S. Prescription Drug Financing* (Oct. 12, 2023), https://www.americanprogress.org/article/following-the-money-untangling-u-s-prescription-drug-financing/. The report found that "misaligned incentives throughout the drug pricing system sustain high prices ultimately borne by patients. Patients absorb these high prices through cost sharing or directly out of their pockets if they have not met their deductibles or are uninsured. These unnecessary price increases also burden patients through higher health plan premiums." *Id.*

237. According to a 2023 report by Families USA, a nonpartisan organization that examines health care policy, "almost 20% of health insurance premiums are driven by the rising cost of prescription drugs." Families USA, *Paying the Price: How Drug Manufacturers' Greed Is Making Health Care Less Affordable for All of Us* 5 (November 14, 2023).

238. A 2023 article about PBMs also notes the connection between premiums and the higher costs of drugs, explaining that when drug costs increase, premium costs increase as well, because "[i]nsurance premiums and copayments are based on list prices." Arthur Gale, *If Pharmacy Benefit Managers Raise Drug Prices, Then Why Are They Needed?*, Mo. Med., July/August 2023, at 244.

239. An article from Peterson Center on Healthcare and KFF's Health System Tracker states, "Prescription drugs are one of the leading contributors to health spending growth, and insurers frequently cite these higher drug costs as a reason for raising premiums." Gary Claxton et al., *Examining High Prescription Drug Spending for People with Employer Sponsored Health Insurance* (Oct. 27, 2016), https://www.healthsystemtracker.org/brief/examining-high-prescription-drug-spending-for-people-with-employer-sponsored-health-insurance/. The article further notes that retail prescription drug spending represents a larger share of total employer insurance benefits than retail drugs represent as a share of total national health spending, and therefore "growth in prescription drug spending may have a relatively large effect on employer-sponsored health insurance premiums." *Id.*

240. In a 2024 report commissioned by the Employee Benefits Security Administration, RAND Corporation (a nonprofit, nonpartisan research organization) found that "drug spending is conceptually related to premiums." Andrew W. Mulcahy et al., *Prescription Drug Prices, Rebates, and Insurance Premiums* 4, RAND (Dec. 5, 2024), https://www.rand.org/pubs/research_reports/RRA1820-3.html. The RAND report observed "a general trend of increasing health care and prescription drug costs to enrollees, *including premiums*," since 2014, *id.* at 30 (emphasis added), and stated that "[h]igher drug spending will, holding all else constant, lead to higher premiums." *Id.* at 52. The report further explain[ed] that "[i]nsurers set health insurance premiums based on actuarial projections of spending in the year," and that "actuaries project aggregate drug spending forward to estimate next-year spending." *Id.* at 18, 54. RAND also found that, for employer-sponsored health insurance coverage, "[t]he employer share of the premium remained steady at 82-83 percent per year across 2014-2023." *Id.* at 19. In other words, as drug costs rose between 2014 and 2023, they were borne by both plan

participants and their employer proportionally relative to the percentage that each contributed to the total insurance premium, which remained stable over time.

241.    Had Defendants not committed the fiduciary breaches and caused the Plan to engage in the prohibited transactions alleged here, the Plan's annual spending would have been substantially lower, which in turn would have reduced the required employee premium contributions each year, including those made by Plaintiffs.  They paid more in premiums than they would have paid absent Defendants' fiduciary breaches.

242.    Plaintiffs, as employees of JPMorgan and participants in the Salaried Medical Plan, were required to pay, and did pay, monthly healthcare premiums into the Trust.  While they were employed by JPMorgan, Plaintiffs paid the amount of employee contributions required by Defendants each month, and were injured by increases in those premiums.  Those premium increases were attributable to rising Plan expenses, including expenses associated with excessive prescription drug costs.

243.    In 2015, the Plan's participants made approximately $563 million in contributions to the Trust.  In 2016, the Plan's participants made approximately $567 million in contributions to the Trust.  In 2017, the Plan's participants made approximately $593 million in contributions to the Trust.  In 2018, the Plan's participants made approximately $610 million in contributions to the Trust.  In 2019, the Plan's participants made approximately $625 million in contributions to the Trust.  In 2020, the Plan's participants made approximately $633 million in contributions to the Trust.  In 2021, the Plan's participants made approximately $623 million in contributions to the Trust.  In 2022, the Plan's participants made approximately $668 million in contributions to the Trust.  In 2023, the Plan's participants made approximately $714 million in contributions to the Trust.

244.    In addition, if Defendants had not agreed to terms that forced the Plan to overpay for prescription drugs and related fees, the Plan would have used Plan assets to deliver additional healthcare benefits to Plaintiffs and other participants/beneficiaries.  In 2023, for example, the Trust received $2,435,360,398 in additional plan assets, from a combination of employee contributions, employer contributions, and investment income.  Pursuant to ERISA, those assets were required to be spent for the exclusive purpose of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the plan.  In the same year, the Trust used $2,315,189,784 of plan assets on claims payments and plan expenses.  A significant portion of that among was spent on overpayments for prescription drugs and fees.  If Defendants had not forced the Plan to waste that money by paying excessive prices for prescription drugs and related fees, the Plan would have been required by ERISA to use—and would have used—that money to deliver additional benefits to participants/beneficiaries, including Plaintiffs.  The same is true of prior Plan years.

**B.      Defendants' Conduct Caused Plaintiffs To Pay More in Out-Of-Pocket Costs.**

245.    Defendants' unlawful conduct also caused Plaintiffs to pay more out-of-pocket for prescription drugs than they otherwise would have paid.

246.    The term "out-of-pocket" refers to payments other than monthly premiums that a plan participant pays for medical services and prescription drugs—*i.e.*, amounts that are not covered by the health plan.  For example, plan participants may be required to pay a $25 co-pay for a doctor visit, with the health plan covering the rest of the cost.  The $25 co-pay is an "out of pocket" cost.  Similarly, plan participants may be required to pay 20% co-insurance for a hospital visit, meaning that the health plan pays 80% of the overall charge and the employee pays the other 20%.  That 20% co-insurance payment is an "out of pocket" cost.

247.     While enrolled in the Plan, Plaintiff Seth Stern has obtained numerous prescriptions for generic drugs for which Defendants agreed to unreasonable prices, including █████████ (309.59% markup at time of prescriptions), █████████ (627.22%), and █████████ (287.43%). For example, in October 2023, Stern filled a 60-unit prescription of █████. At the time, the acquisition cost for that prescription was only $2.01. However, Defendants agreed to terms with Caremark under which that prescription cost nearly four times as much, $8.25. Stern was required to pay that full amount out-of-pocket, directly bearing the cost for the overcharge.

248.     While enrolled in the Plan, Plaintiff Angela Bindner obtained numerous prescriptions for generic drugs for which Defendants agreed to unreasonable prices, including █████████ (400% markup at time of prescriptions). For example, in March 2022, Bindner filled a 90-unit prescription of █████. At the time, the acquisition cost for that prescription was only $5.69. However, Defendants agreed to terms with Caremark under which that prescription cost over eight times as much, $45.73. Bindner was required to pay $30 out-of-pocket for the prescription, directly bearing most of the overcharge.

249.     While enrolled in the Plan, Plaintiff Marianne Schmitt obtained numerous prescriptions for generic drugs for which Defendants agreed to unreasonable prices, including █████████ (327% markup at time of prescriptions), █████████ (185.32%), █████████ (284.49%), and █████████ (39.1%). For example, in October 2023, Schmitt filled a 90-unit prescription of █████. At the time, the acquisition cost for that prescription was only $4.30. However, Defendants agreed to terms with Caremark under which that prescription cost over four times as much, $18.34. Schmitt was required to pay that full amount out-of-pocket, directly bearing the cost for the overcharge. In December 2023, Schmitt filled a 30-unit prescription of █████. At the time, the acquisition cost for that prescription was only $1.87. However, Defendants agreed

to terms with Caremark under which that prescription cost almost four times as much, $7.19. Schmitt was required to pay that full amount out-of-pocket, directly bearing the cost for the overcharge.

### C. Plaintiffs Did Not Reach Their Out-of-Pocket Maximums.

250. Under the Plan, Plaintiff Seth Stern has separate out-of-pocket maximums for spending on medical services and spending on prescription drugs. He did not reach his out-of-pocket maximum for prescription drug benefits in 2022, 2023, or 2024. In 2022, he paid a total of $171.73 out-of-pocket for prescription drugs; in 2023, he paid $208.25 out-of-pocket for prescription drugs; and in 2024, he paid $163.37 out-of-pocket for prescription drugs.

251. Under the Plan, Plaintiff Angela Bindner has separate out-of-pocket maximums for spending on medical services and spending on prescription drugs. She did not reach either out-of-pocket maximum in 2022. That year, she paid $295 out-of-pocket for medical services and $31.93 for prescription drugs.

252. Under the Plan, Plaintiff Marianne Schmitt has a combined out-of-pocket maximum for medical services and prescription drugs. Schmitt did not reach her out-of-pocket maximum for medical benefits and prescription drug benefits in 2022, 2023, or 2024. In 2022, she incurred no out-of-pocket expenses for medical services and paid $35.78 out-of-pocket for prescription drugs. In 2023, she incurred $878.71 in out-of-pocket expenses for medical services and $240.60 in out-of-pocket expenses for prescription drugs. In 2024, she incurred $574.30 in out-of-pocket expenses for medical services and $104.22 in out-of-pocket expenses for prescription drugs.

### PLAN-WIDE RELIEF

253. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of an ERISA plan to bring an action on behalf of such plan and to obtain the plan-wide remedies provided by 29

U.S.C. § 1109(a). Plaintiffs seek relief on behalf of the Plan pursuant to this statutory provision for purposes of their Causes of Action in Counts One, Three, and Four.

254.     Plaintiffs seek recovery for injuries to the Plan sustained as a result of the breaches of fiduciary duties referenced in Counts One and Three, and the prohibited transactions referenced in Count Four, from the beginning of the statute of limitations period through judgment in this matter.

255.     Plaintiffs are adequate to bring this derivative action on behalf of the Plan, and their interests are aligned with the Plan's participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation, and they intend to pursue this action vigorously on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

256.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following proposed class:[2]

> All persons who were participants in or beneficiaries of the Plan from the beginning of the statute of limitations period through judgment in this matter (the "Class Period").

257.     The members of the putative class are so numerous that joinder of all potential class members is impracticable.  Plaintiffs do not know the exact size of the class but are informed and believe that the proposed class includes tens of thousands of persons residing across the United States.

---

[2] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

258.     Plaintiffs' claims are typical of the claims of other members of the proposed class. Like other class members, Plaintiffs participated in the Plan and suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other class members with respect to their prescription drug coverage, medical coverage, and payment obligations.  Plaintiffs' claims and the claims of all class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the class have been similarly affected by Defendants' wrongful conduct.

259.     There are questions of law and fact common to the class that predominate over any individual issues that might exist.  Common questions include, but are not limited to, whether the Defendants are fiduciaries of the Plan; whether Defendants breached their fiduciary duties by engaging in the conduct described in this Complaint; whether Defendants engaged in prohibited transactions; whether the fiduciary breaches and other alleged ERISA violations caused the Plan to overpay for prescription drugs and class members to share in that financial burden; whether JPMorgan profited from the breaches described herein; and whether the Plan and the class member participants and beneficiaries are entitled to monetary, injunctive, and other equitable relief.

260.     Plaintiffs will fairly and adequately protect the interests of the class members. Plaintiffs have no interests antagonistic to those of other members of the class, and they are committed to the vigorous prosecution of this action.  In addition, Plaintiffs have retained counsel competent and experienced in class-action litigation, including ERISA class actions.

261.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy and would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would

establish incompatible standards of conduct. A class action would save time, effort, and expense and assure uniformity of decision for persons similarly situated without sacrificing procedural unfairness or any undesirable result.

262. Plaintiffs are unaware of any members of the proposed class who are interested in presenting their claims in a separate action, nor would it be economically feasible for them to do so.

263. This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of the claims to class litigation. The proposed class has a high degree of cohesion.

## CAUSES OF ACTION

### COUNT ONE
### Breach of Fiduciary Duties – 29 U.S.C. §§ 1104(a), 1132(a)(2)
### (on behalf of Plaintiffs, the Class, and the Plan against All Defendants)

264. Plaintiffs, on behalf of themselves and all others similarly situated, and on behalf of the Plan, incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

265. Defendants were required to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan. In addition, Defendants were required to act with the care, skill, prudence, and diligence required by ERISA.

266. These duties required Defendants to (among other things) prudently manage the Plan's prescription-drug benefit program, carefully monitor the Plan's PBM and prescription drug costs and fees to ensure that the Plan and its participants/beneficiaries paid only reasonable amounts for each prescription drug, and independently assess the formulary placement of each

drug and not simply follow the conflicted advice of an EBC or PBM. Defendants were required to consider all relevant factors and options under the circumstances, including alternative arrangements that were available to the Plan, PBM alternatives, the conflicts of interest of its vendors, whether the prices of drugs under the Plan's PBM contract were reasonable, and steps taken by other companies that successfully lowered their prescription-drug costs. Defendants were also required to act solely in the interests of the Plan and its participants/beneficiaries.

267.    Instead of prudently and loyally managing the Plan and carefully monitoring the Plan's costs with an eye single to the Plan and its participants/beneficiaries, Defendants effectively abdicated their fiduciary duties to a for-profit PBM, gave the PBM free rein without any meaningful monitoring or review, allowed the Plan and its participants/beneficiaries to pay unnecessarily high prices for prescription drugs and administrative fees, ceded control of the Plan's formulary to conflicted third parties, failed to ensure that decisions were made in the best interests of the Plan and its participants/beneficiaries, failed to conduct adequate reviews of the Plan's costs, failed to steer participants/beneficiaries to lower-cost options, failed to engage in a prudent process for monitoring the Plan's formulary, and failed to take other available steps that would have saved the Plan and its participants/beneficiaries millions of dollars. In the process, Defendants placed JPMorgan's own financial interests ahead of those of the Plan and its participants/beneficiaries.

268.    In addition, each of the fiduciaries with responsibility for appointing other fiduciaries, including JPMCo, JPMBank, and the Compensation Committee, breached their fiduciary duties by failing to appropriately monitor their appointed fiduciaries, failing to ensure that their performance was in compliance with ERISA's fiduciary duties and other statutory standards under ERISA, and failing to take prompt and effective remedial action to remedy the

unlawful conduct outlined herein and prevent it from continuing.  This was inconsistent with basic

fiduciary monitoring obligations under ERISA. *See* 29 C.F.R. 2509.75-8 at FR-17.

269.    Defendants' breaches of fiduciary duties needlessly increased the amounts that the

Plan paid for prescription drugs, and also increased the amounts that Plaintiffs and other members

of the class were required to pay in premiums and out-of-pocket costs, including deductibles, co-

pays, and co-insurance, and resulted in lower wages or limited wage growth.

270.    Pursuant to 29 U.S.C. § 1132(a)(2), Plaintiffs are entitled to obtain relief under 29

U.S.C. § 1109(a) for Defendants' fiduciary breaches, including: (i) recovery of losses to the Plan;

(ii) disgorgement of profits; and (iii) other equitable or remedial relief as the Court deems

appropriate, such as permanent injunctive relief, removal of the current fiduciaries, replacement

of the Plan's PBM, appointment of an independent fiduciary, surcharge, restitution, and other

remedies.

## COUNT TWO
### Breach of Fiduciary Duties – 29 U.S.C. §§ 1104(a), 1132(a)(3)
### (on behalf of Plaintiffs and the Class against All Defendants)

271.    Plaintiffs, on behalf of themselves and all others similarly situated, incorporate by

reference all previous paragraphs of this Complaint as if fully re-written herein.

272.    Defendants were required to discharge their duties with respect to the Plan solely

in the interest of the Plan's participants and beneficiaries, and for the exclusive purpose of

providing benefits to participants and beneficiaries and defraying reasonable expenses of

administering the Plan.  In addition, Defendants were required to act with the care, skill, prudence,

and diligence required by ERISA.

273.    These duties required Defendants to (among other things) prudently manage the

Plan's prescription-drug benefit program, carefully monitor the Plan's PBM and prescription drug

costs and fees to ensure that the Plan and its participants/beneficiaries paid only reasonable amounts for each prescription drug, and independently assess the formulary placement of each drug and not simply follow the conflicted advice of an EBC or PBM. In making decisions about the prescription-drug program, Defendants were required to consider all relevant factors and options under the circumstances, including alternative arrangements that were available to the Plan, alternative PBMs, the conflicts of interest of its vendors, whether the prices of drugs under the Plan's PBM contract were reasonable, and steps taken by other companies that successfully lowered their prescription-drug costs. Defendants were also required to act solely in the interests of the Plan and its participants/beneficiaries.

274. Instead of prudently and loyally managing the Plan and carefully monitoring the Plan's costs with an eye single to the Plan and its participants/beneficiaries, Defendants effectively abdicated their fiduciary duties to a for-profit PBM, gave the PBM free rein without any meaningful monitoring or review, allowed the Plan and its participants/beneficiaries to pay unnecessarily high prices for prescription drugs and administrative fees, ceded control of the Plan's formulary to conflicted third parties, failed to ensure that decisions were made in the best interests of the Plan and its participants/beneficiaries, failed to conduct adequate reviews of the Plan's costs, failed to steer participants/beneficiaries to lower-cost options, failed to engage in a prudent process for monitoring the Plan's formulary, and failed to take other available steps that would have saved the Plan and its participants/beneficiaries millions of dollars. In the process, Defendants unlawfully placed JPMorgan's own financial interests ahead of those of the Plan and its participants/beneficiaries.

275. In addition, each of the fiduciaries with responsibility for appointing other fiduciaries, including JPMCo, JPMBank, and the Compensation Committee, breached their

fiduciary duties by failing to appropriately monitor their appointed fiduciaries, failing to ensure that their performance was in compliance with ERISA's fiduciary duties and other statutory standards under ERISA, and failing to take prompt and effective remedial action to remedy the unlawful conduct outlined herein and prevent it from continuing. This was inconsistent with basic fiduciary monitoring obligations under ERISA. *See* 29 C.F.R. 2509.75-8 at FR-17.

276.    Defendants' breaches of fiduciary duties needlessly increased the amounts that the Plan paid for prescription drugs, and also increased the amounts that Plaintiffs and other members of the class were required to pay in premiums and out-of-pocket costs, including deductibles, co-pays, and co-insurance, and resulted in lower wages or limited wage growth.

277.    Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiffs and members of the class are entitled to injunctive relief and other equitable relief including, without limitation, the removal of the current fiduciaries, replacement of the Plan's PBM, appointment of an independent fiduciary, surcharge, restitution, and other remedies.

**COUNT FOUR**
**Prohibited Transactions – 29 U.S.C. § 1106(a)(1), 1132(a)(2)**
**(on behalf of Plaintiffs, the Class, and the Plan against all Defendants)**

278.    Plaintiffs, on behalf of themselves and all others similarly situated, and on behalf of the Plan, incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

279.    As a service provider to the Plan, Caremark is a party in interest. 29 U.S.C. § 1002(14)(B). Caremark is also vertically integrated with CVS, which is a JPMorgan banking client.

280.    By retaining and continuing to contract with Caremark and by causing the Plan to repeatedly make excessive payments to Caremark throughout the Class Period, Defendants caused

the Plan to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plan and Caremark prohibited by 29 U.S.C. § 1106(a)(1)(A), a furnishing of goods and services between the Plan and Caremark prohibited by 29 U.S.C. § 1106(a)(1)(C), and a transfer of the Plan's assets to, or use by or for the benefit of, Caremark prohibited by 29 U.S.C. § 1106(a)(1)(D).

281.    Defendants retained Caremark (a traditional PBM) as their PBM and declined to take appropriate measures to monitor Caremark or control costs in order to benefit Caremark, avoid blowback from JPMorgan's clients in the healthcare industry, and smooth the way for JPMorgan's banking business in the lucrative healthcare field.

282.    The compensation that Defendants paid to Caremark was not reasonable.

283.    These prohibited transactions are not subject to any exemption under ERISA or applicable regulations.

284.    Defendants' prohibited transactions needlessly increased the amounts that the Plan paid for prescription drugs, and as a result increased the amounts that Plaintiffs and members of the class were required to pay in premiums and out-of-pocket costs.

285.    Pursuant to 29 U.S.C. § 1132(a)(2), Plaintiffs are entitled to obtain relief under 29 U.S.C. § 1109(a) for Defendants' prohibited transactions, including: (i) recovery of losses to the Plan; (ii) disgorgement of profits; and (iii) other equitable or remedial relief as the Court deems appropriate, such as permanent injunctive relief, removal of the current fiduciaries, replacement of the Plan's PBM, appointment of an independent fiduciary, surcharge, restitution, rescission, and other remedies.

## COUNT FIVE
### Prohibited Transactions – 29 U.S.C. § 1106(a)(1), 1132(a)(3)
### (on behalf of Plaintiffs and the Class against All Defendants)

286.     Plaintiffs, on behalf of themselves and all others similarly situated, incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

287.     As a service provider to the Plan, Caremark is a party in interest.  29 U.S.C. § 1002(14)(B). Caremark is also vertically integrated with CVS, which is a JPMorgan banking client.

288.     By causing the Plan to enter into contracts with Caremark throughout the Class Period, Defendants caused the Plan to engage in transactions that Defendant knew or should have known constituted an exchange of property between the Plan and Caremark prohibited by 29 U.S.C. § 1106(a)(1)(A), a furnishing of goods and services between the Plan and Caremark prohibited by 29 U.S.C. § 1106(a)(1)(C), and a transfer of the Plan's assets to, or use by or for the benefit of Caremark prohibited by 29 U.S.C. § 1106(a)(1)(D).

289.     Defendants retained Caremark (a traditional PBM) as their PBM and declined to take appropriate measures to monitor Caremark or control costs in order to benefit Caremark, avoid blowback from JPMorgan's clients in the healthcare industry, and smooth the way for JPMorgan's banking business in the lucrative healthcare field.

290.     The compensation that Defendants agreed to pay Caremark was not reasonable.

291.     These prohibited transactions are not subject to any other exemption under ERISA or applicable regulations.

292.     Defendants' prohibited transactions increased the amounts that Plaintiffs and members of the class were required to pay in premiums, out-of-pocket costs, deductibles, co-pays, and co-insurance.

293.     Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiffs and members of the class are entitled to injunctive relief and other equitable relief including, without limitation, the removal of the current fiduciaries, replacement of the Plan's PBM, appointment of an independent fiduciary, surcharge, restitution, rescission, and other remedies.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment on their behalf and that of the Plan and Proposed Class as follows:

294.     Certifying and maintaining this action as a class action, with Plaintiffs designated as class representatives and with their counsel appointed as class counsel;

295.     Finding and declaring that Defendants have breached their fiduciary duties and engaged in prohibited transactions as described above;

296.     Enjoining Defendants from any further such violations of ERISA;

297.     Ordering Defendants to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty and prohibited transaction, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duties and prohibited transactions;

298.     Awarding surcharge, restitution, rescission, or other make-whole equitable relief to Plaintiffs and members of the class to remedy Defendants' breaches of fiduciary duties and prohibited transactions;

299.     Removing the Plan's fiduciary or fiduciaries and appointing an independent fiduciary or fiduciaries to run the Plan;

300.     Removing and replacing the Plan's PBM and/or requiring a search for alternative PBM candidates to replace the Plan's PBM;

301. Awarding, as appropriate, other forms of monetary, injunctive, and other equitable

relief;

302. Awarding pre-judgment, post-judgment, and statutory interest;

303. Awarding attorneys' fees and costs; and

304. Awarding such other and further relief as the Court may deem just and proper.

Dated: March 7, 2025

Respectfully Submitted,

Michael Eisenkraft
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797
meisenkraft@cohenmilstein.com

Michelle Yau (*pro hac vice* application forthcoming)
Daniel Sutter (*pro hac vice* application forthcoming)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave. NW, Eighth Floor
Washington, D.C. 20005
(202) 408-4600
myau@cohenmilstein.com
dsutter@cohenmilstein.com

Kai Richter (*pro hac vice* application forthcoming)
COHEN MILSTEIN SELLERS & TOLL, PLLC
400 South 4th Street #401-27
Minneapolis, MN 55415
(612) 807-1575
krichter@cohenmilstein.com

Jamie Crooks (*pro hac vice* application forthcoming)
Michael Lieberman (*pro hac vice* application forthcoming)
Tamar Katz (*pro hac vice* application forthcoming)
FAIRMARK PARTNERS, LLP
1001 G Street NW
Suite 400 East
Washington, DC 20001

- 97 -

Ph: (619) 507-4182
Email: jamie@fairmarklaw.com
michael@fairmarklaw.com
tamar@fairmarklaw.com

*Attorneys for Plaintiffs and the Proposed Class*