UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SETH STERN, ANGELA BINDNER, and
MARIANNE SCHMITT, on their own behalf,
on behalf of all others similarly situated, and
on behalf of the JPMorgan Chase Health Care
and Insurance Program for Active Employees
and its component Medical Plan,

        Plaintiffs,

    -against-

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK N.A., JPMORGAN CHASE
U.S. BENEFITS EXECUTIVE, and
JPMORGAN CHASE COMPENSATION &
MANAGEMENT DEVELOPMENT
COMMITTEE,

        Defendants.

---

Case No. 1:25-cv-02097 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

 Plaintiffs, current and former JPMorgan employees, bring this putative class action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging that Defendants breached their fiduciary duties and engaged in prohibited transactions by mismanaging the prescription-drug component of JPMorgan's self-funded employee health plan. *See* Dkt. 1 ("Complaint" or "Compl.") ¶¶ 3, 11, 17.[1] Now before the Court is Defendants' motion to dismiss the Complaint in its entirety for lack of standing and failure to state a claim on which relief can be granted. *See* Dkt. 29 ("Mot."). For the reasons that follow, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

---

[1] Plaintiffs' Complaint initially identified certain individual defendants, Compl. at 1, but Plaintiffs subsequently dismissed their claims against those defendants without prejudice, Dkt. 37 at 1.

## BACKGROUND

### I.    Factual Allegations

The following facts are drawn from the Complaint and taken as true for purposes of this motion. *See Costin v. Glens Falls Hosp.*, 103 F.4th 946, 952 (2d Cir. 2024).

### A.    The Plan

Plaintiffs are current and former participants[2] of an employee health benefit plan governed by ERISA (the "Plan"). Compl. ¶¶ 13-15. Defendants sponsor and administer the Plan. *Id.* ¶¶ 18-20, 22. The Plan provides medical and prescription-drug benefits to JPMorgan employees and beneficiaries. *Id.* ¶¶ 224-25.

The Plan is self-funded.[3] *Id.* ¶ 224. Rather than purchasing insurance, participants' benefits are paid directly from the JPMorgan Chase VEBA Trust for Active Employees (the "Trust"). *Id.* ¶¶ 27, 224, 226. The Trust is funded by employer contributions, employee payroll deductions, and investment income, and all Trust assets constitute assets of the Plan. *Id.* ¶¶ 27, 226.

Defendant JPMorgan Chase Bank, N.A. ("JPM Bank") is the Plan's designated sponsor. *Id.* ¶ 19. JMP Bank and JPMorgan Chase & Co. ("JPMCo") (together, "JPMorgan") are Plan

---

[2] A "participant" is "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer." 29 U.S.C. § 1002(7).

[3] "Insured plans pay set premiums to an insurance company in exchange for full payment of their members' prescription drugs. Capitated plans pay set amounts to a [pharmacy benefit manager] in exchange for full payment of their members' prescription drugs. The insurer or the [pharmacy benefit manager] carry all the risk of claims for prescription drug costs. Self-funded plans, however, pay a [pharmacy benefit manager] an administrative fee, but no premium, and retain for themselves the obligation of paying for the prescription drugs provided to their beneficiaries and participants." *Cent. States S.E. & S.W. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 185 n.2 (2d Cir. 2005).

employers and alleged to be Plan fiduciaries with discretionary authority over Plan administration and vendor selection. *Id.* ¶¶ 18-19. JPMorgan Chase U.S. Benefits Executive ("Benefits Executive") is the named Plan Administrator, and members of the Compensation & Management Development Committee ("Compensation Committee") are alleged to exercise discretionary authority over Plan administration and costs. *Id.* ¶¶ 20, 22.

      **B.**    **Alleged Breaches of Fiduciary Duty**

      The core of the Complaint centers on allegations that Defendants breached ERISA's fiduciary duties of prudence and loyalty in connection with the administration of the Plan's prescription-drug component.

      *1.   Duty of Prudence*

      The Complaint alleges that Defendants agreed to or permitted grossly inflated prescription-drug prices, causing the Plan and its participants to pay millions of dollars more than necessary. *Id.* ¶¶ 103, 107. Plaintiffs provide three examples of Defendants' breach of the duty of prudence. First, Plaintiffs assert that they take issue with Defendants' selection and oversight of the Plan's pharmacy benefit manager ("PBM"). Defendants retained CVS Caremark ("Caremark") to serve as PBM of the Plan. *Id.* ¶¶ 17, 104. As PBM, Caremark was responsible for negotiating with pharmacies, managing formularies, processing prescription-drug claims, and contracting with drug manufacturers. *Id.* ¶¶ 50-51. Plaintiffs allege that Defendants failed to prudently select and scrutinize Caremark by, among other things, failing to conduct competitive requests for proposals, failing to benchmark Caremark's pricing against the market, and failing to negotiate pricing terms that would protect the Plan from excessive costs. *Id.* ¶¶ 105-08, 171-78.

      Second, Plaintiffs allege that Defendants permitted the Plan to pay excessive prices for prescription drugs, particularly generic drugs, relative to pharmacy acquisition costs and publicly

available cash prices. *Id.* ¶¶ 112, 121, 128. By way of example, Plaintiffs allege that the Plan paid $749.30 for a 30-unit prescription of entecavir, despite the drug being widely available at retail pharmacies for under $40. *Id.* ¶ 119. The Plan also allegedly paid $1,310.99 for a 30-unit prescription of cinacalcet, even though average pharmacy acquisition costs were approximately $25.50. *Id.* ¶ 120. Plaintiffs themselves allegedly paid between $1.99 to $40.04 more than the pharmacy acquisition cost for their prescription drugs, amounting to a 39.10% to 703.97% markup. *See id.* ¶¶ 127, 247-49. Such pricing, Plaintiffs allege, resulted in large part from Caremark's reliance on a traditional PBM model. *Id.* ¶¶ 107-08. That model is allegedly built on opaque pricing structures, including pricing tied to Average Wholesale Price ("AWP"), "a benchmark that describes the average price that pharmacies pay to acquire that drug from wholesalers," *id.* ¶ 56, and spread pricing, which is "when a PBM negotiates a price with pharmacies that is lower than the price it charges the prescription-drug plan," *id.* ¶ 59. *Id.* ¶¶ 57-63. According to the Complaint, AWP is widely recognized as bearing little relationship to pharmacies' actual acquisition costs, particularly for generic drugs. *Id.* ¶¶ 56-58, 60. And spread pricing allowed Caremark to retain the difference between what the Plan paid and what pharmacies received. *Id.* ¶¶ 59, 61. For example, with spread pricing, a PBM could negotiate a price of $17 for a participant's prescription with the pharmacy, and then, if the PBM's agreement with the plan permits, charge the plan $20 for that prescription and pocket the $3 difference. *Id.* ¶ 59. In contrast, pass-through PBMs are alleged to bill a given plan the same amount paid to pharmacies and earn revenue solely through flat administrative fees, passing through rebates and discounts to a plan's participants. *Id.* ¶¶ 8, 53, 68-72. Thus, Plaintiffs contend, Defendants acted imprudently by allowing Caremark to use the traditional PBM model.

Third, Plaintiffs allege that Caremark classified certain drugs as "specialty" drugs, a designation that carries higher reimbursement rates, without objective or consistently applied

standards.  *Id.* ¶¶ 90-98, 126.  They further allege that Defendants allowed Plan participants to overpay for biosimilar drugs by narrowing the field of options.  *Id.* ¶¶ 130-31.  Plaintiffs contend that these decisions were informed by Caremark's alleged vertical integrations with CVS Specialty and Cordavis.  *Id.* ¶¶ 67, 129.  According to the Complaint, Caremark's integrations created incentives to (1) classify drugs as specialty drugs and steer Plan participants to CVS-owned pharmacies and (2) steer Plan participants toward higher-priced biosimilar drugs manufactured by Cordavis.  *Id.* ¶¶ 126, 129-35, 145, 173.  Plaintiffs allege that Defendants failed to negotiate with Caremark to prevent such practices.  *Id.* ¶¶ 133, 135, 173.

At bottom, Plaintiffs allege that Defendants, in structuring the Plan, failed to consider readily available alternatives to the traditional PBM model, including pass-through PBM arrangements, specialty-drug carve-outs, and contracting with lower-cost retail or online pharmacies.  *Id.* ¶¶ 68, 74, 83-84, 98, 102.  According to the Complaint, other employers adopted one or more such alternatives during the relevant period.  *Id.* ¶¶ 205-20.

### 2.  *Duty of Loyalty*

Plaintiffs allege that Defendants breached their duty of loyalty by permitting Caremark's pricing practices to persist despite knowing that those practices enriched Caremark at the expense of the Plan.  *Id.* ¶¶ 147, 156, 158, 169.  The Complaint further alleges that Defendants maintained extensive business relationships with pharmaceutical companies and Caremark's parent company through investment-banking services and industry conferences, and that these relationships created conflicts of interest that influenced Defendants' fiduciary decisions.  *Id.* ¶¶ 150-55, 159-68.  Specifically, the Complaint references JPMorgan's involvement in Haven Healthcare, a joint venture reportedly formed to address rising healthcare costs, which, according to Plaintiffs, indicates that JPMorgan was aware of potential cost-saving measures and chose not to implement them.  *Id.* ¶¶ 147-49, 203.  JPMorgan later abandoned the venture to avoid

5

jeopardizing its investment banking and other business relationships in the healthcare industry, allegedly demonstrating further conflicts. *Id.* ¶¶ 10, 147, 150-56.

Plaintiffs also allege that JPMorgan was a member of industry groups, including the Purchaser Business Group on Health and the Health Transformation Alliance, that warned against traditional PBM pricing practices and recommended other approaches, but that Defendants did not implement those groups' cost-saving recommendations because of Defendants' business relationships. *Id.* ¶¶ 136-46, 202-04.

### C.    Alleged Prohibited Transactions with a Party in Interest

Plaintiffs separately allege that Caremark was a "party in interest" under ERISA and that Defendants caused the Plan to engage in prohibited transactions by transferring Plan assets to Caremark in exchange for services. *Id.* ¶¶ 278-82. Plaintiffs allege that the compensation Caremark received — including revenue from spread pricing and retained rebates — was unreasonable, and that the transactions therefore do not qualify for any exemption under ERISA's prohibited-transaction provisions. *Id.* ¶¶ 17, 280-83.

### D.    The Financial Consequences

Plaintiffs contend that, as a result of Defendants' alleged mismanagement, Plaintiffs have suffered various financial consequences. First, Plaintiffs allege that they incurred higher out-of-pocket costs, including higher co-pays (a fixed fee paid at the time of medical service or drug purchase), deductibles (the amount an insured must pay before the Plan covers expenses), and co-insurance payments (a percentage of the costs paid by the insured after meeting their deductible). *Id.* ¶¶ 3-4, 30, 86-87, 135, 221-23, 245-52, 269, 276, 292. According to the Complaint, these overpayments were a direct consequence of Defendants' decision to select Caremark as the Plan's PBM. *Id.* ¶¶ 245-49. In so doing, Defendants allegedly agreed to

markups in drug prices that represented a profit for Caremark, with no corresponding benefit for the Plan or its participants. *Id.* ¶¶ 108, 121, 135, 171.

Second, Plaintiffs claim that they paid increased premiums, which were allegedly attributable to the Plan's higher overall drug spending. *Id.* ¶¶ 3-4, 135, 224-33, 269, 276, 292. Each year, Defendants allegedly set employer and participant contribution rates based on projected Plan expenses. *Id.* ¶ 227. According to the Complaint, Defendants structured contributions so that Plan participants paid approximately 30% of total healthcare costs, with JPMorgan paying the remaining 70%. *Id.* ¶¶ 228-30. The Complaint alleges that this cost-sharing methodology was applied consistently throughout the class period. *Id.* ¶¶ 228, 231-32. As a result, increases in Plan expenditures — including increases attributable to prescription-drug costs — allegedly translated directly into higher participant premium contributions. *Id.* ¶¶ 227, 233.

Plaintiffs seek various forms of monetary and equitable relief, including recovery of the Plan's losses, restitution, surcharge, recission, and permanent injunctive relief such as removal of the current Plan fiduciaries, replacement of Caremark as the Plan's PBM, and appointment of an independent Plan fiduciary. *Id.* ¶¶ 297-300.

## II.    Procedural History

Plaintiffs brought this action, individually and on behalf of the Plan and all others similarly situated, on March 13, 2025. *See* Compl. On June 3, 2025, Defendants moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) and Rule 12(b)(6) for lack of standing and failure to state a claim on which relief can be granted. Mot.; Dkt. 30 ("Br."); Dkt. 31 ("Rosenberg Decl."); Dkts. 31-1 to 31-8. On July 25, 2025, Plaintiffs filed their opposition. *See* Dkt. 35 ("Opp."); Dkt. 36 ("Richter Decl."); Dkt. 36-1; Dkt. 37 ("Haydell Decl."). On August 22, 2025, Defendants submitted their reply. Dkt. 38 ("Reply").

On December 4, 2025, Defendants filed a notice of supplemental authority, Dkt. 39 ("Notice"), to which Plaintiff responded the next day, Dkt. 40 ("Resp."). The motion is fully briefed. On February 13, 2026, the parties appeared before the Court for oral argument on Defendants' motion. *See* Feb. 13, 2026 Transcript ("Tr.").

## LEGAL STANDARD

To survive a Rule 12(b)(1) motion to dismiss, "'the plaintiff must clearly allege facts [in his complaint] demonstrating each element' of standing," and "the complaint's factual allegations of standing must be 'plausible' and 'nonconclusory.'" *Lugo v. City of Troy*, 114 F.4th 80, 87 (2d Cir. 2024) (alteration in original) (first quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016);and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 680 (2009)). "In assessing whether there is subject matter jurisdiction, the Court must accept as true all material facts alleged in the complaint, but 'the court may resolve [any] disputed jurisdictional fact issues by referring to evidence outside of the pleadings.'" *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 254 (S.D.N.Y. 2018) (alteration in original) (citation omitted) (quoting *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000)).

Under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc) (quoting *Iqbal*, 556 U.S. at 678). The Court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010)(quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)). However, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

"Determining whether a complaint states a plausible claim" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at

679.  In making this determination, a court is generally limited to the "facts stated on the face of the complaint," as well as "documents appended to the complaint or incorporated in the complaint by reference," "matters of which judicial notice may be taken," and documents "integral" to the complaint.  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citations omitted); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[A] court may consider documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." (omissions in original) (internal citation and quotation marks omitted)); *Temple v. Hudson View Owners Corp.*, 222 F. Supp. 3d 318, 323 (S.D.N.Y. 2016) ("A document is 'integral' if the complaint 'relies heavily on its terms and effects.'" (quoting *Chambers*, 282 F.3d at 153)). "Where a document is referenced in a complaint, 'the documents control and this Court need not accept as true the allegations in the . . . complaint.'" *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (quoting *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).

Here, the Court considers the Plan document and summary plan description ("SPD"), Dkt. 31-1 ("Plan Document"); Dkt. 31-2 ("SPD"), as well as the Plan's annual Form 5500 reports from 2019 to 2023, Dkt. 31-3 ("2019 Form 5500"); Dkt. 31-4 ("2020 Form 5500"); Dkt. 31-5 ("2021 Form 5500"); Dkt. 31-6 ("2022 Form 5500"); Dkt. 31-7 ("2023 Form 5500").[4]  The Plan Document and SPD are integral to Plaintiffs' Complaint.  *Med. Soc'y. v. UnitedHealth Grp. Inc.*, No. 16-cv-05265 (JPO), 2017 WL 4023350, at *3 n.3 (S.D.N.Y. Sept. 11, 2017) ("Courts

---

[4] Non-excerpted versions of the Plan's annual Form 5500s are available for download from the U.S. Department of Labor's EFAST system.  *See* U.S. Dep't of Labor, *Form 5500 Search*, https://www.efast.dol.gov/5500Search.

routinely consider ERISA plan documents and their summary plan descriptions on motions to dismiss" (quoting *Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice HMO, Inc.*, No. 13-cv-06551 (DLC), 2016 WL 2939164, at *3 (S.D.N.Y. May 19, 2016)).  And the Form 5500 reports are incorporated by reference in Plaintiffs' Complaint.  Compl. ¶¶ 17, 21, 227; *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 267 n.3 (S.D.N.Y. 2023) ("The plaintiffs reference Form 5500 information in their complaint.  The document may therefore be considered on this motion to dismiss because it is incorporated by reference in the complaint." (citation omitted)).

## DISCUSSION

Defendants move to dismiss for lack of standing under Rule 12(b)(1) and for failure to state an ERISA claim, pursuant to Rule 12(b)(6).  Br. at 2.  The Court begins with Defendants' Rule 12(b)(1) motion.  *See Daly v. Citigroup Inc.*, 939 F.3d 415, 426 (2d Cir. 2019) (observing that where defendants move to dismiss under Rules 12(b)(1) and 12(b)(6), the court "consider[s] the Rule 12(b)(1) challenge first" since dismissal "for lack of subject matter jurisdiction" renders the 12(b)(6) dispute "moot" (internal quotation marks and citation omitted)); *Narcisse v. Progressive Cas. Ins. Co.*, 778 F. Supp. 3d 597, 603 (S.D.N.Y. 2025) (resolving Rule 12(b)(1) motion to dismiss for lack of standing before Rule 12(b)(6) motion to dismiss for failure to state a claim).

### I.    Standing

Defendants move to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction, arguing that Plaintiffs lack standing because they have not suffered a concrete injury.  Br. at 7-13.  Defendants' argument is threefold.  First, as a general matter, Defendants contend that because Plaintiffs received all benefits promised under the Plan, they suffered no cognizable injury under *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020).  *Id.* at 8-9.  Second, Defendants assert that Plaintiffs' out-of-pocket costs theory of standing is too speculative because Plaintiffs

do not provide the appropriate price comparisons to establish actual overpayment. *Id.* at 11-13. Third, Defendants argue that Plaintiffs' higher premiums theory is likewise speculative because there is no direct relationship between Plan costs and participant premiums. *Id.* at 10-11. The Court agrees that Plaintiffs' higher premium theory is too speculative, but concludes that Plaintiffs nevertheless have standing because overpaying for a product is a cognizable injury in fact.

### A.    Legal Framework

Article III standing is a requirement for this Court's jurisdiction. *See, e.g.*, *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) ("It is well established that 'a plaintiff must demonstrate standing for each claim [s]he seeks to press.'" (alteration in original) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006))); *In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 672 (S.D.N.Y. 2018) (examining standing of participants in self-funded health plan to bring ERISA claims), *aff'd sub nom.*, *Doe 1 v. Express Scripts, Inc.*, 837 F. App'x 44 (2d Cir. 2020) (summary order). To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Defendants here challenge only the first element — injury-in-fact. Br. at 7.

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561; *see also Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 120 (2d Cir. 2017) ("[T]he plaintiff has the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists[.]"). "[T]o demonstrate a constitutionally justiciable injury under ERISA, plaintiffs must allege that they suffered specific losses as a result of the alleged breach

of fiduciary duty." *In re UBS ERISA Litig.*, No. 08-cv-06696 (RJS), 2014 WL 4812387, at *6

(S.D.N.Y. Sept. 29, 2014), *aff'd sub nom.*, *Taveras v. UBS AG*, 612 F. App'x 27 (2d Cir. 2015)

(summary order).  The injury must be "concrete and particularized" and "actual or imminent"

rather than "conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at

560).

       As the Supreme Court articulated in *Thole*, "[t]here is no ERISA exception to Article III."

590 U.S. at 547.  Plaintiffs cannot rely solely on the fact that they are bringing derivative claims

under ERISA to establish standing.  *In re Omnicom ERISA Lit.*, No. 20-cv-04141 (CM), 2021

WL 3292487, at *10 (S.D.N.Y. Aug. 2, 2021).  "[P]lan participants suing in a derivative capacity

must still satisfy Article III's individualized-injury requirement." *Patterson v. Morgan Stanley*,

No. 16-cv-06568 (RJS), 2019 WL 4934834, at *5 (S.D.N.Y. Oct. 7, 2019).  "To sue under

ERISA, a plaintiff must have both constitutional standing and a cause of action under ERISA.

Under *Thole*, the former requires a plaintiff to allege a loss that affected his personal account or

receipt of benefits due to him to ensure the plaintiff has a 'concrete stake in th[e] dispute.'"

*Antoine v. Marsh & McLennan Cos., Inc.*, No. 22-cv-06637 (JPC), 2023 WL 6386005, at *6

(S.D.N.Y. Sept. 30, 2023) (citations omitted) (alteration in original) (quoting *Thole*, 590 U.S. at

547).  Courts have commented that in the Second Circuit there is "some tension regarding the

requisite pleading standard for purposes of standing." *Plutzer ex rel. Tharanco Grp., Inc. v.

Bankers Tr. Co. of S. Dakota*, No. 22-cv-561, 2022 WL 17086483, at *2 (2d Cir. Nov. 21, 2022)

(summary order). *Compare Harry v. Total Gas & Power N. Am., Inc*., 889 F.3d 104, 110-11 (2d

Cir. 2018) (finding that injury in fact must, at minimum, be pleaded so as "to make [the] claim of

injury colorable but not enough to make it plausible"), *with Calcano v. Swarovski N. Am. Ltd.*, 36

F.4th 68, 75 (2d Cir. 2022) ("Although we generally accept the truth of a plaintiff's allegations at

the motion to dismiss stage, the plaintiff still 'bears the burden of alleging facts that affirmatively

and plausibly suggest that [the plaintiff] has standing to sue.'") (quoting *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015)).  Regardless of the standard applied, Plaintiffs have met their burden.

### B.    Injury in the Form of Higher Premiums

Taking each alleged form of injury in turn, Plaintiffs' higher premium theory is too speculative to serve as a basis for standing.  Plaintiffs' theory rests on the premise that increases in overall Plan spending necessarily translated into higher participant contributions pursuant to a consistent 30/70 cost-sharing structure.  Compl. ¶¶ 227-28.  But the Complaint itself undermines that premise.  The alleged 30% participant share was not fixed; from 2015 to 2023, participant contributions ranged from 29.32% to 35.49% of total costs.  *Id.* ¶ 229.  That variability is inconsistent with the notion of a rigid formula under which premiums rose and fell with Plan expenditures.

Moreover, the 2023 Form 5500 on which Plaintiffs rely states only that "Participant contributions . . . are determined based on the *projected* total annual Plan costs," *id.* ¶ 227 (emphasis added) (quoting 2023 Form 5500) — not that they rise and fall dollar-for-dollar with *actual* Plan spending, or that any particular cost category (such as the at-issue prescription-drug component) is passed through to participants.  The governing Plan Document further confirms the breadth of sponsor discretion: Section 5.2(a) provides that "[e]ach Participant in the Plan shall contribute to the Plan amounts determined in the *sole discretion* of the Plan Administrator," Plan Document at 5 (emphasis added), mirroring the discretionary structure found dispositive in similar cases.  *See, e.g.*, *Navarro v. Wells Fargo & Co.*, No. 24-cv-3043, 2025 WL 897717, at *9 (D. Minn. Mar. 24, 2025); *Lewandowski v. Johnson & Johnson* ("*Lewandowski II*"), No. 24-671 (ZNQ) (RLS), 2025 WL 3296009, at *5 (D.N.J. Nov. 26, 2025), *appeal docketed*, No. 26-1107 (3d Cir. Jan. 21, 2026).  Where contribution rates are set prospectively, based on projections, and

subject to discretionary allocation decisions, it is too speculative to conclude that alleged overspending "had any effect at all" on participant premiums. *See Knudsen v. MetLife Grp., Inc.*, 117 F.4th 570, 582 (3d Cir. 2024).

The speculative nature of Plaintiffs' theory is further illustrated by their allegations regarding the Plan during the COVID-19 pandemic. The Plan paid approximately $245 million less in claims in 2020 than in 2019, and then approximately $310 million more in 2021. *See* 2021 Form 5500 at MTD-165; 2020 Form 5500 at MTD-160; 2019 Form 5500 at MTD-155. Yet, participant contributions remained relatively consistent during this three-year period. *See* 2021 Form 5500 at MTD-165; 2020 Form 5500 at MTD-160; 2019 Form 5500 at MTD-155. If dramatic swings in total Plan spending did not produce corresponding reductions or increases in participant contributions, the Court cannot plausibly infer that lower prescription-drug costs would necessarily have resulted in lower contributions. Accordingly, Plaintiffs' higher premium theory is not sufficiently concrete to confer Article III standing.

### C.    Injury in the Form of Out-of-Pocket Costs

Plaintiffs also allege a personal financial loss — namely out-of-pocket overpayments for prescription drugs — as a result of Defendants' alleged fiduciary breaches. Allegations of this kind are generally sufficient to confer standing. *TransUnion LLC*, 594 U.S. at 425 ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 642 (2007) (Souter, J., dissenting) ("In the case of economic . . . harms, of course, the 'injury in fact' question is straightforward.").

Defendants' cited cases do not compel a contrary finding here. Defendants rely principally on *Thole*, in which the Supreme Court concluded that retiree participants in a defined-benefit pension plan lacked standing to bring their ERISA claims against U.S. Bank for

its alleged plan mismanagement. 590 U.S. at 542-46. But unlike the defined-benefit pension plan in *Thole*, through which participants "receive[d] a fixed payment each month," *id.* at 540, the Plan here is a self-funded welfare plan under which Plaintiffs allege they personally paid inflated out-of-pocket costs tied to the excessive prescription-drug prices set by the Plan's PBM, Caremark. *Compare Thole*, 590 U.S. at 540 ("[T]he plaintiffs have not sustained any monetary injury[.]"), *with* Compl. ¶ 127, 246-49 (alleging specific overpayments by Plaintiffs) *and id.* ¶ 112 (analyzing average markup for "366 of the 404 generic drugs of th[e] [Plan's] formularies"). Indeed, even the post-*Thole* cases cited by Defendants recognize that allegations of personal financial harm can confer standing. *See, e.g.*, *Knudsen*, 117 F.4th at 580 ("While [defendant] is correct that sponsors of self-funded health insurance plans, like pension plans, bear all the risk of distributing benefits to beneficiaries, we cannot ignore a more fundamental tenet of injury-in-fact: financial harm, even if only a few pennies, is a concrete, non-speculative injury." (alteration adopted and internal quotation marks and citation omitted)); *Lewandowski v. Johnson & Johnson* ("*Lewandowski I*"), No. 24-671 (ZNQ) (RLS), 2025 WL 288230, at *5 (D.N.J. Jan. 24, 2025) ("In plain terms, when Plaintiff spent more money on drugs at the pharmacy, which was allegedly the result of Defendants' breach of fiduciary duties, Plaintiff suffered a cognizable injury."), *appeal docketed*, No. 26-1107 (3d Cir. Jan. 21, 2026). More importantly, courts in this Circuit have readily held that economic injury of this nature is concrete and particularized. *See John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) ("[O]verpaying for a product results in a financial loss constituting a particularized and concrete injury in fact."); *see also, e.g.*, *In re Express Scripts*, 285 F. Supp. 3d at 672 ("Because Plaintiffs have alleged that they overpaid for certain prescription drugs as a result of inflated pricing set through the PBM Agreement, they have adequately alleged injury-in-fact[.]"). Plaintiffs have therefore made a sufficient showing to establish Article III standing.

In arguing otherwise, Defendants cite to *Gonzalez de Fuente v. Preferred Home Care of New York, LLC*, 858 F. App'x. 432 (2d Cir. 2021) (summary order).  Br. at 2, 7-10.  Plaintiffs there were certified home health aides in an employee benefit plan who filed a class action claiming that their employers misused contributions to the plan required by New York's Home Care Worker Wage Parity Law.  858 F. App'x. at 432-33.  The Second Circuit affirmed the district court's dismissal for lack of standing.  *Id.* at 434.  That holding does not alter the Court's analysis here for three reasons.  First, *Gonzalez de Fuente* is a summary order, "which, of course do[es] not provide binding authority."  *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 702 n.4 (2d Cir. 2009).  Second, *Gonzalez de Fuente* is distinguishable because, unlike Plaintiffs here, the plaintiffs in that case did not plead specific overpayments; rather, they generally "cite[d] the[ir] [p]lan's high out of pocket costs and accessibility issues."  *Gonzalez de Fuente v. Preferred Home Care of New York LLC*, No. 18-cv-06749 (AMD) (PK), 2020 WL 5994957, at *3 (E.D.N.Y. Oct. 9, 2020), *aff'd*, 858 F. App'x 432 (2d Cir. 2021) (summary order).  Lastly, rather than pointing to specific overpayments, the plaintiffs in *Gonzalez de Fuente* relied solely on their New York Wage Parity Law claims to distinguish their case from *Thole*, "[a]pparently conceding that they ha[d] not claimed concrete harm under ERISA."  *Id.* ("It may be true that the plaintiffs are entitled to additional compensation under the Wage Parity Law, but they have no right under ERISA[.]").  Put simply, the Second Circuit was not tasked with answering the question before this Court: whether allegations of specific overpayments are sufficiently particularized and concrete to confer standing.

Defendants' other cases, while persuasive as to Plaintiffs' higher premiums theory, are inapposite on this point.  In support of their argument that Plaintiffs' out-of-pocket costs theory is too speculative to confer standing, Defendants point to three familiar cases: *Knudsen v. MetLife Grp., Inc.*; *Navarro v. Wells Fargo & Co.*; and *Lewandowski II.*  Br. at 11; Notice at 2.

None of these cases alters the Court's conclusion here.  First, *Knudsen* presented facts akin to *Gonzalez de Fuente* and can be distinguished on the same grounds.  The plaintiffs in both cases made only general allegations that their out-of-pocket costs were higher than they would have been absent the alleged fiduciary breaches.  The plaintiffs' central contention in *Knudsen* was that MetLife, their plan's administrator, had misallocated $65 million in drug rebates to itself, at the plan's expense.  *Knudsen*, 117 F.4th at 574.  As the Third Circuit observed, the plaintiffs in *Knudsen* "d[id] not allege which out-of-pocket costs increased, in what years, or by how much" as a result of this alleged misallocation.  *Id.* 582.  Rather, the plaintiffs merely asserted that, had the rebates instead been directed to the plan, "MetLife may have reduced co-pays and co-insurance" for pharmaceutical benefits.  *Id.* at 575 (citation modified).  In contrast, Plaintiffs here do not rely on generalizations; they point to specific overpayments, made on specific dates, at specific markups.  Compl. ¶¶ 247-49.  The *Knudsen* court itself acknowledged that "financial harm" of the kind alleged by Plaintiffs "is a concrete, non-speculative injury."  117 F.4th at 580 (internal quotation marks and citation omitted).

Defendants next point to *Navarro*, which relied heavily on *Knudsen*.  The plaintiffs in *Navarro*, participants in a medical benefit plan, alleged that their employer, Wells Fargo, mismanaged its prescription-drug-benefits program with PBM Express Scripts, resulting in plan participants paying substantially more in premiums and out-of-pocket costs for prescription drugs than they would have absent the alleged mismanagement.  *Navarro*, 2025 WL 897717, at *3.  As a threshold matter, the *Navarro* court agreed with the finding in *Knudsen* that "a plaintiff suing a fiduciary of an ERISA-governed defined-benefit health plan" may, in some circumstances, "establish standing on a theory of harm premised on excessive out-of-pocket costs."  *Id.* at *8.  On the facts before it, however, the court found the plaintiffs had failed to do so.  *Id.* at *10.  Critically, the court took issue with the plaintiffs' out-of-pocket costs theory not

because of a lack of concreteness, but rather because of the absence of "a causal connection between [p]laintiffs' increased costs and [Express Scripts]'s administrative fees." *Id.* at *9. The *Navarro* court thus appeared to acknowledge implicitly that overpayments satisfy the concreteness element of Article III standing; a causal connection was just not adequately pleded.

Unlike the defendants in *Navarro*, Defendants here raise no arguments with respect to the causal element of Article III standing. Nor could they. In rejecting the plaintiffs' out-of-pocket cost theory, the *Navarro* court emphasized that the plaintiffs had conducted price comparisons "on a subset of prescription drugs in the [p]lan's formulary, which itself represents only a subset of the total benefits whose costs [p]lan participants' contributions may be used to cover." *Id.* (citations omitted). This selective analysis, the court held, was "too tenuous to show causation[.]" *Id.* at *10. In contrast, Plaintiffs here have analyzed every one of the 404 generic drugs contained in the Plan's two formularies. *See* Compl. ¶ 112 (finding average markup of 211.1% "for 366 of the 404 generic drugs on the[] formularies"); *id.* ¶¶ 121-25 (providing analysis and examples of markups for remaining 38 drugs). While Defendants may dispute whether Plaintiffs' use of NADAC and cash prices as benchmarks in their pricing analysis is appropriate, as Defendants acknowledged at oral argument, this is a question for the merits and not a ground for dismissal based on lack of standing. Tr. at 11:18-21. *Navarro* is, therefore, inapt.

Defendants' final case is *Lewandowski II*, the findings of which are premised almost entirely on the court's analysis in *Navarro*. *See Lewandowski II*, 2025 WL 3296009, at *4-6. For that reason alone, *Lewandowski II* is likewise inapposite on this point. But *Lewandowski II* is further unpersuasive because it incorrectly assumes that receiving other plan benefits offsets the harm from prescription-drug overpayments. Specifically, *Lewandowski II* went further than *Navarro* in suggesting that it is relevant to the standing analysis that prescription-drug

18

overcharges could be offset by benefits received from other covered services.  *Id.* at *6 ("Lewandowski alleges that she overpaid $210 for two prescriptions in 2023.  However — in that same year — she received [p]lan benefits totaling over $200,000." (citation omitted)).  The Court disagrees that receiving other benefits eliminates the economic harm caused by overpaying for a specific benefit.  *Cf. Barrows v. Becerra*, 24 F.4th 116, 128 (2d Cir. 2022) (finding Article III standing where plaintiffs alleged injury from lack of insurance coverage under Part A despite receiving coverage under Part B, because "whether or not an individual class member suffers a bottom-line financial injury in a given instance, all members of the class are deprived of their property interest in coverage under Part A").  The Court therefore finds *Lewandowski II*'s analysis of the out-of-pocket expenses theory unpersuasive.

In sum, Plaintiffs have alleged facts that satisfy Article III standing.  Defendants' motion to dismiss under Rule 12(b)(1) is, accordingly, denied.[5]

---

[5] It bears mention that that, on the merits, Plaintiffs' allegations that they overpaid for their prescriptions fall apart on closer inspection.  Although not a health-benefit plan case, *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259 (S.D.N.Y. 2023) is instructive.  The plaintiffs in *Singh* alleged, *inter alia*, that the recordkeeping fees that their 401(k) plan charged were "unreasonably excessive, indicating that the [p]lan was managed imprudently." *Singh*, 650 F. Supp. 3d at 266.  Like Plaintiffs here, the *Singh* plaintiffs urged an inference of fiduciary breach based on alleged overpayments.  The court declined to so infer, finding that "[b]ecause the plaintiffs' [fee] comparison d[id] not compare apples to apples, the comparison fail[ed] to indicate plausibly imprudence on the part of the defendants." *Id.* at 267.  So too here.  Plaintiffs' allegations of overpayment for the drugs they purchased are premised solely on the difference between each drug's pharmacy acquisition cost (*i.e.*, the NADAC) and Plaintiffs' out-of-pocket costs for the same.  Compl. ¶¶ 247-49.  But as Plaintiffs acknowledge, "[t]he NADAC database uses survey data to determine the *average* . . . amount that *a pharmacy pays* to acquire a prescription drug from its suppliers." *Id.* ¶ 109 (emphasis added).  Plaintiffs' comparison therefore fails on multiple counts.  First, because NADAC is an average, Plaintiffs fail to even allege what *their* pharmacy paid for a given drug — and accordingly fail to establish the actual markup in purchase price. *See, e.g.*, *McCaffree Fin. Corp. v. ADP, Inc.*, No. 20-5492 (ES) (JRA), 2023 WL 2728787, at *15 (D.N.J. Mar. 31, 2023) (dismissing ERISA breach of fiduciary duty claim where "[r]ather than point to the fees paid by other specific plans, [the plaintiffs] . . . allege[d] that [d]efendants paid excessive administrative fees and total plan costs based on industry-wide averages"); *Kendall v. Pharm. Prod. Dev., LLC*, No. 20-cv-71-D, 2021 WL 1231415, at *7 (E.D.N.C. Mar. 31, 2021) ("A median value for an entire category cannot be said to be identical

## II.    Merits

Defendants also move to dismiss the Complaint for failure to state a claim under Rule

12(b)(6).  Plaintiffs bring four claims under ERISA, alleging violations of two substantive

provisions: Sections 404[6] and 406.[7]  Compl. ¶¶ 264-93.[8]  Counts One and Two allege that

Defendants breached their fiduciary duties of loyalty and prudence under ERISA and seek relief

pursuant to Section 409 and Section 502, respectively.  *Id.* ¶¶ 264-77.  Counts Four and Five

_____

save for price.").  Second, and more importantly, Plaintiffs merely plead that the Plan
beneficiaries paid more for drugs than did *pharmacies* — not similarly situated plan
beneficiaries.  *Cf. Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 167 (E.D.N.Y. 2022)
("[P]laintiff does not allege that any plans *actually* pay those rates, [or] that those rates were
available to the [p]lan in the market at the relevant times[.]").  While Plaintiffs offer a singular
plan comparison, that of Charter Communications ("Charter"), Compl. ¶ 207, that comparison
likewise fails because Plaintiffs fail to establish that the beneficiaries of Charter's plan are
similarly situated.  Charter employs about half as many employees as JPMorgan, *compare id.*
("approximately 175,000 employees"), *with id.* ¶ 108 ("over 300,000 employees"), and Plaintiffs
allege "next to nothing" about the other products and services that Charter contracted for, *Singh
v. Deloitte LLP*, 123 F.4th 88, 94 (2d Cir. 2024).  Therefore, even if the Complaint concerned
fiduciary conduct, which, as discussed below, it does not, *see infra* Section II.B, Plaintiffs do not
plead actual overpayment on their part sufficient to support an inference of breach.

[6] Section 404(a)(1)(A) requires that an ERISA fiduciary's actions with respect to the Plan be
taken "for the exclusive purpose of providing benefits to participants and their beneficiaries."  29
U.S.C. § 1104(a)(1)(A).  Section 404(a)(1)(B) requires that an ERISA fiduciary discharge its
duties "with the care, skill, prudence, and diligence . . . that a prudent man acting in a like
capacity . . . would use."  *Id.* § 1104(a)(1)(B).

[7] Section 406(a) bars fiduciaries from knowingly engaging in transactions between the plan and a
party in interest involving, among other things, the "sale or exchange" of property, the furnishing
of "goods, services, or facilities," or the "transfer" of plan assets.  *Id.* § 1106(a)(1)(A), (C), (D).

[8] The Complaint also briefly references Section 405, Compl. ¶¶ 18-19, but does not invoke it as a
basis for any of Plaintiffs' causes of action.

Section 405 establishes co-fiduciary liability under ERISA in three scenarios: (1) if the
secondary fiduciary knowingly participates in or conceals another fiduciary's breach, knowing it
violates ERISA, 29 U.S.C. § 1105(a)(1); (2) if the secondary fiduciary enables a breach by
failing to act with reasonable prudence as required by Section 404(a), *id.* § 1105(a)(2); or (3) if
the secondary fiduciary knows of a breach and does not make reasonable efforts to remedy it, *id.*
§ 1105(a)(3).

allege that Defendants engaged in prohibited transactions and likewise seek relief under Sections 409 and 502. *Id.* ¶¶ 278-93.[9]  Section 409 provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any [fiduciary duty] shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."  29 U.S.C. § 1109(a).  Section 502, by contrast, allows plan participants, beneficiaries, and fiduciaries to bring actions under ERISA for equitable relief.  29 U.S.C. § 1132(a)(3).

As a threshold matter, Defendants contend that all four claims fail because the conduct that Plaintiffs challenge is not fiduciary conduct, but rather non-fiduciary "settlor" or corporate decisions.  Br. at 13-17.  In addition, Defendants claim that Plaintiffs have failed to state a claim as to all counts on the merits.  *Id.* at 17-27.  The Court finds that the conduct challenged under Counts One and Two are not fiduciary in nature and may be dismissed on that basis alone.  However, in light of the Supreme Court's recent clarification of the minimal allegations required to plead a prohibited transaction claim, the Court will not dismiss Plaintiffs' Counts Four and Five.

### A.    Legal Framework

"Only those who are deemed fiduciaries are subject to ERISA liability."  *Hudson v. Nat'l Football League Mgmt. Council*, No. 18-cv-04483 (GHW) (RWL), 2019 WL 5722220, at *8 (S.D.N.Y. Sept. 5, 2019), *report and recommendation adopted as modified on other grounds*, 2019 WL 4784680 (S.D.N.Y. Sept. 30, 2019).  Thus, "[i]n every case charging breach of ERISA fiduciary duty[,] the threshold question is whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  *Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 366 (2d Cir. 2014) (citation modified) (quoting

---

[9] There is no Count Three asserted in the Complaint.  *See* Compl. ¶¶ 264-93.

*Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)).  "Fiduciaries under ERISA are those so named in the plan, or those who exercise fiduciary functions." *In re Citigroup ERISA Litig.*, 104 F. Supp. 3d 599, 613 (S.D.N.Y. 2015), *aff'd sub nom.*, *Muehlgay v. Citigroup, Inc.*, 649 F. App'x 110 (2d Cir. 2016) (summary order).  Only Defendant Benefits Executive is a named Plan fiduciary.  *See* Compl. ¶¶ 18-20, 22; *see also* 29 U.S.C. § 1102(a)(2) ("[T]he term 'named fiduciary' means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly.").  ERISA provides that a person, even if not named as such, may be a fiduciary "'to the extent' she, *inter alia*, (a) 'exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets' or (b) 'has any discretionary authority or discretionary responsibility in the administration of such plan.'"  *Coulter*, 753 F.3d at 366 (quoting 29 U.S.C. § 1002(21)(A)).  "The Supreme Court has emphasized the limiting effect of the statutory phrase 'to the extent' because an ERISA fiduciary 'may wear different hats.' Accordingly, 'a person may be an ERISA fiduciary with respect to certain matters but not others.'"  *Patrico v. Voya Fin., Inc.*, No. 16-cv-07070 (LGS), 2017 WL 2684065, at *2 (S.D.N.Y. June 20, 2017) (first quoting *Pegram*, 530 U.S. at 225; and then  quoting *Coulter*, 753 F.3d at 366).  "In defining the scope of a fiduciary's duty under ERISA, courts have distinguished between fiduciary functions, which give rise to ERISA liability, and 'settlor' functions, which are akin to actions taken by the settlor of a trust and do not trigger ERISA liability."  *Coulter*, 753 F.3d at 367.  The question before the Court is, therefore, "whether [a particular defendant] was acting as a fiduciary (that is, was performing a fiduciary function) *when taking the action subject to complaint*."  *Pegram*, 530 U.S. at 226 (emphasis added).  That

question "can be determined as a matter of law at the motion to dismiss stage." *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 565 (S.D.N.Y. 2011).

### B.    Breach of Fiduciary Duty: Counts One and Two

The Complaint alleges that Defendants breached their ERISA fiduciary duties of prudence and loyalty primarily through the way they structured the Plan's prescription-drug program.  Plaintiffs allege that Defendants imprudently failed to negotiate terms with Caremark to protect the Plan from excessive costs, allowing Caremark to use a traditional PBM model characterized by opaque pricing, including AWP benchmarks and spread pricing, which allegedly inflated costs to the Plan and its participants.  *Id.* ¶¶ 17, 50-63, 104, 171-72.  Additionally, Plaintiffs assert that Defendants permitted the classification of certain drugs as "specialty" and narrowed biosimilar options in ways that increased Plan spending, citing Caremark's vertical integration with CVS Specialty and Cordavis as creating incentives for higher-cost prescriptions.  *Id.* ¶¶ 67, 90-98, 126-35, 173.  According to the Complaint, Defendants failed to consider alternative plan structures, including pass-through PBMs, specialty-drug carve-outs, or contracting with lower-cost pharmacies, even though other employers adopted these options during the relevant period.  *Id.* ¶¶ 68, 74, 83-84, 98, 102, 145, 174-78, 205-20.

Furthermore, Plaintiffs allege that Defendants breached their duty of loyalty by allowing Caremark's pricing practices to persist, despite awareness that they enriched Caremark at the Plan's expense, and by maintaining business relationships with pharmaceutical companies and Caremark's parent that allegedly influenced fiduciary decisions.  *Id.* ¶¶ 136-56, 158-169, 203-04.

In examining these allegations, is it clear that they collectively focus less on administration and more on Defendants' decisions regarding the design and structure of the Plan's pharmacy benefit arrangements.  "Many plan fiduciaries contract with [PBMs] to help

manage and administer the prescription-drug portion of their health plans." Compl. ¶ 50. Like
its peers, JPMorgan contracted with a PBM, Caremark, to help with both "administering
[JPMorgan]'s prescription-drug benefits by resolving prescription-drug claims, processing prior
authorizations," and "set[ting] the benefits promised by the Plan." Reply at 6 (emphasis
omitted); *see also* Compl. ¶¶ 30, 50 (describing both aspects of PBM role). Plaintiffs'
allegations do not concern benefits administration; only the latter Plan-design decisions are the
subject of Plaintiffs' Complaint.[10]

"[A]n employer's decisions about the content of a plan are not themselves fiduciary acts."
*Pegram*, 530 U.S. at 226; *see also Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) ("Nothing
in ERISA requires employers to establish employee benefit plans. Nor does ERISA mandate
what kind of benefits employers must provide if they choose to have such a plan."). Here,
although framed in the language of fiduciary breach, Plaintiffs' theory targets the structure of the
pharmacy benefit itself — how the PBM was compensated, how drugs were categorized, what
pricing benchmarks were used, and which alternatives were not adopted. Those are choices
about the architecture of the benefit offering, not about the discretionary management of plan
assets or the administration of particular claims. *Compare Hughes Aircraft Co. v. Jacobson*, 525
U.S. 432, 444 (1999) ("ERISA's fiduciary duty requirement simply is not implicated where [the
Plan's settlor] makes a decision regarding the form or structure of the Plan such as who is

---

[10] Plaintiffs initially contended that Defendants imprudently selected Caremark as the Plan's
PBM because "on information and belief," Defendants did not engage in a bidding process,
Compl. ¶ 105, but Plaintiffs appear to have abandoned this claim, Opp. at 18 (now framing their
claims as being concerned solely with "monitor[ing]" the PBM) — presumably because
Defendants have pointed out that Plaintiffs' assumption that there was no open RFP process is
incorrect, Br. at 18 n.20 (asserting that Plaintiffs' assumption about bidding "is erroneous").
Furthermore, Plaintiffs acknowledge that Caremark is one of the "big three [PBMs]," Compl.
¶ 220; *see also id.* ¶ 90, which undermines any (now abandoned) claim that the selection of
Caremark, standing alone, constitutes a breach of fiduciary duty under ERISA.

entitled to receive Plan benefits and in what amounts, or how such benefits are calculated."), *and In re UnitedHealth Grp. PBM Litig.*, No. 16-cv-03352, 2017 WL 6512222, at *10 (D. Minn. Dec. 19, 2017) ("Setting the payout details of a plan, including distribution of 'profit derived from the spread between subscription income and expenses of care and administration' does not risk breach of any fiduciary duties[.]" (quoting *Pegram*, 530 U.S. at 226)), *and Lockheed Corp.*, 517 U.S. 882, 890 (1996) (holding that an employer does not act as a fiduciary when it establishes, modifies, or terminates an ERISA-covered pension plan), *and Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 757 (7th Cir. 1999) (holding that employer's choices about plan structure are not fiduciary actions), *and Argay v. Nat'l Grid USA Serv. Co.*, 503 F. App'x 40, 42 (2d Cir. 2012) (summary order) (finding that "setting premiums" is not a fiduciary act), *and Moeckel v. Caremark, Inc.*, 622 F. Supp. 2d 663, 693 (M.D. Tenn. 2007) ("[Employer]'s contracting decisions as to what, and how, to pay Caremark for the services rendered under the PBM Agreements, as well as what formulary(ies) and drug interchange programs to adopt for its plan relate to plan design decisions, which are also non-fiduciary in nature."), *and Mulder v. PCS Health Sys., Inc.*, 432 F. Supp. 2d 450, 458-59 (D.N.J. 2006) (finding that "plan design decision regarding the makeup of the plan" was not fiduciary action), *with F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987) (observing that "the processing of claims" may be an "area over which [one] has discretionary authority" sufficient to establish a fiduciary relationship (quoting *Schulist v. Blue Cross*, 717 F.2d 1127, 1131-32 (7th Cir. 1983))), *and United States v. Glick*, 142 F.3d 520, 527-28 (2d Cir. 1998) (finding that agent who "exercise[s] unhampered discretion in setting [his own] commission rate" is a fiduciary), *and Greenblatt v. Prescription Plan Servs. Corp.*, 783 F. Supp. 814, 821 (S.D.N.Y. 1992) (holding that defendant was a fiduciary because it was "given broad discretion in implementing information-gathering and claims processing systems for the plan").

25

Courts have consistently treated decisions of the kind outlined in the Complaint as settlor functions. The gravamen of Plaintiffs' Complaint is Defendants' alleged failure to consider or implement alternative pricing structures for the Plan's prescription-drug component. *See, e.g.*, Compl. ¶ 66 ("Prudent fiduciaries negotiate with their PBMs to minimize or eliminate any portion of rebates or other financial concessions from manufacturers that the PBM or its GPO retains instead of passing through to the plan."); *id.* ¶ 135 ("No prudent fiduciary would allow (much less force) plan participants/beneficiaries to purchase the most expensive biosimilar version of a drug."); *id.* ¶ 145 ("Despite the recommendation from HTA, Defendants did not carve out specialty drugs from the Plan's PBM contract with Caremark."); *id.* ¶ 171 ("Prudent fiduciaries would have . . . used th[eir] bargaining power to demand and obtain substantially better contractual terms, including terms relating to prices and the way in which prices are determined."); *id.* ¶ 172 ("Defendants could have . . . ensured that the Plan's prices for generic drugs are set forth in a fixed unit-cost schedule or NADAC-based price instead of with reference to AWP."); *id.* ¶ 174 ("[T]he Plan and its participants/beneficiaries would have been better served by switching from a traditional PBM to a pass-through PBM, and those benefits would have been clear at the time of contracting."). By focusing on the absence of these alternatives, Plaintiffs assert that the design of the Plan itself should have been different, and that a different structure would have reduced costs and better served the participants. This argument, at its core, challenges the choices made regarding the architecture of the Plan's prescription-drug benefit component, rather than specific acts of plan management or administration. Defining the formulary framework, determining cost-sharing terms, and choosing between pricing models are components of benefit design. *See, e.g.*, *In re Express Scripts*, 285 F. Supp. 3d at 682 (finding no fiduciary status where Plaintiffs "in essence" attributed their overpayments "to the PBM Agreement itself, instead of [defendant]'s interpretation or application of their particular

[employer] health plans, and explaining that"); *id.* ("Plaintiffs have no right under ERISA to receive 'competitive benchmark pricing,' or even average pricing, for prescription drugs."); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995) ("ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits.  Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."); *Moeckel*, 622 F. Supp. 2d at 678 ("[Employer Defendant's] decision to enter into the PBM Agreement with Caremark, and to agree to the various terms contained therein, was a plan design decision, exempt from fiduciary review.").  None of those challenged choices are fiduciary in nature.

In their Opposition, Plaintiffs assert that they "do not allege that JPMorgan breached its fiduciary duties by adopting the Plan's formulary, setting employee contributions at 30% of total Plan spending, or requiring employee cost-sharing for drugs.  Rather, Plaintiffs allege that, *given the benefit design JPMorgan chose to adopt*, it had an ongoing duty to monitor Caremark to ensure that costs were reasonable."  Opp. at 18 (citation omitted).  Plaintiffs recasting their structural criticisms as failures to "monitor" does not alter their allegations' essential character.  On this point, *Doe One v. CVS Pharmacy, Inc.* is instructive.  348 F. Supp. 3d 967 (N.D. Cal. 2018), *aff'd in part, vacated in part on other grounds, remanded sub nom.*, *Doe v. CVS Pharm., Inc.*, 982 F.3d 1204 (9th Cir. 2020).  The court in *Doe One* addressed materially similar allegations that a plan sponsor imprudently entered into and maintained a PBM arrangement with unfavorable pricing terms.  The court held that adopting a particular prescription-drug benefit structure and agreeing to its financial terms were aspects of plan design, not fiduciary administration.  *Id.* at 1000-02 ("The challenge is to the Employer Defendants' 'decision regarding the form or structure of the Plan' offered to employees.  That decision does not create a fiduciary duty." (citation omitted) (quoting *Hughes Aircraft Co.*, 525 U.S. at 444)).  It further

rejected efforts to reframe the same theory as a breach of a duty to monitor, explaining that such claims were simply challenges to plan design "packaged in another guise." *Id.* at 1002.  That reasoning applies with equal force here.  Plaintiffs' monitoring theory depends entirely on the premise that Defendants should have redesigned the pharmacy benefit by renegotiating compensation terms, abandoning spread pricing, carving out specialty drugs, or adopting a pass-through model.  Compl. ¶¶ 68, 74, 83-84, 98, 102, 145, 174-78.  ERISA, however, distinguishes between administering a plan in accordance with its terms, which can be fiduciary in nature, and deciding what those terms will be in the first place, which is not.  *See, e.g.*, *Massaro v. Palladino*, 19 F.4th 197, 212-16 (2d Cir. 2021) (distinguishing "fiduciary" function of administering the plan in accordance with plan documents from "settlor" function of amending benefit plan).  The Complaint challenges only the latter.

Plaintiffs' duty of loyalty allegations fare no better.  Beyond the PBM arrangement itself, the Complaint points to Defendants' broader corporate activities, including the formation and dissolution of Haven Healthcare, mergers and acquisitions, client relationships, and other business dealings, as evidence of their divided loyalties.  Compl. ¶¶ 136-56, 158-169, 203-04.  These are paradigmatic business judgments undertaken in a corporate capacity.  *Doe 1*, 837 F. App'x at 48 ("[W]hile a traditional fiduciary is not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiaries, under ERISA a fiduciary may have financial interests adverse to beneficiaries." (citation modified)); *Patterson*, 2019 WL 4934834, at *14 (finding that "the mere existence of a business relationship between two large financial institutions is not enough" to support a claim for breach of duty of loyalty).  As the Second Circuit has made clear, "'general fiduciary duties under ERISA [are] not triggered' . . . when the decision at issue is, 'at its core, a corporate business decision, and not one of a plan administrator.'"  *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d

352, 357 n.2 (2d Cir. 2016) (alterations in original) (quoting *Flanigan v. Gen. Elec. Co.*, 242

F.3d 78, 88 (2d Cir. 2001)).  Here, decisions about joint ventures, corporate strategy, or

relationships with third parties do not become fiduciary acts merely because Defendants also

sponsor an ERISA plan.  ERISA simply does not require that "day-to-day corporate business

transactions, which may have a collateral effect on prospective, contingent employee benefits, be

performed solely in the interest of plan participants."  *Varity Corp. v. Howe*, 516 U.S. 489, 529

(1996) (Thomas, J., dissenting) (quoting *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 947 (6th

Cir. 1990)); *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 646 (8th Cir. 2007)

("ERISA does not prohibit an employer from acting in accordance with its interests as employer

when not administering the plan." (quoting *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th

Cir. 1986)).  Thus, like their prudence claims, Plaintiffs' loyalty claims challenge settlor and

corporate conduct, not actions taken in a fiduciary capacity under ERISA.

The Court therefore finds that Defendants did not act as fiduciaries with respect to Counts

One and Two and dismisses those claims accordingly.

### C.    Prohibited Transaction Claims: Counts Four and Five

Plaintiffs allege that Defendants engaged in prohibited transactions by transferring assets

to Caremark in exchange for services, with compensation that included spread pricing and

retained rebates, which they allege was unreasonable and not exempt under ERISA.

Compl. ¶¶ 17, 278-83.  In addition to those variable fees, Plaintiffs allege that "[t]he Plan pays

Caremark about $3 million annually in administrative fees . . . from the Plan."  *Id.* ¶ 17.  Taken

together, this compensation, Plaintiffs assert, was excessive and therefore "unreasonable."  *Id.*

¶ 66.

### 1. *Plaintiffs' Prohibited Transaction Claims Challenge a Fiduciary Act*

ERISA Section 406, codified at 29 U.S.C. § 1106, "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241-42 (2000) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993)). For Plaintiffs to state a prohibited transaction claim under Section 406, Defendants must have acted as fiduciaries with respect to the complained-of conduct. *See Lockheed*, 517 U.S. at 892 ("[T]he Court of Appeals erred in holding that the Retirement Committee members violated the prohibited transaction section of ERISA without making the requisite finding of fiduciary status."); *Flanigan*, 242 F.3d at 87 ("[P]rohibited transaction rules apply only to decisions by [a person] acting in its fiduciary capacity."); *accord Pegram*, 530 U.S. at 226. The complained-of conduct here is JPMorgan "enter[ing] into and/or renew[ing] a contract with Caremark" and its payments to Caremark thereunder. Compl. ¶¶ 104, 280.

"Hiring a service provider in and of itself is a fiduciary function." U.S. Dep't of Labor, *Meeting Your Fiduciary Responsibilities*, https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities (Sept. 2021); *see also Mahoney v. J.J. Weiser & Co., Inc.*, 564 F. Supp. 2d 248, 255 (S.D.N.Y. 2008) (finding that "selecting and monitoring a fund's service providers" is a fiduciary function), *aff'd sub nom.*, *Mahoney v. JJ Weiser & Co., Inc.*, 339 F. App'x 46 (2d Cir. 2009) (summary order); *accord Pineiro v. Pension Benefit Guar. Corp.*, 318 F. Supp. 2d 67, 93 (S.D.N.Y. 2003); *Liss v. Smith*, 991 F. Supp. 278, 300 (S.D.N.Y. 1998). It is undisputed that, as the Plan's PBM, Caremark is a service provider. Reply at 6 (discussing "Caremark's service-provider role"); Compl. ¶ 52 ("PBMs are service providers to prescription-drug plans."). Defendants thus acted as fiduciaries when they "entered into and/or renewed [the PBM agreement] with Caremark" and made related

payments.  Compl. ¶ 104.  Accordingly, the Court turns to the merits of Plaintiffs' prohibited transaction claims.

### 2.  *Plaintiffs Assert Plausible Prohibited Transaction Claims*

According to the Complaint, in contracting with Caremark, Defendants violated ERISA Section 406(a)'s bar on prohibited transactions in three respects.  First, Plaintiffs assert that Defendants knowingly led the Plan to engage in the "exchange" of "property" with Caremark, a "party in interest."  Compl. ¶ 288 (citing 29 U.S.C. § 1106(a)(1)(A)).  It is undisputed that Caremark, as the Plan's PBM, is a party in interest because "[t]he term 'party in interest' means, as to an employee benefit plan-- . . . a person providing services to such plan."  29 U.S.C. § 1002(14)(B).  Second, Plaintiffs claim that Defendants knowingly permitted Caremark to "furnish[] goods and services" to the Plan, namely PBM services.  Compl. ¶ 288 (citing 29 U.S.C. § 1106(a)(1)(C)).  Lastly, Plaintiffs allege that Defendants facilitated the "transfer of the Plan's assets to, or use by or for the benefit of Caremark."  *Id.* (citing 29 U.S.C. § 1106(a)(1)(D)).

Plaintiffs' allegations track the respective elements of Section 406's subsections, specifically 29 U.S.C. § 1106(a)(1)(A), (C), and (D).  As relevant here: "Section 1106(a)(1)(C) contains three elements . . . (1) 'causing a plan to engage in a transaction' (2) that the fiduciary 'knows or should know constitutes a direct or indirect furnishing of goods, services, or facilities' (3) 'between the plan and a party in interest.'"  *Cunningham v. Cornell Univ.*, 604 U.S. 693, 700 (2025) (alterations adopted) (quoting 29 U.S.C. § 1106(a)(1)(C)).  Plaintiffs plead all three elements.  They allege that (1) Defendants "entered into and/or renewed a contract with Caremark," Compl ¶ 104, and "repeatedly ma[d]e excessive payments to Caremark," *id.* ¶ 280; (2) Defendants "caused the Plan to engage in transactions that [they] knew or should have known constituted . . . a furnishing of services between the Plan and Caremark," *id.* ¶¶ 280, 288; and (3)

"[a]s a service provider to the Plan, Caremark is a party in interest," *id.* ¶¶ 279, 287.  *See also, e.g.*, *id.* ¶¶ 17, 50-51 (alleging various services furnished by Caremark as a PBM).

Section 1106(a)(1)(D)'s elements mirror those of Section 1106(a)(1)(C), except that the prohibited transaction is the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."  29 U.S.C. § 1106(a)(1)(D).  Plaintiffs plead this element as well.  The Complaint alleges that "[a]ll or most of the Plan's expenses are paid from" the Trust and all "funds held by the Trust are assets of the Plan," Compl. ¶ 27, and that Trust funds were transferred to Caremark in exchange for its services, *id.* ¶ 17.  *See Carfora v. Teachers Ins. Annuity Ass'n of Am.*, 631 F. Supp. 3d 125, 151 (S.D.N.Y. 2022) ("[T]he term 'plan assets' plainly extends to money or invested capital[.]"), *amended in part*, No. 21-cv-08384 (KPF), 2023 WL 5352402 (S.D.N.Y. Aug. 21, 2023); 29 C.F.R. § 2510.3-102(a)(1) (defining "plan assets").

Lastly, Plaintiffs allege that Defendants caused the Plan to "exchange . . . property between the plan and a party in interest," 29 U.S.C. § 1106(a)(1)(A), with the property being the cash compensation that Caremark received for its PBM services.  Comp. ¶ 17; *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979) ("Money, of course, is a form of property.").

Even though Defendants may have ample defenses to this claim, pursuant to the Supreme Court's recent opinion in *Cunningham v. Cornell University*, Plaintiffs' allegations are sufficient to assert a plausible prohibited transaction claim at this juncture.  604 U.S. 693 (2025).  In a unanimous opinion, the Supreme Court held that ERISA plaintiffs need only plausibly allege the elements of a prohibited-transaction claim.  *Id.* at 709 ("The Court today holds that plaintiffs seeking to state a § 1106(a)(1)(C) claim must plausibly allege that a plan fiduciary engaged in a transaction proscribed therein, no more, no less.").  The defendant employer in *Cunningham* had retained two entities to provide recordkeeping and administrative services in connection with the plaintiffs' retirement plans.  *Id.* at 698.  Like Plaintiffs here, the *Cunningham* plaintiffs argued

that the entities' "furnishing of recordkeeping and administrative services to the plans [wa]s a prohibited transaction" under Section 1106(a)(1)(C). *Id.* (alteration adopted). The plaintiffs likewise further alleged that the fees that the defendant employer was paying for these services, which similarly came "from a set portion of plan assets" was "more than a reasonable recordkeeping fee." *Id.* The Second Circuit had affirmed the district court's dismissal of the plaintiffs' prohibited transaction claim, finding that "to plead a violation of § 1106(a)(1)(C), a complaint must plausibly allege that a fiduciary has caused the plan to engage in a transaction that constitutes the 'furnishing of . . . services . . . between the plan and a party in interest' *where that transaction was unnecessary or involved unreasonable compensation*." *Cunningham v. Cornell Univ.*, 86 F.4th 961, 975 (2d Cir. 2023) (quoting 29 U.S.C. § 1106(a)(1)(C)), *rev'd and remanded*, 604 U.S. 693 (2025). The Supreme Court reversed, finding that the Second Circuit erred in "imply[ing] that all of the § 1108 exemptions are incorporated as elements of every § 1106(a) violation." *Cunningham*, 604 U.S. at 704. Instead, the Court concluded, "plaintiffs need do no more than plead a violation of § 1006(a)(1)(C)." *Id.* at 700; *see also id.* at 710 (Alito, J., concurring) ("The upshot is that all that a plaintiff must do in order to file a complaint that will get by a motion to dismiss . . . is to allege that the administrator" "employ[ed] outside firms to provide services[.]"). In so finding, the Supreme Court acknowledged that this "barebones" pleading standard could result in claims "too easily get[ting] past the motion-to-dismiss stage." *Id.* at 708. Nevertheless, the Supreme Court concluded it was bound to "read [Section 406] the way Congress wrote it." *Id.* (quoting *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 102 (2008)).[11] As is this Court.

---

[11] The Supreme Court enumerated various "tools at [the district courts'] disposal to screen out meritless claims before discovery." *Cunningham*, 604 U.S. at 708. Relevant here, "a district court may insist that a plaintiff file a reply to an answer that raises one of the § 1108 exemptions

Accordingly, because Plaintiffs' allegations track the elements of Section 406, Defendants' motion as to dismiss Counts Four and Five is denied.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss Counts One and Two with prejudice and DENIES the motion to dismiss Counts Four and Five.  The Clerk of Court is respectfully directed to terminate the motion at Dkt. 29.

Defendants shall file their Answer to the Complaint by **March 25, 2026**, and Plaintiffs shall file their reply pursuant to Federal Rule of Civil Procedure 7(a)(7) to address Defendants' invoked exemptions, if any, by **April 8, 2026**.

Dated:  March 9, 2026
       New York, New York

SO ORDERED.

_____
JENNIFER L. ROCHON
United States District Judge

---

as an affirmative defense."  *Id.* at 711 (Alito, J., concurring); *see also id.* at 708 (noting same power).  The Court intends to make use of this procedural tool.