**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SETH STERN, et al.

Plaintiffs,

v.

JPMORGAN CHASE & CO., et al.

Defendants.

Case No. 1:25-cv-02097

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 4

    I.    The Plan ............................................................................................................. 4

    II.   Plaintiffs' Complaint ......................................................................................... 5

    III.  The Court's motion-to-dismiss order ................................................................ 7

    IV.  Plaintiffs' Reply to Defendants' Answer ......................................................... 9

LEGAL STANDARD ................................................................................................... 11

ARGUMENT ................................................................................................................ 12

    I.    Plaintiffs fail to allege a plausible prohibited-transaction claim. ................... 12

        A.   Plaintiffs misstate the "necessary services" prong and plead no facts overcoming that the services here are "necessary" for the operation of a health plan. ................................................................................................ 13

        B.   Plaintiffs have not pleaded specific facts that Defendants paid more than reasonable compensation for benefits-administration services. ............... 15

    II.   Plaintiffs' prohibited-transaction claims are barred by ERISA's statute of repose ........ 17

    III.  Plaintiffs lack standing to bring their prohibited-transaction claims .............. 20

        A.   Plaintiffs' alleged injury of excessive out-of-pocket costs is not fairly traceable to the purported prohibited transactions. ................................. 21

        B.   Plaintiffs do not plausibly allege injury-in-fact ...................................... 25

CONCLUSION ............................................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*1-800 Contacts, Inc. v. JAND, Inc.*,
  119 F.4th 234 (2d Cir. 2024) ................................................................................11

*Acosta v. Chimes D.C., Inc.*,
  2019 WL 931710 (D. Md. Feb. 26, 2019) ..............................................................15

*Altman v. Bedford Cent. Sch. Dist.*,
  245 F.3d 49 (2d Cir. 2001)..............................................................................24, 25

*Browe v. CTC Corp.*,
  15 F.4th 175 (2d Cir. 2021) ...................................................................................17

*Bugielski v. AT&T Servs., Inc.*,
  76 F.4th 894 (9th Cir. 2023) ..................................................................................14

*Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*,
  582 U.S. 497 (2017)................................................................................................17

*Cassell v. Vanderbilt Univ.*,
  285 F. Supp. 3d 1056 (M.D. Tenn. 2018)...............................................................18

*Chao v. Graf*,
  2002 WL 1611122 (D. Nev. Feb. 1, 2002) .............................................................14

*Cunningham v. Cornell Univ.*,
  604 U.S. 693 (2025)......................................................2, 8, 9, 10, 11, 12, 15, 16

*D.L. Markham DDS, MSD, Inc. 401(K) Plan v. Variable Annuity Life Ins. Co.*,
  88 F.4th 602 (5th Cir. 2023) ..................................................................................18

*David v. Alphin*,
  704 F.3d 327 (4th Cir. 2013) ..................................................................................18

*Davis v. FEC*,
  554 U.S. 724 (2008)............................................................................................3, 20

*Doe 1 v. Express Scripts, Inc.*,
  837 F. App'x 44 (2d Cir. 2020) ..............................................................................19

*In re Express Scripts/Anthem ERISA Litig.*,
  285 F. Supp. 3d 655 (S.D.N.Y. 2018).....................................................................19

*Fisher v. Dallas Cnty.*,
    299 F.R.D. 527 (N.D. Tex. 2014) ...................................................................................12, 15

*Heidel v. Governor of New York State*,
    2023 WL 1115926 (2d Cir. Jan. 31, 2023) .............................................................................21

*Johnson v. U.S. Off. of Pers. Mgmt.*,
    783 F.3d 655 (7th Cir. 2015) ..................................................................................................22

*Knight First Amend. Inst. at Columbia Univ. v. United States Citizenship &*
    *Immigr. Servs.*,
    30 F.4th 318 (2d Cir. 2022) ....................................................................................................14

*Kraus v. Snow Teeth Whitening LLC*,
    2022 WL 4642170 (E.D.N.Y. Sept. 15, 2022) .......................................................................27

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024).................................................................................................................14

*Lugo v. City of Troy, New York*,
    114 F.4th 80 (2d Cir. 2024) ....................................................................................................25

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).................................................................................................................20

*Mahon v. Ticor Title Ins. Co.*,
    683 F.3d 59 (2d Cir. 2012).......................................................................................................21

*N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*,
    898 F.3d 461 (5th Cir. 2018) .....................................................................................................4

*Navarro v. Wells Fargo & Co.*,
    2025 WL 897717 (D. Minn. Mar. 24, 2025) ....................................................................23, 24

*Navarro v. Wells Fargo & Co.*,
    2026 WL 591454 (D. Minn. Mar. 3, 2026) ......................................................................23, 25

*Ortiz v. Consol. Edison Co. of New York, Inc.*,
    801 F. Supp. 3d 260 (S.D.N.Y. 2025)...................................................................................3, 20

*P. Stolz Fam. P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004).......................................................................................................20

*Plutzer on behalf of Tharanco Grp., Inc. v. Bankers Tr. Co. of S. Dakota*,
    2022 WL 17086483 (2d Cir. Nov. 21, 2022)..........................................................................26

*Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*,
    721 F.3d 95 (2d Cir. 2013)........................................................................................................17

*Shaulis v. Nordstrom, Inc.*,
   865 F.3d 1 (1st Cir. 2017)........................................................................................27

*Singh v. Deloitte LLP*,
   123 F.4th 88 (2d Cir. 2013) ...............................................................................15, 16

*Singh v. Deloitte LLP*,
   650 F. Supp. 3d 259 (S.D.N.Y. 2023).....................................................................26

*SoundExchange, Inc. v. Sirius XM Radio Inc.*,
   796 F. Supp. 3d 1 (S.D.N.Y. 2025).........................................................................11

*Taylor v. BDO USA, P.C.*,
   2025 WL 2420941 (D. Mass. Aug. 21, 2025) .........................................................27

*Thole v. U.S. Bank N.A.*,
   590 U.S. 538 (2020).......................................................................................20, 22, 26

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021)................................................................................................21

*United States v. Taylor*,
   596 U.S. 845 (2022)................................................................................................14

*White v. Chevron Corp.*,
   2017 WL 2352137 (N.D. Cal. May 31, 2017) ........................................................19

*White v. Chevron Corp.*,
   752 F. App'x 453 (9th Cir. 2018) ..........................................................................18

**Statutes:**

29 U.S.C. §1002(14) ........................................................................................................13

29 U.S.C. §1106(a) ..........................................................................................................12

29 U.S.C. §1106(a)(1)(A) ..................................................................................................7

29 U.S.C. §1106(a)(1)(B) ..................................................................................................7

29 U.S.C. §1106(a)(1)(D) ..................................................................................................7

29 U.S.C. §1108(b)(2) .................................................................2, 9, 10, 12, 13, 15, 16

29 U.S.C. §1113(1) ...............................................................................................2, 17, 18

**Other Authorities:**

29 C.F.R. §2550.408b-2(b)..............................................................................................14

iii

42 Fed. Reg. 32389 (June 24, 1977) ............................................................................................14

91 Fed. Reg. 4348 (Jan. 30, 2026) .............................................................................................17

Axis Advisors, *Unravelling the Drug Pricing Blame Game* (Sept. 19, 2023),
    https://www.3axisadvisors.com/projects/2023/9/19/unravelling-the-drug-
    pricing-blame-game ...........................................................................................................24

PBGH, *Purchasing Standards for Plan Sponsors* (June 2023),
    https://www.pbgh.org/wp-content/uploads/2023/10/PBGH-PBM-Common-
    Purchasing-Standards.pdf ....................................................................................................6

Neil Weinberg & Robert Langreth, *Drug Costs Too High? Fire the Middleman*,
    Bloomberg (Mar. 3, 2017), https://www.bloomberg.com/news/articles/2017-
    03-03/drug-costs-too-high-fire-the-middleman ...................................................................5

**INTRODUCTION**

Following the Court's dismissal of the core of Plaintiffs' ERISA lawsuit, Plaintiffs are left with "prohibited transaction" claims that were an afterthought in their Complaint.  Now that both parties have, as the Court directed, submitted additional pleadings, those prohibited-transaction claims fail as a matter of law.  Plaintiffs have done no meaningful work to show how these prohibited-transaction claims fall outside ERISA's statutory safe harbor for necessary services procured for reasonable compensation or are timely under the statue of repose.  Further, with the focus now squarely on Plaintiffs' prohibited-transaction claims, they have not articulated how their alleged Article III injury relates to those specific claims—if they suffered injury at all.

The prohibited-transaction claims that survived Defendants' motion to dismiss were not Plaintiffs' Plan A for this litigation.  "The gravamen of Plaintiffs' Complaint," the Court held, challenged non-fiduciary conduct by focusing on the design and structure of JPMorgan Chase & Co.'s ("JPMC") prescription-drug plan (the "Plan").  MTD Order 26.  That non-fiduciary conduct included Defendants' establishment of the Plan's formulary, the cost-sharing terms, the selection of pricing models for prescription drugs, and the decision to allegedly use a "traditional" pharmacy-benefit manager ("PBM") model, rather than a "pass-through" model.  Though overseeing a PBM's (Caremark) services in "resolving prescription-drug claims" and "processing prior authorizations" was fiduciary conduct, the non-fiduciary conduct was settlor in nature and thus could not be the basis of fiduciary claims under ERISA.  *Id.* at 24 (brackets omitted).  Accordingly, the Court dismissed the fiduciary claims challenging the settlor conduct that was the gravamen of the Complaint.

Plaintiffs' threadbare prohibited-transaction claims, however, survived.  As the Court correctly acknowledged, MTD Order 32-33, the Supreme Court recently held that the normal *Twombly/Iqbal* pleading standard governs prohibited-transaction claims, even when a statutory

1

exemption to a prohibited transaction might apply.  But the Supreme Court also directed district courts to use "existing tools" to screen out prohibited-transaction claims "before discovery" where the challenged transaction is covered by a statutory exemption.  *Cunningham v. Cornell Univ.*, 604 U.S. 693, 708 (2025).  The Court followed that procedure here, requiring Plaintiffs to file a Reply to Defendants' Answer "putting forward specific, nonconclusory factual allegations showing" that any prohibited-transaction exemption invoked by Defendants "does not apply" to the fiduciary transactions.  *Id.* (brackets and quotation marks omitted); MTD Order 33 n.11.  Plaintiffs have filed that Reply, but have not identified any "specific, non-conclusory factual allegations" saving their prohibited-transaction claims.  Those claims are now subject to dismissal, for three reasons.

First, Plaintiffs' prohibited-transaction claims fail on the merits.  Defendants' Answer invoked the prohibited-transaction exemption of 29 U.S.C. §1108(b)(2), which exempts from ERISA's prohibited-transaction provisions contracting with a service provider for "services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."  Plaintiffs' pleadings are devoid of any factual allegations plausibly suggesting that Caremark's benefits-administration services are unnecessary, or that the Plan paid more than reasonable compensation for those services.  Indeed, even as to Plaintiffs' original, broader challenge to the prescription-drug structure and pricing, this Court already held that Plaintiffs failed to plausibly allege overpayments by the Plan.  Plaintiffs offer even less to plausibly show that the Plan overpaid Caremark for benefits-administration services.

Second, Plaintiffs' prohibited-transaction claims are time-barred by ERISA's six-year statute of repose.  29 U.S.C. §1113(1).  Plaintiffs' claims challenge the retention of Caremark, which occurred more than six years before Plaintiffs filed their Complaint on March 13, 2025, and

2

courts have rejected continuing-violation theories of prohibited transactions that would circumvent ERISA's statute of repose.

Finally, Plaintiffs lack Article III standing to press the prohibited-transaction claims that remain in this case. Standing is not dispensed in gross but must instead be established "for each claim [a plaintiff] claims to press." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation omitted). But Plaintiffs' alleged injury and Plaintiffs' prohibited-transaction claims are unrelated to each other. Plaintiffs' only theory of Article III injury that this Court previously considered viable was an "out-of-pocket" costs theory that Plaintiffs were overcharged for prescription drugs by pharmacies. MTD Order 15-19. Even if that alleged injury were sufficiently traceable to Plaintiffs' challenge to the Plan's structure and prescription-drug pricing to permit jurisdiction over those claims, Plaintiff's only claim left to press is that the fiduciaries' retention of Caremark for benefits-administration services was a prohibited transaction. Plaintiffs do not offer any facts plausibly suggesting that the out-of-pocket costs they paid *pharmacies* for four prescription drugs are fairly traceable to the Plan's fiduciary retention of *Caremark* for benefits-administration services. Nor, under Second Circuit precedent, do they plausibly allege that those costs constitute *over*charges in the first place as required by Second Circuit precedent. Accordingly, the Court also can and should reconsider its earlier conclusion regarding Article III's injury-in-fact prong. *See Ortiz v. Consol. Edison Co. of New York, Inc.*, 801 F. Supp. 3d 260, 325 (S.D.N.Y. 2025) (Rochon, J.) (exercising discretion under "law of the case doctrine" to reconsider prior conclusion).

In all events, this Court should grant judgment on the pleadings and dismiss the remainder of Plaintiffs' Complaint.

## BACKGROUND[1]

### I. The Plan

JPMC voluntarily makes available medical benefits, including prescription-drug coverage, to eligible JPMC employees, their spouses, and their dependents through the Plan.  Compl. ¶17.  Historically, benefits have been funded primarily by JPMC.  Compl. ¶229.  In total, JPMC contributed more than $7 billion from 2019-2023—$1.7 billion in 2023 alone—to fund these healthcare benefits.

The Plan's medical component in which Plaintiffs participate is "self-funded," meaning that JPMC bears direct financial responsibility for Plan benefits that are not paid by participants, including prescription-drug benefits and all costs paid to any of the Plan's service providers.  Compl. ¶224.  In self-funded plans the "employer is responsible for paying claims and bearing the financial risk" of doing so.  *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 468 (5th Cir. 2018).  Accordingly, if claims, healthcare costs, or any other Plan expenses are higher than expected, JPMC is responsible for paying the difference.

The costs participants pay toward their healthcare varies based on a wide variety of factors specified in the Plan document.[2]  Currently, preventive drugs are provided at no out-of-pocket expense to Plan participants, no deductible applies to prescription-drug benefits, and once Plan participants reach an annual out-of-pocket maximum the Plan pays 100% of the cost of covered

---

[1] Because this Court is already familiar with the factual background, *see* MTD Order 2-7, for the sake of brevity Defendants have avoided an extended discussion of the details of the Plan.  A lengthy description was included at pages 3-7 of Defendants' motion to dismiss (ECF No. 30).  Unless otherwise noted, any exhibits referenced herein refer to the exhibits attached to the Rosenberg Declaration, which was filed contemporaneously with Defendants' motion to dismiss.  ECF No. 31.  They are properly before this Court for the reasons explained in the Court's opinion.  MTD Order 9-10.

[2] Ex. B, SPD, at MTD-051-057, MTD-073.

prescription drugs.[3]  Plaintiffs do not allege that they personally paid expenses directly to Plan service providers, including Caremark, and the Plan itself expressly provides that administrative expenses are paid out of the Plan's Trust.[4]

Caremark has served as the Plan's PBM during the entirety of the Putative Class Period. Compl. ¶17.  Caremark is widely used in the health-plan marketplace—it is one of three PBMs used by the vast majority of U.S. health plans.  Compl. ¶¶90, 207.  According to a source cited in the Complaint (¶208), the Big 3 PBMs "process about 70% of the nation's prescriptions."[5]  As this Court has previously explained, PBMs can provide a variety of offerings to health plans and the employers that sponsor them.  Those offerings include assistance with the design of the Plan's prescription-drug-benefit program (*e.g.*, determining the formulary, setting pricing benchmarks, deciding on the plan structure), as well as assistance administering the program as designed (*e.g.*, resolving prescription-drug claims, processing prior authorizations, and the like).  MTD Order 23-24.

## II.    **Plaintiffs' Complaint**

The "gravamen of Plaintiffs' Complaint" was rooted in "Defendants' alleged failure to consider or implement alternative pricing structures for the Plan's prescription-drug component." MTD Order 26.    Put differently, Plaintiffs were "collectively focus[ed] less on [Plan] administration and more on Defendants' decisions regarding the design and structure of the Plan's pharmacy benefit arrangements."  *Id.* at 23.

---

[3] *Id.* at MTD-043, MTD-073, MTD-111.

[4] Ex. A, Plan Document, MTD-004

[5] Neil Weinberg & Robert Langreth, *Drug Costs Too High? Fire the Middleman*, Bloomberg (Mar. 3, 2017), https://www.bloomberg.com/news/articles/2017-03-03/drug-costs-too-high-fire-the-middleman.

For example, Plaintiffs initially alleged that Defendants mismanaged the Plan's prescription-drug program by failing to negotiate sufficiently favorable terms for the Plan's formulary—the list of prescription drugs covered under the Plan—resulting in excessively priced prescription drugs. *See* MTD Order 26. In general, Plaintiffs complained that "pass-through" PBM arrangements are more favorable to plans and participants than "traditional" arrangements that use "spread" pricing and permit the PBM to retain prescription-drug rebates. Compl. ¶¶8, 53-74. And Plaintiffs assumed that because the Plan uses Caremark, a "traditional PBM," it pays for services through "spread" compensation instead of a "pass-through" model, resulting in excessive prescription-drug costs (*e.g.*, Compl. ¶¶8, 53, 104, 174).

Plaintiffs also contended that the "specialty" drugs on the Plan's formulary were, on average, several times higher than average pharmacy "acquisition" costs reported in the "NADAC" database. Compl. ¶¶109, 112-126; MTD Order 23. As Plaintiffs' cited source explains, NADAC is a measure of some pharmacies' average costs to *acquire* drugs, not the prices they *charge customers* for those drugs (prices that includes fees, as well as the pharmacies' own profits). MTD Order 19-20 n.5.[6] Plaintiffs also alleged that Defendants allowed Caremark to steer participants toward high-priced biosimilar drugs developed by a Caremark-affiliated company. Compl. ¶¶129-135; MTD Order 5.

Plaintiffs never alleged *they* were ever prescribed these specialty drugs or biosimilars. Instead, they alleged they collectively purchased 11 common generic drugs that they contend cost the Plan more than the pharmacy acquisition cost reported in NADAC. Compl. ¶127. For example, Plaintiffs pointed to one drug that was priced at $4.73, but had a NADAC-reported

---

[6] PBGH, *Purchasing Standards for Plan Sponsors* 11 (June 2023), https://www.pbgh.org/wp-content/uploads/2023/10/PBGH-PBM-Common-Purchasing-Standards.pdf (quoted in ¶¶138-141).

average acquisition cost of $2.74. *Id.* Plaintiffs pointed to only four drugs on this list for which they paid out-of-pocket costs, the most expensive of which was $30. Compl. ¶¶247-249.

Based on these allegations, Plaintiffs originally brought four claims under ERISA. Counts I and II alleged that Defendants breached their fiduciary duties of prudence and loyalty under 29 U.S.C. §1104(a)(1)(A)-(B). Compl. ¶¶264-267. Counts IV and V alleged that Defendants' dealings with Caremark constituted prohibited transactions under 29 U.S.C. §1106(a)(1)(A)-(B), (D). Compl. ¶¶278-293.[7]

### III.    The Court's motion-to-dismiss order

On March 9, 2026, the Court granted in part and denied in part Defendants' motion to dismiss. The Court first rejected that Plaintiffs had adequately pleaded their "higher premiums" theory of standing, but concluded that they had sufficiently alleged standing based on an "out-of-pocket overpayments" theory. MTD Order 11, 13-19. Under that latter theory, Plaintiffs asserted that "Defendants' alleged mismanagement" caused them to incur "higher out-of-pocket costs" for certain prescription drugs. *Id.* at 6.

After concluding that Plaintiffs had plausibly alleged their out-of-pocket costs theory, the Court dismissed Counts I and II, which alleged breaches of ERISA's fiduciary duties of prudence and loyalty. MTD Order 23-29. The Court reasoned that Defendants were not acting as fiduciaries when making decisions regarding "the design and structure of the Plan's pharmacy benefit arrangements" including "how the PBM was compensated, how drugs were categorized, what pricing benchmarks were used, and which alternatives were not adopted." *Id.* at 23-29. The Court also determined that, "even if the Complaint concerned fiduciary conduct," "Plaintiffs d[id] not

---

[7] The Complaint contained no Count III.

7

plead actual overpayment" by the Plan for prescription drugs sufficient to plausibly support "an inference of breach." *Id.* at 19-20 n.5.

The Court denied Defendants' motion to dismiss only as to Counts IV and V, alleging prohibited transactions. MTD Order 29-34. As to those claims, the Court recognized that a viable prohibited-transaction claim would have to challenge *fiduciary*, not *settlor*, conduct. *Id.* at 30. The Court determined that Plaintiffs had adequately pleaded that Defendants acted as fiduciaries when "entering into and/or renewing a contract" with Caremark and when making "payments to Caremark thereunder." *Id.* at 30 (quotation marks and brackets omitted). But, as limited by the Court's ruling on Plaintiffs' fiduciary-breach claims, this aspect of the Court's order is necessarily limited to the only aspect of Defendants' conduct that was fiduciary in nature: the retention of Caremark to assist in *administering* prescription-drug benefits by, for example, "resolving prescription-drug claims" and "processing prior authorizations." *Id.* at 24 (quoting ECF No. 38, at 6). It does not encompass actions Defendants took as to Caremark's role in helping JPMC set Plan benefits by establishing the formulary, determining the method of PBM compensation, deciding pricing benchmarks, and selecting a structure (pass-through or otherwise) for prescription-drug benefits. *Id.* at 23-24, 30. Those functions still do not concern fiduciary conduct, and thus are not the proper subject of a prohibited-transaction claim. *See id.* at 30.

Although the Court allowed the service-provider aspects of Plaintiffs' prohibited-transaction claims to proceed, it ordered Plaintiffs to "file [a] reply pursuant to Federal Rule of Civil Procedure 7(a)(7) to address" any exemptions Defendants "invoked" in their Answer. MTD Order 34. The Court recognized that, as explained in *Cunningham*, "ERISA plaintiffs need only plausibly allege the elements of a prohibited-transaction claim," and need not affirmatively plead around prohibited-transaction exemptions in the first instance. *Id.* at 32-33. Yet it also

8

acknowledged that "this 'barebones' pleading standard could result in claims 'too easily get[ting] past the motion-to-dismiss stage.'" *Id.* at 33 (quoting *Cunningham*, 604 U.S. at 708). One way the Supreme Court suggested that district courts could thereafter "screen out [such] meritless claims" is to "insist that a plaintiff file a reply to an answer that raises one of the §1108 exemptions as an affirmative defense." *Id.* at 33-34 & n.11. If the plaintiffs' reply fails to allege "specific, nonconclusory factual allegations showing the exemption does not apply," the Supreme Court explained, district courts "may then dismiss th[ose] suits" at the close of the pleadings. *Cunningham*, 604 U.S. at 708. This Court decided to make use of that mechanism here. MTD Order 33-34 & n.11.

## IV.    Plaintiffs' Reply to Defendants' Answer

Defendants' Answer invokes as an affirmative defense 29 U.S.C. §1108(b)(2), which exempts from ERISA's prohibited-transaction provisions contracting with a service provider for "services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefore." *See* Answer p. 61 (Third Defense). Defendants' Answer also alleged that processing claims and providing prior authorizations, among other things, are necessary services for the operation of a health plan, and that when the Plan conducted a request for proposal for PBM services, Caremark "was both the cheapest of all of the bidders on a total cost basis, including claims administration services and processing, and was graded by the benefits consulting firm retained by Defendants to be the most advantageous for the Plan qualitatively." Answer ¶13. Defendants also specifically alleged that, under its contract with Caremark, "the amount Caremark has charged the Plan for prescription drugs has been the same as what Caremark reimbursed network pharmacies for retail, mail, and specialty drugs" and that "Caremark has not received spread-based compensation in connection with the Plan." Answer ¶18.

Under this Court's order, Defendants' invocation of the §1108(b)(2) exemption triggered Plaintiffs' obligation to file a Reply setting forth specific, nonconclusory factual allegations plausibly establishing that the exemption is not satisfied.  *See* MTD Order 34; *Cunningham*, 604 U.S. at 708.

In their Reply, Plaintiffs first contest that the exemption's necessary-services component is satisfied here.  Reply ¶¶5-10.  They do not claim that the types of benefits-administration services that Caremark provides to the Plan—*e.g.*, resolving prescription-drug claims and processing prior authorizations—are not "necessary for the establishment or operation of the plan," as §1108(b)(2) provides.  Rather, they contend that it was not necessary for JPMC *to outsource* those functions to "any third-party PBM," or to Caremark in particular.  Reply ¶¶6-10 (claiming that JPMC could have "administer[ed] its own prescription drug program," "provid[ed] pharmacy benefits directly," or retained a different PBM (such as a pass-through PBM), rather than Caremark).

Plaintiffs also contest that the compensation paid to Caremark was reasonable.  Reply ¶¶11-38.  They "deny that the terms of the Caremark Agreement are financially competitive," but largely do not plead facts supporting that denial.  Reply. ¶13.  Rather, they dispute that Defendants' robust processes for monitoring Caremark, including by performing market checks, requests for proposals, and considering alternative providers, support that Caremark's compensation was reasonable (Reply ¶¶14-26), and they refer back to allegations in their Complaint regarding the structure and design of the Plan's prescription-drug benefits, including:

- the alleged lack of carve-outs for specialty drugs (Reply ¶20);

- the alleged failure to contract with a PBM offering pass-through pricing (Reply ¶25);

- Defendants' alleged adoption of a "spread pricing" model (Reply ¶29);

- alleged "pricing discrepancies" between the alleged prices that the Plan paid for prescription drugs and alleged pharmacy-acquisition costs or prices allegedly paid by other plans (Reply ¶32); and

- the alleged pricing benchmarks Defendants allegedly chose to use (*i.e.*, the alleged failure to use NADAC as the pricing benchmark) (Reply ¶34).

Plaintiffs also allege decreases in prices for 352 of the drugs covered by the Plan since they filed this lawsuit, which they claim "demonstrates that the prices charged beforehand was unreasonable" and "undercuts" the notion that Caremark was paid reasonable compensation. Reply ¶36.

**LEGAL STANDARD**

In deciding motions for judgment on the pleadings under Rule 12(c), this Court "applies the same standard it would on a motion to dismiss under Rule 12(b)(6)." *SoundExchange, Inc. v. Sirius XM Radio Inc.*, 796 F. Supp. 3d 1, 7 (S.D.N.Y. 2025). Thus, a Rule 12(c) motion should be granted unless the plaintiffs' pleadings "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (citation omitted). In deciding such motions, the Court may properly consider "(1) the non-movant's pleadings; (2) the documents that are attached to, integral to, or incorporated by the pleadings; and (3) judicially noticeable extrinsic evidence." *1-800 Contacts, Inc. v. JAND, Inc.*, 119 F.4th 234, 246 (2d Cir. 2024).

This same standard applies to that aspect of Defendants' motion challenging Plaintiffs' failure to plausibly allege that Defendants engaged in any nonexempt prohibited transactions. As explained in *Cunningham*, when a court orders ERISA plaintiffs to file a Rule 7(a)(7) reply addressing any prohibited-transaction exemption invoked by a defendant's answer, the plaintiffs must put "forward specific, nonconclusory factual allegations showing the exemption does not

11

apply." 604 U.S. at 708 (quoting *Crawford-El v. Britton*, 523 U.S. 574, 598, (1998)). If they cannot "plausibly" allege such "specific, nonconclusory factual allegations," their prohibited-transaction claims are subject to dismissal. *Id.* As other courts have put it in other contexts in which Rule 7(a)(7) is employed, "[t]he case should not be allowed to proceed unless plaintiffs can assert specific facts that, if true, would overcome the defense." *Fisher v. Dallas Cnty.*, 299 F.R.D. 527, 532 (N.D. Tex. 2014).

## ARGUMENT

### I.     Plaintiffs fail to allege a plausible prohibited-transaction claim.

Plaintiffs' prohibited-transaction claims, both brought under §1106(a), should be dismissed because the allegations in Plaintiffs' Complaint and Reply do not plausibly demonstrate that the retention of Caremark to provide benefits-administration services falls outside of a statutory exemption.

Notwithstanding the general bar on prohibited transactions in §1106(a), §1108(b)(2) exempts "making reasonable arrangements with a party in interest for ... services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." *Cunningham*, 604 U.S. at 695. As noted, in response to this exemption that was "invoked" by Defendants' Answer, MTD Order 34, Plaintiffs were required to "put[] forward specific, nonconclusory factual allegations showing the exemption does not apply," *Cunningham*, 604 U.S. at 708 (quotation marks omitted). In other words: to "assert specific facts that, if true, would overcome the defense." *Fisher*, 299 F.R.D. at 532. Plaintiffs have failed to do so as to both the necessary-services and reasonable-compensation prongs of the §1108(b)(2) exemption. They instead distort what it means for services to be "necessary." And they allege nothing about the quality or costs of the benefits-administration services that Caremark provides to the Plan as

12

compared to what other PBMs offer or that similar health plans receive for those services—allegations that are necessary in this context.

> **A.**   **Plaintiffs misstate the "necessary services" prong and plead no facts overcoming that the services here are "necessary" for the operation of a health plan.**

Plaintiffs suggest in their Reply that Defendants cannot rely on the §1108(b)(2) exemption because it was not "necessary" for Defendants to outsource prescription-drug-plan administrative services at all, or to Caremark in particular. Reply ¶¶5-10. But that is not how the exemption works. The exemption turns on whether *the services fiduciaries procured* were necessary to the operation of a plan (here, a health plan), not whether a plan's fiduciaries had no option but to retain the *specific service provider* they ultimately selected. The latter interpretation of §1108(b)(2) could never be satisfied given the wide variety of service-provider options available in the market and the theoretically ever-present option of simply providing plan-administration services in-house. And Defendants are unaware of any case, regulation, or other authority that adopts Plaintiffs' view, which is contrary to the statutory text, regulatory guidance, caselaw, and common sense.

On the text, the plain language of the statute asks whether the types of "services" outsourced are "necessary"—not, as Plaintiffs would have it, whether it was "necessary" to outsource performance of those services to a service provider. It provides an exemption for:

> Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.

29 U.S.C. §1108(b)(2). While "party in interest" is defined to include "a person providing services to [a] plan," 29 U.S.C. §1002(14), "necessary" modifies the word "services," not the term "party in interest." Thus, Plaintiffs' interpretation would require the impermissible addition of an extra

"necessary" before the term "party in interest." *Knight First Amend. Inst. at Columbia Univ. v. United States Citizenship & Immigr. Servs.*, 30 F.4th 318, 331 (2d Cir. 2022) ("It is not the province of the courts to add words to statutes that Congress has enacted."). That "other services" follows particular types of services ("legal" and "accounting"), rather than particular types of service *providers* ("accountants" or "lawyers") further underscores that "services necessary" does not mean "service providers necessary." *United States v. Taylor*, 596 U.S. 845, 856 (2022) ("a law's terms are best understood by 'the company [they] kee[p]'"). By its plain terms, then, the statute provides that plans may contract with service providers so long as the types of "services" contracted for are "necessary"—even if plan sponsors could theoretically provide those services in-house, and even if providers other than the one selected are available.

Longstanding Department of Labor guidance points the same way. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (noting "longstanding practice of the government ... can inform [a court's] determination of what the law is") (quotation marks omitted)). Since 1977, a DOL regulation has spoken in terms of "necessary services"—not "necessary service providers." 42 Fed. Reg. 32389, 32390 (June 24, 1977) (codified at 29 C.F.R. §2550.408b-2(b)). According to that regulation, a "*service* is necessary for the establishment or operation of a plan ... if the *service* is appropriate and helpful to the plan obtaining the *service* in carrying out the purposes for which the plan is established or maintained." 29 C.F.R. §2550.408b-2(b) (emphases added).

Given the clear text and longstanding administrative interpretation of the provision, courts addressing the question also have spoken universally in terms of "necessary services" rather than "necessary service providers." *See, e.g.*, *Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 901 (9th Cir. 2023) (noting the exemption covers "'service transactions' that keep plans running

14

smoothly"); *Acosta v. Chimes D.C., Inc.*, 2019 WL 931710, at *15 (D. Md. Feb. 26, 2019) (finding "services were necessary for the operation of the [p]lan"); *Chao v. Graf*, 2002 WL 1611122, at *13 (D. Nev. Feb. 1, 2002) (deeming marketing "services" necessary). Plaintiffs simply have no support for the notion that the exemption applies only if JPMC were unable to perform the outsourced services in-house, or only if the service provider selected was the only entity capable of providing those services.

Properly understood as focused on the necessity of the services themselves, Plaintiffs have failed to "assert specific facts that, if true, would overcome the defense." *Fisher*, 299 F.R.D. at 532. Plaintiffs nowhere allege that a health plan does not need claims-administration or prior-authorization services—because such an assertion would be patently implausible on its face given the obvious necessity of benefits-administration services in a medical-benefit plan. Instead, their allegations rise and fall on their inaccurate interpretation of ERISA—they allege, for example, that Caremark's services were not truly "necessary" *for this Plan* because JPMC considered managing pharmacy benefits in-house and because other PBMs were available. Reply ¶¶5-9. But as noted, those allegations speak to the wrong question and, accordingly, do not "overcome the defense" that Defendants' Answer properly invoked. *Fisher*, 299 F.R.D. at 532.

**B.    Plaintiffs have not pleaded specific facts that Defendants paid more than reasonable compensation for benefits-administration services.**

Plaintiffs also have not articulated "specific, nonconclusory factual allegations" demonstrating that Caremark received "more than reasonable" compensation for the benefits-administration services it provided. 29 U.S.C. §1108(b)(2); *Cunningham*, 604 U.S. at 708. The Second Circuit has squarely held that whether a service provider's compensation is "excessive" must be viewed "relative 'to the services rendered.'" *Singh v. Deloitte LLP*, 123 F.4th 88, 93 (2d Cir. 2013). Accordingly, what is necessary are facts regarding the compensation paid, and "the

nature and quality of the services provided." *Id.* at 94.  And where a plaintiff is attempting to plead excessive compensation by means of comparison, they "must state facts to show the funds or services being compared are, indeed, comparable." *Id*. (citation omitted); *accord id.* ("[T]he way to plausibly plead a claim of this type is to identify similar plans [being provided] the same services for less." (brackets in original) (quoting *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022))).

Plaintiffs have failed to do so here.  To begin, even if the services at issue were the plan-design services in setting drug pricing terms that this Court held do not implicate ERISA's fiduciary obligations, this Court has already held—correctly—that Plaintiffs' Complaint did not plausibly allege that *the Plan* paid excessive costs, because Plaintiffs' comparators are not apples-to-apples.  MTD Order 19-20 n.5.  And Plaintiffs' Reply added virtually nothing.  Instead, Plaintiffs simply denied Defendants' invocation of the §1108(b)(2) defense, denied that the robust processes described in Defendants' Answer plausibly support that Caremark was paid reasonable compensation, and pointed back repeatedly to the allegations in Plaintiffs' Complaint.  Reply ¶¶11-38.  Other than that, Plaintiffs asserted that *some* drug prices have dropped since Plaintiffs originally pulled pricing information from the Plan portal to include in the Complaint (which was two Plan years ago)—an allegation that Plaintiffs had already put before the Court in advance of the motion-to-dismiss hearing.  Reply ¶¶11-38; ECF No. 44 (pre-hearing letter).[8]

---

[8] Plaintiffs also repeatedly fault Defendants for failing to produce evidence in their Answer (*e.g.*, Reply ¶12 & n.1), but Plaintiffs ignore that under the Rule 7(a)(7) procedure that the Supreme Court encouraged and this Court invoked, Plaintiffs must affirmatively offer "specific, nonconclusory factual allegations showing the [§1108(b)(2)] exemption does not apply." *Cunningham*, 604 U.S. at 708.  Plaintiffs cannot do so simply by denying Defendants' invocation of the exemption.  While Plaintiffs want to skip over the pleadings stage to get right to discovery, the pleadings provide no basis to get to evidentiary stages of the case.

In any event, Plaintiffs' challenge to the Plan's prescription-drug pricing and structure is no longer at issue in this case; the Court already dismissed those claims because they challenge non-fiduciary conduct. And Plaintiffs' pleadings taken together allege next to nothing about what is left in the case: the level of administrative services Caremark provides, or how the costs paid for them compare to those paid by similarly situated plans retaining similar services. *That* deficiency is particularly acute given how the Court has narrowed Plaintiffs' claims—this Court dismissed Plaintiffs' claims targeting Caremark's Plan-design assistance (which does not implicate ERISA's fiduciary obligations) and allowed Plaintiffs' claims to go forward only on a narrow prohibited-transaction theory related to Caremark's benefits-administration services, such as claims processing. MTD Order 24. Plaintiffs allege literally nothing about *those* services, Caremark's compensation for them, or the quality (or cost) of similar services obtained by other health plans or offered by other PBMs.[9]

## II.    **Plaintiffs' prohibited-transaction claims are barred by ERISA's statute of repose.**

Plaintiffs' prohibited-transaction claims also fail because they are untimely. ERISA bars plaintiffs from bringing suit more than six years after the last action constituting a part of the violation. 29 U.S.C. §1113(1). The six-year limitations period under §1113(1) "is a statute of repose that begins running ... irrespective of whether the injured party knows of the conduct or injury." *Browe v. CTC Corp.*, 15 F.4th 175, 190 (2d Cir. 2021). "The purpose of a statute of repose is to create 'an absolute bar on a defendant's temporal liability.'" *Cal. Pub. Emps.' Ret.*

---

[9] Plaintiffs assert that reasonable compensation cannot be assessed "without addressing prescription drug pricing." Reply ¶33. That disregards this Court's motion-to-dismiss ruling, and in any event is based *entirely* on a *proposed* regulation that is not yet in effect that would newly bring drug pricing within the fiduciary-oversight umbrella. *See* Improving Transparency Into Pharmacy Benefit Manager Fee Disclosure, 91 Fed. Reg. 4348, 4425 (Jan. 30, 2026). Whether or not that proposed regulation can withstand an APA challenge, it is not the law now and does not support Plaintiffs' prohibited-transaction claims.

*Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 507 (2017).  "In light of [this] purpose ... the provision is in general not subject to tolling."  *Id.*; *accord Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 107 (2d Cir. 2013).

Here, the challenged "transactions" are the Plan's engagement with Caremark to provide PBM services.  Compl. ¶¶104, 280; MTD Order 30.  Plaintiffs filed their Complaint on March 13, 2025, meaning they can only challenge transactions post-dating March 13, 2019.  29 U.S.C. §1113(1).  Yet it is clear from the Forms 5500 that Caremark has served as the Plan's PBM since well before that date.[10]  Indeed, Plaintiffs admit that Caremark has been the Plan's PBM since 2006.  Answer ¶1; Reply ¶2.  Any challenge to Defendants' initial contracting with Caremark is accordingly time-barred and should be dismissed.  *See White v. Chevron Corp.*, 752 F. App'x 453, 455 (9th Cir. 2018) (affirming dismissal of prohibited-transaction claim as time-barred "because the transaction alleged to have violated the statute—hiring [a service provider]—[wa]s alleged to have occurred in 2002, and th[e] action was not commenced until 2016").

Plaintiffs may try to base their prohibited-transaction claims on contractual renewals or payments made to Caremark on an ongoing basis.  But in the context of a prohibited-transaction claim (as opposed to a cause of action for breach of ERISA's fiduciary duties of prudence and loyalty, which include an ongoing duty to monitor), "the only action that can support an alleged prohibited transaction is the initial" action of selecting a particular service provider.  *David v. Alphin*, 704 F.3d 327, 340 (4th Cir. 2013); *accord D.L. Markham DDS, MSD, Inc. 401(K) Plan v. Variable Annuity Life Ins. Co.*, 88 F.4th 602, 612 (5th Cir. 2023) ("'transaction' under §1106(a) does not include payments in accordance with a contract").  Plaintiffs therefore cannot defeat ERISA's repose period by pointing to "continued transactions"—that is, renewals of the

---

[10] Ex. I, 2017 Form 5500, at 46 (Santos Declaration).

18

relationship or individual payments thereunder—between a plan and a service provider that occur only as a result of that "initial" action. *See Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1068 (M.D. Tenn. 2018). "[T]here is no such thing as a 'continuing' prohibited transaction." *White v. Chevron Corp.*, 2017 WL 2352137, at \*22 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018).[11]

*White* is instructive. There, the plaintiffs asserted a prohibited-transaction claim premised on the defendants' hiring of a recordkeeper fourteen years before the complaint was filed. 2017 WL 2352137, at \*22. Seeking to avoid dismissal, the plaintiffs claimed that the initial hiring, although outside the repose period, resulted in the recordkeeper "receiving excessive compensation" within the repose period, making their claim timely as to those specific payments. *Id.* The district court disagreed. *Id.* The "continuing violation" doctrine on which the plaintiffs premised their argument, the court reasoned, is "inapplicable" to prohibited-transaction claims, since the "duty to monitor" on which the doctrine is based is "tethered" only to "[29 U.S.C.] §1104's duty of prudence"—"not the 'prohibited transactions' element of §1106." *Id.* It accordingly dismissed the claim as untimely. *Id.*; *accord Cassell*, 285 F. Supp. 3d at 1067-69.

The same result should follow here. Any transactions with Caremark postdating March 13, 2019, exist only as a result of the primary "transaction" of the first retention of Caremark's

---

[11] One court in this district has determined that "[a] plaintiff may ... sue under ERISA for the renewal of a contract where the renewal took place within six years of the filing of the complaint." *In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 674 (S.D.N.Y. 2018), *aff'd sub nom. Doe 1 v. Express Scripts, Inc.*, 837 F. App'x 44 (2d Cir. 2020). That holding is against the weight of the authority and, notably, the Second Circuit did not address that portion of the district court's opinion on appeal. *See generally Doe 1 v. Express Scripts, Inc.*, 837 F. App'x 44 (2d Cir. 2020).

benefits-administration services.  That retention occurred well before March 13, 2019, making challenges to that transaction time-barred.  *Supra*, p. 18.[12]

III.    <u>**Plaintiffs lack standing to bring their prohibited-transaction claims.**</u>[13]

This Court's motion-to-dismiss decision and Plaintiffs' Reply have crystallized an additional problem with Plaintiffs' case: their failure to plead Article III standing to specifically challenge the retention of Caremark for benefits-administration services.

As the Supreme Court has emphasized, "[t]here is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020).  Courts apply the "ordinary Article III standing analysis," which at the pleading stage requires plaintiffs to "plausibly and clearly" allege (i) "an injury in fact" that is concrete, particularized, and actual or imminent, *id.* at 540, 544, 547, (ii) fairly traceable to the alleged fiduciary violations, and (iii) likely to be redressed by a favorable decision, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 563 n.2 (1992).  Plaintiffs fail to satisfy both Article III's traceability requirement and its injury-in-fact component.

---

[12] That Ms. Schmitt did not become a Plan participant until 2022 does not change the analysis.  *See* Compl. ¶15.  "[A] repose period can run to completion even before injury has occurred to a potential plaintiff, extinguishing a cause of action before it even accrues."  *P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 103 (2d Cir. 2004).

[13] This Court previously concluded that Plaintiffs satisfied Article III based on their allegations of overpaying out-of-pocket for prescription drugs at the pharmacy.  MTD Order 14-19.  However, that was before this Court dismissed the "gravamen of Plaintiffs' Complaint"—Defendants' design of the Plan's prescription-drug component, including the determination of the formulary, cost-sharing terms, drug pricing terms, etc.—because it involved *non-fiduciary* conduct that cannot be challenged under ERISA's fiduciary provisions.  *Id.* at 23-20.  This Court did not specifically consider whether Plaintiffs' out-of-pocket-costs theory could provide standing to challenge the narrow prohibited-transaction claims that the Court allowed to go forward.  Because standing must be established for each claim, *Davis*, 554 U.S. at 734, Plaintiffs always bear the burden of establishing standing at every stage of the proceedings, and this Court always has the authority to revisit its prior decisions before final judgment, Defendants again challenge Plaintiffs' standing here for Plaintiffs' surviving claims.  *See Ortiz*, 801 F. Supp. 3d at 325 (noting "discretion" under "law of the case doctrine" and reconsidering prior conclusion).

Again, the only aspect of Plaintiffs' case that this Court allowed to go forward are claims that fiduciaries engaged in a prohibited transaction by retaining Caremark to provide benefits-administration services to the Plan. But the injuries Plaintiffs point to are alleged out-of-pocket payments to pharmacies for prescription drugs. Even if those payments sufficed to establish standing to challenge Defendants' decisions regarding the structure, terms, and pricing of the Plan's prescription-drug component, Plaintiffs offer no allegations that those alleged overpayments are fairly traceable to the Plan's payments to Caremark for administering the Plan's prescription-drug benefits *as designed*. Nor, in any event, have Plaintiffs established that the out-of-pocket costs they paid for four generic prescription drugs represent "overpayments" necessary to amount to an Article III injury under Second Circuit precedent.

### A.    Plaintiffs' alleged injury of excessive out-of-pocket costs is not fairly traceable to the purported prohibited transactions.

Plaintiffs allege that they have standing as a result of the out-of-pocket costs they paid for four prescription drugs. Compl. ¶¶284, 292. But Plaintiffs have failed to plausibly allege that those costs are fairly traceable to the Plan's retention of Caremark to *administer* prescription-drug benefits by, *e.g.*, resolving prescription-drug claims and providing prior authorizations. The Complaint's allegations, in other words, "never connect the dots" between Plaintiffs' "alleged injuries" and the claimed prohibited transactions. *Heidel v. Governor of New York State*, 2023 WL 1115926, at *2 (2d Cir. Jan. 31, 2023).

"[S]tanding is not dispensed in gross." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Instead, "a plaintiff must demonstrate standing for each claim [s]he seeks to press." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006)). This means that, "for each claim of wrongdoing alleged, a plaintiff must demonstrate ... that [s]he has suffered ... an injury that is traceable *to the wrongdoing*

21

*alleged in that particular claim.*" *Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 661 (7th Cir. 2015) (emphasis added). Put differently, "a plaintiff's injury must match the legal problem [s]he alleges." *Id.* at 663; *accord Malinowski v. Int'l Bus. Mach. Corp.*, 2025 WL 965812, at *4 (S.D.N.Y. Mar. 31, 2025) (plaintiffs must plead facts supporting that the "decried adverse actions could be reasonably construed as resulting from the" challenged conduct).

Here, the only "legal problem" remaining in the case is the purported prohibited transaction that Defendants, acting in their fiduciary capacity, caused between the Plan and Caremark, *i.e.*, the retention of Caremark to administer the prescription-drug plan as designed—by, for example, "resolving prescription-drug claims" and "processing prior authorizations," but not helping JPMC "set[] the benefits promised by the Plan" by setting the formularies or determining drug pricing. MTD Order 24, 30. Thus, to have standing to assert their claims, Plaintiffs must "plausibly and clearly" plead facts demonstrating that their alleged injury (purportedly overpaying for prescription drugs out-of-pocket at the pharmacy), is traceable to the only fiduciary conduct that this Court held is at issue in this case (hiring and paying Caremark for its service-provider functions in helping Defendants administer the plan—*not* setting drug prices). *Thole*, 590 U.S. at 544. But they have not, and there is no nonspeculative reason to infer such a connection here.

First, Plaintiffs do not plead that the out-of-pocket drug costs they claim to have paid are at all connected to the compensation paid to Caremark for its benefits-administration functions. The Complaint instead alleges that those drug costs were informed by matters of Plan design, such as setting the formulary, setting the prescription-drug pricing structure, determining pricing benchmarks, and deciding or negotiating drug costs—all non-fiduciary functions that cannot form the basis of a prohibited-transaction claim. *See* MTD Order 23-26, 30; *e.g.*, Compl. ¶¶86, 156, 172, 173, 174. Plaintiffs nowhere allege that the retail-drug costs they paid were connected to

22

Caremark's role as a benefits administrator, *i.e.*, processing and resolving drug-reimbursement claims, or to any monetary transfers the Plan made to Caremark for those services. Indeed, Plaintiffs do not allege that the out-of-pocket drug costs they incurred were paid to Caremark or any other party in interest (they were paid to pharmacies), or that the benefits-administration services that Caremark provides to the Plan have any relationship to out-of-pocket drug pricing.

Nor would it be proper to simply infer such a causal relationship, for reasons similar to those explained in *Navarro v. Wells Fargo & Co.*, 2025 WL 897717 (D. Minn. Mar. 24, 2025). There, the plaintiffs claimed that the compensation paid to a PBM resulted in increased health premiums and out-of-pocket drug costs. *See id.* at *3. The court rejected that standing theory in part for lack of traceability. *Id.* at *9. Even with the plaintiffs' "attempts to establish a direct connection" between amounts paid to the PBM via the alleged prohibited transactions and Plaintiffs' contribution rates and prescription-drug costs, the court reasoned, it was too "speculative" that the former "had any effect at all" on the latter. *Id.* And in a subsequent decision (considering the plaintiffs' amended complaint), the court reiterated that there are "simply too many variables" contributing to these types of pricing decisions to infer that the alleged overcharges were traceable to the Plan's PBM arrangement. *Navarro v. Wells Fargo & Co.*, 2026 WL 591454, at *9 (D. Minn. Mar. 3, 2026) (addressing participant contribution amounts); *see also id.* at *10 (concluding that the plaintiffs' theory of standing based on out-of-pocket costs paid to pharmacies "fails for essentially the same reasons").

Here, similar to *Navarro*, all that Plaintiffs allege as to the connection between the drug costs they claim to have paid and Defendants' alleged prohibited transactions is that the latter "increased the amounts that [they] were required to pay in ... out-of-pocket costs." Compl. ¶284. But, like in *Navarro*, Plaintiffs do not explain how they get from point A to point B. Indeed, as

23

Defendants previously explained, prescription-drug pricing is exceedingly complicated—it is influenced by manufacturers' pricing decisions, supply-chain issues, tariffs, and regulatory issues, in addition to deals negotiated by PBMs.[14]  Here, as in *Navarro*, it is those variables that, when considered alongside Plaintiffs' failure to explain how the purported prohibited transactions figure into the analysis, render the link between the prescription-drug costs that Plaintiffs paid and the alleged prohibited transactions completely speculative.  And that deficiency is particularly acute given how this case has been narrowed; unlike in *Navarro* (in which the court was evaluating standing to challenge the design and pricing terms of the sponsor's prescription-drug plan), the challenged conduct is limited to Defendants' retention of Caremark to provide benefits-administration services—conduct even further causally removed from the injury alleged than in *Navarro*.  Any connection between payments to Caremark for the limited service-provider functions that are the subject of the remaining prohibited-transaction claims, and the out-of-pocket drug costs that Plaintiffs claim to have paid *to pharmacies*, is thus "tenuous at best." *Navarro*, 2025 WL 897717, at \*9.

The Court previously viewed *Navarro*'s traceability reasoning as inapt because Plaintiffs here have conducted NADAC price comparisons as to more drugs on the Plan's formulary than in

---

[14] *See generally* Axis Advisors, *Unravelling the Drug Pricing Blame Game* (Sept. 19, 2023), https://www.3axisadvisors.com/projects/2023/9/19/unravelling-the-drug-pricing-blame-game. The Court's motion-to-dismiss order operated under the assumption that Defendants had not challenged the "causal element" of Article III standing.  MTD Order 18.  Respectfully, however, Defendants addressed traceability at length in their briefing (both their motion, ECF No. 30, at 12-13, and their reply, ECF No. 38, at 4), and at oral argument (Hrg. Tr. 12:16-13:4).  In any event, standing is jurisdictional and can be raised or revisited at any time. *See Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 69 (2d Cir. 2001).  And here, Plaintiffs' jurisdictional problems have become even more pronounced now that the only fiduciary conduct remaining is Caremark's provision of services to *administer* the Plan as designed—and Plaintiffs nowhere allege that the Plan's retention of Caremark for those services influenced the amounts they paid to the pharmacy out-of-pocket.

*Navarro*.  MTD Order 18.  But the *Navarro* court's subsequent opinion (which was not before this Court at the time of its motion-to-dismiss ruling) did not even mention the quantity of the plaintiffs' drug comparisons as a relevant factor in the standing analysis—even while expressly acknowledging that "the price comparisons alleged ... are staggering."  2026 WL 591454, at *11. And nothing about a higher quantity of drug comparisons (260 in *Navarro* versus 404 here) could supply the missing causal link given the myriad factors that contribute to drug pricing at the pharmacy level, as noted above.  That Plaintiffs here ran more price comparisons than in *Navarro* does not in any way account for those dynamics.

At bottom, Plaintiffs have offered no allegations plausibly supporting the bare assertion that the prescription-drug costs they paid were influenced by retaining and paying Caremark for the benefits-administration functions remaining in this case.  Their "lower out-of-pocket costs" theory of standing accordingly fails for lack of traceability.

**B.    Plaintiffs do not plausibly allege injury-in-fact.**

Separately from the lack of traceability between Plaintiffs' purported out-of-pocket costs and the prohibited-transaction claims that remain, this Court also lacks jurisdiction for an independent reason: Under Second Circuit precedent, Plaintiffs' allegations about the out-of-pocket prescription drug costs that they incurred do not plausibly plead a constitutionally-cognizable overcharge injury.[15]  While Plaintiffs allege that they *paid* for prescription drugs, they (sensibly) do not claim that simply *paying* for prescription drugs is an injury.  Instead, they claim

---

[15] This Court previously ruled that Plaintiffs alleged an Article III injury based on an overcharge theory.  MTD Order 14-15.  But this Court must assure itself of jurisdiction at every stage of the proceedings, *see Lugo v. City of Troy, New York*, 114 F.4th 80, 87 (2d Cir. 2024), and in any event is always empowered to reconsider its prior conclusions at any point before final judgment, *see Altman*, 245 F.3d at 69.  Defendants therefore respectfully again challenge Plaintiffs' failure to plausibly plead an injury in fact consistent with the Second Circuit's overcharge precedents.

an injury from *over*paying for prescription drugs.  Compl. ¶¶127, 247-249.  But they do not plausibly allege any *over*payment at all for their medications.

This Court previously suggested that Plaintiffs' failure to plead the "over" part of overpayment to be a merits issue, rather than a standing issue.  MTD Order 18.  To be sure, standing and the merits are two distinct issues, and they require different allegations.  But Plaintiffs bear the burden of pleading both.  Here, to satisfy the merits and plead a plausible claim for breach of ERISA's fiduciary obligations based on price comparisons, Plaintiffs had to plead a meaningful benchmark plausibly demonstrating that *the Plan* so overpaid for the products or services it received that a court could infer that Plan fiduciaries lacked a prudent and loyal decisionmaking process.  *See Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 266-67 (S.D.N.Y. 2023).  The Court determined that Plaintiffs failed to meet that burden here.  MTD Order 19-20 n.5.  Separately, to satisfy Article III's requirements, Plaintiffs were *also* required to plead that *these three Plaintiffs* actually overpaid for *their four* prescription drugs.  *Thole*, 590 U.S. at 540.  To meet this standing burden, Plaintiffs needed to allege facts plausibly supporting that they were *over*charged for the four prescriptions drugs for which they incurred out-of-pocket costs.

The Second Circuit has been clear on this point: "even if overpayment may constitute a sufficient injury in fact in the general case," a complaint must still "adequately allege that overpayment occurred." *Plutzer on behalf of Tharanco Grp., Inc. v. Bankers Tr. Co. of S. Dakota*, 2022 WL 17086483, at *2 (2d Cir. Nov. 21, 2022) (citing *John v. Whole Foods Market Group Inc.*, 858 F.3d 732, 736 (2d Cir. 2017)).  In other words, it is not enough for plaintiffs to invoke the word "overpayment"; they must plead facts plausibly suggesting that, in fact, an *over*payment occurred.

26

To sufficiently plead that an overpayment occurred, plaintiffs must first establish a plausible baseline from which their allegations of overpayment can be judged. *See Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 12 (1st Cir. 2017) (noting "claims of injury premised on 'overpayment' ... require an objective measure against which the plaintiff's allegations may be evaluated"). One way to establish the necessary baseline is through benchmarking: pleading facts establishing what similarly situated individuals paid for similar products or services. *Compare Kraus v. Snow Teeth Whitening LLC*, 2022 WL 4642170, at *4 (E.D.N.Y. Sept. 15, 2022), *report and recommendation adopted*, 2022 WL 4662819 (E.D.N.Y. Sept. 30, 2022) (plaintiff pleaded overpayment injury by plausibly establishing "that he could have purchased similar ... products ... for a lower price"), *with Taylor v. BDO USA, P.C.*, 2025 WL 2420941, at *3 (D. Mass. Aug. 21, 2025) (dismissing for lack of standing where plaintiff did "not adequately allege any measure" by which to assess claimed overpayment).

Plaintiffs fail to plausibly allege an overpayment injury affecting them in a concrete and personalized way, since they have not established such a plausible baseline against which the prices they allege they paid can be judged. While the Complaint complains about prices paid for "specialty" (Compl. ¶¶112-126) and biosimilar drugs (Compl. ¶¶129-135), it does not allege that any of the Plaintiffs purchased those drugs at all, let alone paid for them out of pocket at an inflated price. Instead, all Plaintiffs do is identify four low-cost generic drugs they claim to have purchased and compare (a) their out-of-pocket costs at a retail pharmacy with (b) the NADAC cost, which is a measure of the average pharmacy *acquisition* costs for the drugs (before fees or the pharmacy's own profits are figured in).[16]    Compl. ¶¶247-249.    Plaintiffs do not allege what *Plaintiffs'*

---

[16] As explained above, NADAC data simply report what a narrow slice of pharmacies responding to a survey procured particular drugs for *on average*, excluding fees much less the pharmacies' profits. *Supra*, p. 6.

*pharmacies* paid for these drugs, what those pharmacies charged others, or what participants of *other plans* paid for the same drugs. At best, these allegations simply suggest that Plaintiffs purchased these four drugs for a higher price than the price at which *some pharmacies acquired* them. None of the allegations suggest Plaintiffs' (very low) prices were excessive, or that by paying the out-of-pocket prices that they did, Plaintiffs overpaid for these four drugs.

Plaintiffs' theory improperly relies on the unremarkable fact that retail prices exceed average wholesale costs. But that gap is not evidence of an overcharge; it is the ordinary structure of retail pricing. By Plaintiffs' logic, every restaurant overcharges every customer, because the meal always costs more than the ingredients. Defendants are unaware of a single case holding that *wholesale* costs are an appropriate benchmark for establishing excessive *retail* pricing. Because Plaintiffs' flour-to-bread comparison does not provide a plausible baseline against which to measure an alleged overcharge, they have not alleged a concrete and particularized injury.

## CONCLUSION

For these reasons, this Court should grant judgment on the pleadings and dismiss the remainder of Plaintiffs' claims.

Dated: June 3, 2026                    Respectfully submitted,

                                       /s/ *James O. Fleckner*
                                       James O. Fleckner, *admitted pro hac vice*
                                       Dave Rosenberg, *admitted pro hac vice*
                                       GOODWIN PROCTER LLP
                                       100 Northern Avenue
                                       Boston, MA 02210
                                       Tel.: (617) 570-1000
                                       jfleckner@goodwinlaw.com
                                       drosenberg@goodwinlaw.com

                                       Gabrielle L. Gould
                                       GOODWIN PROCTER LLP
                                       The New York Times Building
                                       620 Eighth Avenue

New York, New York 10018
Tel.:  (212) 813-8800
ggould@goodwinlaw.com

Jaime A. Santos, *admitted pro hac vice*
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
Tel: (202) 346-4000
jsantos@goodwinlaw.com

## CERTIFICATE OF COMPLIANCE

I, James O. Fleckner, hereby certify that the foregoing Memorandum of Law in Support

of Defendants' Motion for Judgment on the Pleadings contains 8,548 words, as reported by

Microsoft Word, not including those portions of the document that do not count against the word

limit.

*/s/ James O. Fleckner*
James O. Fleckner

29